**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| **ROBERT CLARK, individually and on behalf of himself and all others similarly situated,** | |
|      **Plaintiff,** | |
|   **v.** | **Case No.: 25-cv-379** |
| **JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire,** | |
|      **Defendant.** | |

<u>**CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

## TABLE OF CONTENTS

Introduction………………………………………………………………………………..1

The Parties……………………..…………………………………………………………7

Jurisdiction and Venue………………………………………………………………...12

The Facts……………………………………………………………………………13

I.      The History of Vagrancy and Loitering Laws……….…………………………………..13

II.     The Origins of New Hampshire's Loitering or Prowling Law…………………………..17

III.    RSA 644:6's Aggressive Enforcement, Including Against Unhoused Individuals……...21

The Unconstitutionality of RSA 644:6………………………………………………………38

I.      Vagueness Under the Fourteenth Amendment's Due Process Provisions……………….39

      A.    "Appear[ing] at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity"……………………………...40

      B.    Four Nonexhaustive Factors……………………………………………………...42

      C.    Identify and Explain Presence Requirement……………………………………43

II.     The Fourth Amendment's Right Against Unreasonable Seizures………………………50

Class Allegations……………………………………………………………………...53

Claims for Relief………………………………………………………………………55

Count I (Fourteenth Amendment/Vagueness)…………………………………………...55

Count II (Fourth Amendment)…………………………………………………………...58

Relief Requested………………………………………………………………………59

## INTRODUCTION

1.     This lawsuit is a straightforward facial challenge to New Hampshire's "Loitering or Prowling" statute at N.H. Rev. Stat. Ann. ("RSA") § 644:6.  Through this statute, the State unconstitutionally makes illegal innocent human behaviors that pose no threat to people or society. Under this statute, ordinary conduct—including standing, walking, or congregating in public— becomes unlawful if a police officer arbitrarily determines that it is occurring "under circumstances that warrant alarm for the safety of persons or property in the vicinity."  *See* RSA 644:6, I.  Rather than articulating specific prohibited conduct, the statute defers almost entirely to a police officer's subjective view of what "warrants alarm."  The full text of this challenged statute is attached as *Exhibit A*.

2.     Loitering statutes and other vagrancy laws have historically been used in the United States to discriminate against marginalized communities.  Their broad prohibitions on innocent behaviors (like standing or congregating in public) have allowed police to target and arrest those deemed undesirable.

3.     RSA 644:6 is no exception.  Police in New Hampshire repeatedly use this statute to harass and arbitrarily punish unhoused people.  For example, on September 14, 2018, the Manchester Police Department arrested an unhoused man who was outside a corporate office building.  *Exhibit C*, at CASES001-08.  On November 19, 2021, the Manchester Police Department charged two unhoused individuals with loitering for sleeping in front of an entryway of a church. *See id.*, at CASES022-40.  On March 31, 2022, the Manchester Police Department handcuffed and charged with loitering an unhoused man who was "rustling around in a pile of blankets on the front steps of New Hampshire Fire Insurance Company," who appeared to bury himself in his blankets when he saw three police officers, and who then "abruptly ducked his head and crawled behind a

1

stone pillar" before trying to leave the area by hastily walking in between two of the officers. *See id.*, at CASES041-45. On July 23, 2022, that same police department arrested an unhoused man for loitering who was sleeping alongside another person near the stairs of a parking garage. *See id.*, at CASES046-51. On September 8, 2023, the Hudson Police Department charged and arrested a woman who self-reported as "homeless," who was observed walking in front of a bank "with a large pile of trash and a small white dog," and who appeared distressed. *See id.*, at CASES085-103. On August 1, 2024, the Nashua Police Department arrested a deaf, unhoused woman who was sleeping in a tent "on the sidewalk in plain view directly on the walkway to" a building occupied by various businesses. *See id.,* at CASES127-130. The list goes on and on.

4.      The loitering statute's arbitrary and disproportionate enforcement against these and other unhoused people illustrates its unconstitutionality. Its vague terms invite abuse by authorizing arrests based on mere hunches. This statute's constitutionality is not an academic exercise for these and the hundreds of other individuals who are caught within this statute's vague ambit each year and, as a result, are subjected to judicial proceedings in which they often are not even entitled to counsel.

5.      Indeed, the unhoused community has been aggressively targeted by local governments since the United States Supreme Court's decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), which held that the Eighth Amendment's Cruel and Unusual Punishments Clause did not prevent an Oregon city from enforcing an ordinance restricting camping in public spaces against unhoused individuals, even where they had no alternative place to sleep. In the year that followed the Supreme Court's decision, cities across the country introduced over 320 bills

criminalizing homelessness[1], nearly 220 of which passed.[2]  New Hampshire was no exception.[3]

6.      This targeting has also occurred at the federal level.  On March 28, 2025, President Donald J. Trump issued an executive order titled "Making the District of Columbia Safe and Beautiful," which, among other things, directed "the removal and cleanup of all homeless or vagrant encampments and graffiti on Federal land within the District of Columbia."[4]  And on July 24, 2025, President Trump issued an executive order titled "Ending Crime and Disorder on American Streets" that seeks to "fight[] vagrancy" by "[s]hifting homeless individuals into long-term institutional settings for humane treatment through the appropriate use of civil commitment."  The order also instructs federal agencies to reward cities and states that "enforce prohibitions on urban camping and loitering."[5]  In other words, the order effectively encourages states and municipalities to criminalize and institutionalize unhoused people.

7.      As the language of these executive orders makes clear, the United States is in the midst of a troubling attempt to return to an era of "vagrancy" law enforcement that continues America's legacy of using the criminal legal system to control undesirable people.  This is

---

[1] Criminalizing homelessness refers to laws that punish life-sustaining or unavoidable behaviors of unhoused people, including sleeping, sitting, eating, standing, or remaining in public spaces. Throughout this Complaint the term "unhoused" denotes individuals who meet the federal law definition of homelessness.  *See* 42 U.S.C. § 11302(a); *see also* 24 C.F.R. § 582.5 (defining "homeless").

[2] *One Year Since Grants Pass: Tackling the Criminalization of Homelessness*, Am. C.L. Union (June 23, 2025), https://www.aclu.org/one-year-since-grants-pass-tracking-the-criminalization-of-homelessness.

[3] *See, e.g.*, Sadaf Tokhi, *Some Changes Evident as Manchester Enforces New Camping Ban*, NHPR (Aug. 8, 2024), https://www.nhpr.org/nh-news/2024-08-08/some-changes-evident-as-manchester-enforces-new-camping-ban; Ethan Dewitt, *In Wake of Supreme Court Homelessness Decision, NH Advocates Say Fight Not Over*, N.H. Bulletin (July 9, 2024) ("On July 2, the Manchester Board of Mayor and Aldermen voted to strengthen a ban on camping on city property, subjecting people to fines. And the board removed an exception that had allowed camping during evening hours if there were not enough shelter beds available.  The vote, which will make it easier for city officials to remove encampments on public sidewalks and parks, was a priority for Mayor Jay Ruais, a Republican who was elected in November. And it heralds a potential shift in the way New Hampshire cities and towns approach homelessness after the Supreme Court ruling, critics say."),  https://newhampshirebulletin.com/2024/07/09/in-wake-of-supreme-court-homelessness-decision-nh-advocates-say-fight-not-over/.

[4] Exec. Order No. 14252, 90 Fed. Reg. 14559 (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/making-the-district-of-columbia-safe-and-beautiful/.

[5] Exec. Order "Ending Crime and Disorder on America's Streets," (July 24, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/ending-crime-and-disorder-on-americas-streets/.

precisely what New Hampshire's loitering statute allows.

8.     However, as the United States Supreme Court has repeatedly recognized over the last fifty years, vague laws like New Hampshire's loitering statute offend the constitution's Due Process guarantees if they either (i) fail to give adequate notice of what conduct is prohibited, or (ii) invite arbitrary enforcement. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 166 (1972); *Kolender v. Lawson*, 461 U.S. 352, 361 (1983); *City of Chicago v. Morales*, 527 U.S. 41 (1999); *see also City of Grants Pass v. Johnson*, 603 U.S. 520, 590 (2024) (Sotomayor, J., dissenting) (explaining that these and other precedents finding "some vagrancy laws [ ] unconstitutionally vague" remain unaffected by the *Grants Pass* holding).    RSA 644:6 is unconstitutionally vague under both criteria.

9.     *First*, RSA 644:6's vague terms do not provide adequate notice of what conduct it prohibits.  Under the statute's provisions, "[a] person commits a violation if he knowingly appears at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity."  *See* RSA 644:6, I.  But what constitutes "circumstances that warrant alarm for the safety or persons or property in the vicinity" is imprecise and undefined.  While the statute provides four non-exhaustive examples of "[c]ircumstances which *may* be considered in determining whether such alarm is warranted"—including, for example, when the person "[t]akes flight upon appearance of a law enforcement official or upon questioning by such an official"—these examples fail to adequately clarify what behaviors will be punished.  *See* RSA 644:4, I.  As the statute's use of "may" indicates, consideration of these four circumstances is not required, and the words "include, but are not limited to" indicate that there are other circumstances, not specified in the statute, which may be used to form the basis of an arrest and conviction.  In other words, actual evidence that one of these four specific circumstances exists is not necessary to support an arrest

or conviction under this statute. Because these four circumstances are merely illustrative, the reach of this statute remains unbounded and indeterminate. The four circumstances themselves also do not distinguish between criminal and innocent conduct. Indeed, unhoused persons in particular may seek to evade law enforcement for innocent reasons—including because they are afraid of the very arbitrary enforcement that the loitering law allows—yet the loitering statute circularly uses such evasion as a basis for a subsequent detention, thereby allowing the cycle of perpetual, arbitrary detentions to continue.

10.      Moreover, unlike some loitering laws that have been upheld by courts, RSA 644:6 does *not* require loitering with an intent or purpose to engage in *any* criminal activity, let alone to commit a specific crime—*e.g.*, to solicit gambling or prostitution, or sell illicit drugs. It also does not require a defendant to engage in any overt act associated with criminal activity. The only specified behavior that a violator must engage in is to "appear[] at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity." RSA 644:6, I.

11.      *Second*, RSA 644:6's vague terms and lack of enforcement guidelines invite arbitrary and discriminatory enforcement, which independently render it unconstitutionally vague. Whether a person's behavior violates the statute depends entirely on police officers' subjective judgment of what "warrants alarm for the safety of persons or property in the vicinity."

12.      Nothing in the statute cabins the discretion it bestows on the police. The open-ended list of circumstances that *may* (but need not) be considered does not provide actual guidelines for enforcement. Paragraph II of RSA 644:6 provides that a person—absent "flight or other circumstances [that] make it impossible"—cannot be arrested unless he is afforded "the opportunity to dispel any alarm which would otherwise be warranted" by "identify[ing] himself

and giv[ing] an account for his presence and conduct" in a way that "dispels any alarm."  But this language vests complete discretion in the hands of the police officer to determine whether the person has provided a credible and reliable explanation that "dispels any alarm."  With this unfettered discretion, police bias against marginalized communities, including the unhoused, can determine whose presence "warrants alarm" and what type of circumstances can "dispel any alarm."  As explained in more detail below, this repeatedly happens in New Hampshire.

13.    Separately, RSA 644:6 also violates the Fourth Amendment.  The statute allows police to stop and question any law-abiding person appearing in public (who, nonetheless, is subjectively deemed to "warrant alarm") without the requisite reasonable and articulable suspicion of criminal activity required by *Terry v. Ohio*, 392 U.S. 1, 27 (1968).  And then, if a person fails to respond or their response is subjectively deemed inadequate, an officer's mere suspicion serves as a predicate for arrest, conviction, and punishment.  Thus, the statute also exceeds the bounds of the Fourth Amendment because it allows an officer to conduct an arrest where the officer merely observes suspicious conduct not amounting to probable cause.

14.    New Hampshire's loitering law is both an outlier and a relic.  It continues a shameful legacy of vagrancy laws that used intentionally broad language to criminalize disfavored groups, and gives the police discretion to try to predict future criminal behavior (but without requiring actual criminal misconduct).  Fortunately, multiple courts have rejected similar anachronistic laws.  *See, e.g.*, *City of Portland v. White*, 495 P.2d 778, 778-80 (Or. Ct. App. 1972); *City of Bellevue v. Miller*, 536 P.2d 603, 607 (Wash. 1975) (en banc); *Fields v. Omaha*, 810 F.2d 830, 833-34 (8th Cir. 1987); *State v. Bitt*, 798 P.2d 43, 49 (Idaho 1990).  And at least one other state recently has repudiated these types of laws without judicial intervention.  Just last year, on October 18, 2024, the Delaware Attorney General, following the filing of a lawsuit in July 2023,

*see Wilmington Food Not Bombs v. Jennings*, 1:23-cv-00736-MN (D. Del.), agreed to not enforce Delaware's loitering law—which contains a provision at 11 Del. C. § 1321(6) that is similar to RSA 644:6—"until the Delaware General Assembly acts to amend these Statutes" in light of similar concerns. *See Exhibit D*.

15.    For these reasons, RSA 644:6 is unconstitutional on its face. Accordingly, Plaintiff Robert Clark, on behalf of himself and others similarly situated, brings a claim for declaratory and injunctive relief against Defendant John M. Formella in his capacity as the Attorney General of the State of New Hampshire. Plaintiff and the proposed class seek a ruling that (i) declares that RSA 644:6 facially violates the Fourteenth and Fourth Amendments, and (ii) permanently enjoins the State from enforcing the statute. Plaintiff further alleges as follows:

## THE PARTIES

16.    Plaintiff Robert Clark is a 37-year-old unhoused man living in Concord, New Hampshire.

17.    Mr. Clark currently sleeps in the woods in Concord. Previously, he slept under a bridge near Manchester Street in Concord for about two months. Before that, he slept mainly on a bench outside of the Concord Coalition to End Homelessness building at 238 North Main Street in Concord.

18.    Mr. Clark has been unhoused for around 13 years, since 2012. He grew up in Franklin, New Hampshire. About 13 years ago, he was living with his dad in Concord. His dad lost his job, and they could no longer afford rent, even with Mr. Clark's social security check. As a result, they were evicted. Mr. Clark initially moved to a field near The Friendly Kitchen soup kitchen at 2 South Commercial Street in Concord. Since then, he has moved from place to place in Concord, and he has lived a transient and erratic life with respect to his living situation. When

camps are cleared, he and other people in his situation get kicked out and have to move elsewhere. Or, when someone steals from him and people in his situation, then they have to start over and often move.

19.     Mr. Clark has been diagnosed with post-traumatic stress disorder ("PTSD") and major depression.  When he was a child, he was the victim of sexual abuse.

20.     Mr. Clark has struggled to obtain stable housing for a variety of reasons.  Since he lost his housing in 2012, it has been incredibly difficult for him to get back on his feet.  He is on the public sex offender registry for a 2009 conviction, and landlords do not want to rent to someone with a criminal record.  In his experience, landlords also are less willing to give unhoused people a chance to rent because they assume and expect that unhoused people like him will engage in drug use and will be untrustworthy with respect to rent payment and keeping the property clean. It is very difficult to get a job without housing.  And it is very difficult to get housing without a job.  His mental health also has made it difficult to find housing, as he is very uncomfortable when he talks to people.  With all these challenges, he sometimes wonders whether there is any point in trying to find housing.

21.     Mr. Clark often sleeps on the street instead of in a shelter.  There is no full-time shelter in Concord.  However, there is a 40-bed emergency winter shelter at 238 North Main Street that is open from December to March.  When that emergency winter shelter is open from December to March, he uses it about 90 percent of the time in the evenings.  A person has to arrive at the shelter before around 9:00 p.m. to use it (they can arrive as early as 5:30 p.m.), and occupants must leave by 7:00 a.m. the next morning.  He sometimes does not use the shelter if, for example, he is having a bad day or feeling anxious, or if he does not want to engage with others due to his mental health.  Aside from when he is at this shelter in the winter months, he must spend most of his time

in public.  As a result, he is almost constantly at risk of law enforcement encounters.

22.    Mr. Clark reasonably fears future prosecution under RSA 644:6, especially where he continues to be unhoused and present in public spaces in New Hampshire.  Mr. Clark has been threatened with the law's enforcement many times.  Just recently, a month or two ago, he was walking through Concord at around 1:00 a.m., and he checked an outside ash tray for cigarettes adjacent to the Quick Stop at 201 South Main Street (which was closed at the time) while he was on his way to West Street.  At that time, two bicycle police officers from the Concord Police Department detained him, ran his name through their system using their radio, and told him that if he was outside a business when it was closed, he could be arrested for loitering.  They told him to leave the property, and they watched him until he left the property.  Within the past couple of years, he also has repeatedly been told by the Concord Police Department to "keep moving" and "move along" from public places in Concord, including near the Eagle Square Clock Tower at 90 North Main Street and while he was sitting on the rock wall part of the sidewalk outside the McDonald's restaurant on 90 South Main Street.  When the officers did this, they would run his name, and tell him to "hold on a minute" while they do that.  He felt that he was not free to go until that process was complete.  Also, within the past couple months, he has been told two or three times by the police "you can't just keep loitering around here" in Eagle Square, Bicentennial Square, and the Market Basket parking lot on Storrs Street in Concord.  During these interactions, the Concord Police Department ran his name, and he felt that he was not free to leave until they finished running his name, as the officers said on multiple occasions to "hold on a second until we check for warrants."

23.    Because he continues to be unhoused and present in public spaces in New Hampshire, Mr. Clark is at increased risk of encounters with law enforcement.  And because

Defendant, through the local law enforcement he leads, continuously enforces this law against unhoused people like Mr. Clark, these encounters are likely to result in arrest and prosecution for loitering. Accordingly, there is a real and substantial risk that Mr. Clark will again be subjected to enforcement of RSA 644:6 in the future.

24. Mr. Clark has been arrested and charged twice under the statute, though standing here is not exclusively based on these prior prosecutions.

25. On Thursday, March 16, 2023, at approximately 5:00 a.m., the Concord Police Department arrested Mr. Clark for loitering in the School Street Public Parking Garage, located at 17 School Street in downtown Concord.

26. Before his arrest, Mr. Clark had arrived in the School Street Public Parking Garage at around 4:00 a.m. with a friend who had been kicked out of the Concord emergency winter shelter earlier that morning. Mr. Clark agreed to join his friend so that his friend would not be out by himself in the cold. They took the elevator to the top floor of the parking garage and stayed near the entryway of the elevator on the top floor to stay warm, as the entryway near the elevator is partially enclosed and keeps out some wind. They were there to stay warm. Mr. Clark remembers the temperature being in the 30 degree-range. About 45 minutes after they arrived at the parking garage, Mr. Clark heard the "bump" of police tires before the police arrived.

27. On information and belief, the Concord Police Department's dispatch may have seen Mr. Clark and his friend in the parking garage through a live video feed and then communicated with officers who then arrived on the scene.

28. After hearing the police cars, Mr. Clark and his friend took the elevator down to the bottom of the garage, at which time two police cruisers approached them as they were exiting the garage and began questioning them. At that point, he believed that he was being detained and not

10

free to leave, as the officers said "hold on a second, don't go anywhere."

29.    One of the officers claimed that Mr. Clark and his friend were seen on camera smoking out of tinfoil in the garage.  After Mr. Clark acknowledged that they had smoked drugs in the garage (though they were there for the purpose of keeping warm), the officers arrested both men for loitering.  Mr. Clark believes that he was arrested and charged with loitering because the officers wanted to find some reason to search him in the hope of finding drugs.  Indeed, during the course of this arrest for loitering, the officers cuffed and searched Mr. Clark and his friend.  Mr. Clark had no drugs on him.  But the police alleged that his friend did, and the police charged the friend with both loitering and drug possession.[6]

30.    The officers transported Mr. Clark to the Concord Police Department headquarters. The police processed him for a loitering/prowling violation, and he was released on personal recognizance bail a few hours after the arrest.  He was issued a bail order stating that he must "refrain from excessive use of alcohol, and use of any narcotic drug or controlled substance," and that he shall "not be at or in any City of Concord parking garages."  *See Exhibit B*, at CLK004-5.

31.    The loitering complaint against Mr. Clark states that he "KNOWINGLY appear[ed] at a time and place under circumstances that warranted concern for the safety of persons or property in the vicinity, in that [he] was loitering in the parking garage which would lead to a reasonable person to believe that a crime was about to be perpetrated."  *See id.*, at CLK003.  In support, the complaint only provides a handwritten note, stating that he was "in possession of drugs while walking around a concord city."  *Id.*  However, Mr. Clark was not charged with possessing drugs or any other drug offense.

---

[6] For completeness, the case summary and police report containing the police's allegations against the other individual who was in the parking garage with Mr. Clark can be found at *Exhibit B*, at CLK006-19.

32.     After Mr. Clark defaulted on this charge because he forgot about it, he retained counsel during the summer of 2025 to address this charge.  On August 27, 2025, this charge was nolle prossed.

33.     In 2011, he also was charged by the Concord Police Department with loitering and two other charges (criminal trespass and felon in possession of a dangerous weapon).  The loitering charge was placed on file without a finding.  The criminal trespass charge was placed on file without a finding, and the felon in possession of a dangerous weapon charge was nolle prossed.[7]

34.     Defendant John M. Formella is the Attorney General of the State of New Hampshire. He is named in his official capacity.  His office is located at 1 Granite Place South, Concord, NH 03301. The Attorney General is the chief legal officer and chief law enforcement officer of the State.  He exercises "general supervision of the criminal cases pending before the supreme and superior courts of the state, and with the aid of the county attorneys [he] shall enforce the criminal laws of the state."  RSA 7:6.  Law enforcement officers "shall be subject to the control of the attorney general whenever in the discretion of the latter he shall see fit to exercise the same." RSA 7:11.

## JURSIDICTION AND VENUE

35.     This action arises under the Fourteenth and Fourth Amendments to the U.S. Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

36.     Declaratory relief is authorized by 28 U.S.C. § 2201 and 28 U.S.C. § 2202.

37.     The Defendant is a public official of the State of New Hampshire.  The Defendant

---

[7] For completeness, the case summary and police report containing the police's allegations as to this 2011 incident can be found at *Exhibit B*, at CLK020-33.

12

resides within this District and/or performs official duties within the State of New Hampshire. This Court, accordingly, has personal jurisdiction over the Defendant.

38.     Venue in the District of New Hampshire is based on 28 U.S.C. § 1391(b).

## THE FACTS

### I.    The History of Vagrancy and Loitering Laws.

39.     Loitering and vagrancy statutes have been utilized throughout American history to remove "undesirable" persons from public places even absent any criminal activity. *See Papachristou*, 405 U.S. at 166.

40.     Modern-day loitering laws can be traced to efforts centuries ago to prosecute "vagrants."  The use of vagrancy laws during pre-Revolution early American history "suggests a design to control a mass of persons thought to be potentially criminal," and later iterations of these laws similarly endeavored to "create[] a status of criminality based on past behavior." *See* Model Penal Code § 250.6, cmt. 1, p. 386 (A.L.I. 1980), attached as *Exhibit E* (hereinafter, "Model Penal Code" or "MPC").

41.     During the founding era, vagrancy laws explicitly targeted poor people as "petty criminals," making "poverty [] a crime." *See* William P. Quigley, *Reluctant Charity: Poor Laws in the Original Thirteen States*, 31 U. Rich. L. Rev. 111, 160, 164 (1997).  Vagrancy laws that criminalized "idleness" and those who failed to support themselves or work hard enough persisted into the mid-twentieth century. *See* Risa L. Goluboff, *Vagrant Nation: Police Power, Constitutional Change, and the Making of the 1960s*, 15-17, 81-86 (2016).

42.     Later, vagrancy laws were used to create a racial hierarchy.  "[B]road proscriptions on 'vagrancy' and other dubious offenses" were passed immediately after the Civil War as part of "Black Codes" designed "to subjugate newly freed slaves and maintain the prewar racial

13

hierarchy." *Timbs v. Indiana*, 586 U.S. 146, 153 (2019).  These "Black codes" used intentionally broad language to permit police to arrest Black people simply for appearing in public absent any criminal act.  *See* Bonnie Kristan*, Ahmaud Arbery and the Racist History of Loitering Laws,* The Week (May 7, 2020), [https://theweek.com/articles/912977/ahmaud-arbery-racist-history-loitering-laws](https://theweek.com/articles/912977/ahmaud-arbery-racist-history-loitering-laws).

43.    In addition to explicitly targeting poverty or lack of employment, some simply prohibited loitering.    *See* Michael J.Z. Mannheimer, *The Fourth Amendment: Original Understandings and Modern Policing* 118 (2023) (describing 1866 Kentucky law prohibiting "loitering or rambling about").  While facially race-neutral, these laws were enforced almost exclusively against Black people, and—because violators could be punished by being "hired out" to work on plantations—served to maintain pre-emancipation conditions.  *Id.* at 119-20.  As the United States Supreme Court later recognized, "vagrancy laws were used after the Civil War to keep former slaves in a state of quasi slavery."  *Morales*, 527 U.S. at 53 n.20 (plurality op.).

44.    In addition to targeting racial minorities, other vagrancy laws, known as "ugly laws," were used to exclude people with disabilities from public space.  *See* Susan Schweik, *Kicked to the Curb: Ugly Law Then and Now*, 46 Harv. C.R.-C.L. L. Rev. 1, 16 (2011).  In San Francisco, for example, an 1867 law prohibited street begging and "certain persons"—namely, those who were "diseased, maimed, mutilated or in any way deformed"—"from appearing in streets or public places," with violators facing a $25 fine, 25 days in jail, or both.[8]

45.    Beginning in the mid-twentieth century, courts began to strike down laws, including traditional vagrancy laws, that explicitly punished people for experiencing poverty.  *See, e.g.*,

---

[8] Katie Dowd, *San Francisco Once Pioneered America's Cruelest Legislation: Ugly Laws*, SFGate (Mar. 2, 2020), [https://www.sfgate.com/sfhistory/article/San-Francisco-once-pioneered-ugly-laws-15098902.php](https://www.sfgate.com/sfhistory/article/San-Francisco-once-pioneered-ugly-laws-15098902.php).

*Edwards v. California*, 314 U.S. 160, 176–77 (1941) (rejecting nineteenth-century formulations of the police power that permitted states to exclude "paupers" and "vagabonds" as a "moral pestilence" (citation omitted)); *Goldman v. Knecht*, 295 F. Supp. 897, 908 (D. Colo. 1969) (invalidating statute punishing "idleness or indigency coupled with being able-bodied") (three-judge court); *Wheeler v. Goodman*, 306 F. Supp. 58, 63 (W.D.N.C. 1969) ("Idleness and poverty should not be treated as a criminal offense.") (three-judge court), *vacated*, 401 U.S. 987 (1971) (vacated on *Younger* grounds); *Smith v. Hill*, 285 F. Supp. 556, 558 (E.D.N.C. 1968) (invalidating vagrancy statute on multiple constitutional grounds, including that it "creates a crime of the status of indigency"); *Papachristou*, 405 U.S. 156 (holding that a traditional vagrancy law was void for vagueness where its broad scope and imprecise terms denied proper notice to potential offenders and permitted police officers to exercise unfettered discretion).

46.    While traditional vagrancy laws explicitly targeting poor people largely disappeared after *Papachristou*, many laws remained targeting "loitering."  Like colonial and Jim-Crow-era efforts to regulate "vagrants," "[l]oitering is an imprecise concept," and anti-loitering statutes are "like the more general category of vagrancy laws in requiring little or no proof of actual misconduct by the accused."  Model Penal Code § 250.6, cmt. 2, p. 387, attached as <u>Exhibit E</u>.

47.    The more modern iterations of this type of loitering statute are designed to criminalize *indicia* of future criminal activity, without any actual criminal act occurring.  *See id.*, cmt. 3, p. 388 (explaining desire in Model Penal Code to criminalize situations even in the absence of a substantial step having occurred in the course of conduct planned to culminate in the commission of a crime); *see also* Jordan Berns, Comment, *Is There Something Suspicious About the Constitutionality of Loitering Laws?*, 50 Ohio St. L.J. 717, 717-18 (1989) (discussing the development of vagrancy laws and noting that the Americanization of these laws included using

15

them as a basis to prevent criminal activity).

48.     As recognized by the United States Supreme Court, New Hampshire's "Loitering or Prowling" statute is an example of a "stop-and-identify" law rooted in English vagrancy laws, which subjected people to arrest who aroused suspicion and who could not "give a good account" of themselves.  *See Hiibel v. Sixth Jud. Dist. Ct.*, 542 U.S. 177, 182 (2004) (citing RSA 644:6 as a "stop-and-identify" statute, and noting that: "Stop and identify statutes often combine elements of traditional vagrancy laws with provisions intended to regulate police behavior in the course of investigatory stops.  The statutes vary from State to State, but all permit an officer to ask or require a suspect to disclose his identity.").

49.     It should come as little surprise that—whether fashioned as "vagrancy" or "anti-loitering"—these broad laws have led to overreach, over-policing, discrimination, and civil liberties violations.  The United States Supreme Court has taken notice of these concerns, striking down anti-loitering laws and other modern iterations of these "traditional vagrancy laws" as unconstitutional.  *See Kolender*, 461 U.S. at 360 (invalidating a stop-and-identify loitering statute on vagueness grounds where the California statute at issue required a suspect to give an officer "credible and reliable" identification when stopped, and provided no standard for determining what a suspect must do to comply, resulting in "virtually unrestrained power to arrest and charge persons with a violation"); *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971) (finding Cincinnati, Ohio ordinance making it a crime for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by" unconstitutionally vague); *Morales*, 527 U.S. 41 (striking down Chicago ordinance defining loitering as "to remain in any one place with no apparent purpose," on vagueness grounds).

16

**II.     The Origins of New Hampshire's Loitering or Prowling Law.**

50.     Under New Hampshire's "Loitering or Prowling" statute, "[a] person commits a violation if he knowingly appears at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity."  *See* RSA 644:6, I.  "Circumstances which may be considered in determining whether such alarm is warranted include, but are not limited to, when the actor:

(a) Takes flight upon appearance of a law enforcement official or upon questioning by such an official.

(b) Manifestly endeavors to conceal himself or any object.

(c) Has in his possession tools or other property which would lead a reasonable person to believe a crime was about to be perpetrated. [or]

(d) Examines entrances to a structure which the actor has no authority or legitimate purpose to enter."

*Id.*

51.     Paragraph II of RSA 644:6 states the following: "Prior to any arrest under this section, unless flight or other circumstances make it impossible, a law enforcement official shall afford the actor the opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and give an account for his presence and conduct.  Failure to identify or account for oneself, absent other circumstances, however, shall not be grounds for arrest."  *See* RSA 644:6, II.

52.     Paragraph III of RSA 644:6 states the following: "No person shall be convicted under this section if the law enforcement official did not comply with paragraph II or if it appears at trial that the explanation he gave of his conduct and purposes was true and, if believed by the law enforcement official at the time, would have dispelled the alarm.  In such cases, any record of

the arrest made under authority of paragraph I shall be expunged."[9]

53.    The New Hampshire legislature originally enacted RSA 644:6 in 1971 as part of a larger effort to codify the criminal laws in New Hampshire.  *See* 1971 Legislative History, at 1971LEG 012 (Senate File), attached as *Exhibit F*.  Starting in 1967, the legislature commissioned a nearly two-year examination of New Hampshire's criminal laws that had been "scattered throughout all volumes of the RSAs."  This examination was spearheaded by the Commission to Recommend Codification of Criminal Laws ("the Commission"), which released a report during the 1969 legislative session proposing the text for a new, comprehensive criminal code. *Id.*  In its April 1969 report, the Commission recommended the enactment of, among many other criminal statutes, a loitering statute.  *See* Report of Commission to Recommend Codification of Criminal Laws, Established under Chapter 451 Laws of 1967 ("Codification Report"), at pp. 101-102 (Apr. 1969), *available at*  https://www.courts.nh.gov/sites/g/files/ehbemt471/files/documents/2021-07/hb_904_report.pdf, attached as *Exhibit G*.

54.    After additional legislative study of the Committee's report, the legislature passed the new omnibus criminal code in 1971.  This code included RSA 644:6, with its language unchanged from that proposed by the Commission in its 1969 report.  *See* 1971 Legislative History, at 1971LEG 012 (Senate File), attached as *Exhibit F*; Codification Report, at pp. 101-102, attached as *Exhibit G*.

55.    RSA 644:6's original 1971 version, entitled "Loitering," read as follows:

I. A person is guilty of a violation if he appears at a time or at a place under circumstances that warrant alarm for the safety of persons or property in the vicinity, and, upon inquiry by a law enforcement official, refuses to identify himself or fails to give a reasonably credible account of his conduct and purposes.

---

[9] Paragraph IV adds that, "[i]n this section, 'entrances' means any part of a structure through which entry or egress could be made."  *See* RSA 644:6, IV.

II.  No person shall be convicted under this section if the explanation he gave of his conduct and purposes was true and, if believed by the law enforcement official at the time, would have dispelled the alarm.  In such cases, any record of the arrest or detention made under the authority of paragraph I shall be expunged.

*See* 1971 Legislative History, at 1971LEG 003 (Senate File), attached as *Exhibit F*.

56.    This 1971 version of RSA 644:6 was based on Section 250.6 of the Model Penal Code adopted by the American Law Institute in 1962.  *See* Codification Report, at p. 102 cmt. (stating in Comments to "Loitering" section that it "is a modified version of the Model Penal Code § 250.6"), attached as *Exhibit G*; Model Penal Code § 250.6, cmt. 4, p. 392 & n.28 (A.L.I. 1980) (noting that, as of 1980, "[f]ive states have enacted provisions patterned closely after Section 250.6 of the Model Code," including New Hampshire at RSA 644:6, as well as Arkansas, Delaware, Oregon[10], and Utah[11]), attached as *Exhibit E*.[12]

---

[10] Oregon's statute referenced in the 1980 MPC at Ore. Rev. Stat. § 166.045 was repealed in 1983.

[11] Utah's statute referenced in the 1980 MPC at Utah Code Ann. § 76-9-703 was later repealed.

[12] "Loitering or Prowling" is defined under Section 250.6 of the 1962 Model Penal Code as follows:

> A person commits a violation if he loiters or prowls in a place, at a time, or in a manner not usual for law-abiding individuals under circumstances that warrant alarm for the safety of persons or property in the vicinity.
>
> Among the circumstances which may be considered in determining whether such alarm is warranted is the fact that the actor takes flight upon appearance of a peace officer, refuses to identify himself, or manifestly endeavors to conceal himself or any object.
>
> Unless flight by the actor or other circumstance makes it impracticable, a peace officer shall prior to any arrest for an offense under this section afford the actor an opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and explain his presence and conduct. No person shall be convicted of an offense under this Section if the peace officer did not comply with the preceding sentence, or if it appears at trial that the explanation given by the actor was true and, if believed by the peace officer at the time, would have dispelled the alarm.

American Law Institute, Model Penal Code § 250.6, p. 382 (1980) (paragraph breaks added to differentiate various provisions), attached as *Exhibit E*.  This final 1962 version of Section 250.6 was apparently modified from the version initially proposed in 1961 as part of MPC's Tentative Draft No. 13.  There, the draft proposal was as follows:

> A person who loiters or wanders without apparent reason or business in a place or manner not usual for law-abiding individuals and under circumstances which justify suspicion that he may be engaged or about to engage in a crime commits a violation if he refuses a request of a peace officer that he identify himself and give a reasonably credible account of the lawfulness of his conduct and

57.     Despite the New Hampshire legislature's apparent effort to use the MPC as a model in drafting the 1971 version of RSA 644:6, this 1971 version, among other differences, did not contain the MPC's limitation that the loitering or prowling occur "in a place, at a time, or in a manner *not usual for law-abiding individuals*."  *See* Model Penal Code § 250.6, p. 382 (A.L.I. 1980) (emphasis added), attached as *Exhibit E*.  This language from the MPC, omitted in the 1971 version of RSA 644:6, was viewed in the 1980 comments to 1962 MPC as being critical to avoiding unconstitutional arrests.[13]

58.     In 1985, in response to the United States Supreme Court's decision in *Kolender v. Lawson*, 461 U.S. 352 (1983), the New Hampshire legislature revised RSA 644:6 to its current form.  In *Kolender*, the Supreme Court struck down as unconstitutionally vague a California statute that that "require[d] persons who loiter or wander on the streets to provide a 'credible and reliable' identification and to account for their presence when requested by a peace officer under circumstances that would justify a stop under the standards of *Terry v. Ohio* . . . ."  461 U.S. at 353.

59.     This 1985 amendment brought RSA 644:6 closer in line with Section 250.6 of the 1962 MPC, though it still omitted the MPC's "not usual for law-abiding individuals" language. The legislature made the following three changes:

- Added to Paragraph I four non-exhaustive "[c]ircumstances which may be considered in determining whether such alarm is warranted," which "include, but are not limited

---

purposes.

*Id.* at cmt. 3, p. 390 n.27 (1980), attached as *Exhibit E*.

[13] *See id.* at cmt. 3, p. 390 ("As a threshold matter, the section requires at least some manifestation of aberrant behavior. Specifically, the actor must loiter or prowl 'in a place, at a time, or in a manner *not usual for law-abiding individuals*' The circumstances must be such that this behavior warrants 'alarm for the safety of persons or property in the vicinity. This formulation marks a change from the tentative-draft version of the offense, which was based on justifiable suspicion that the actor was engaged in, or was about to engage in, crime.  This change was thought desirable in order to save the section from attack and possible invalidation as a subterfuge for authorizing arrest without probable cause.") (emphasis added).

to, when the actor "(a) [t]akes flight upon appearance of a law enforcement official or upon questioning by such an official[;] (b) [m]anifestly endeavors to conceal himself or any object[;] (c) [h]as in his possession tools or other property which would lead a reasonable person to believe a crime was about to be perpetrated[;] [or] (d) [e]xamines entrances to a structure which the actor has no authority or legitimate purpose to enter";

- Deleted from Paragraph I the language "and, upon inquiry by a law enforcement official, refuses to identify himself or fails to give a reasonably credible account of his conduct and purposes"; and

- Added a new paragraph stating the following: "Prior to any arrest under this section, unless flight or other circumstances make it impossible, a law enforcement official shall afford the actor the opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and give an account for his presence and conduct. Failure to identify or account for oneself, absent other circumstances, however, shall not be grounds for arrest."

60.    The legislative analysis of the 1985 bill that codified RSA 644:6's current terms (HB361) states that the "bill was requested by the attorney general." *See* 1985 Legislative History, at 1985LEG 008 (House and Senate Files), attached as *Exhibit H*.  The New Hampshire Attorney General's Office explained in a March 5, 1985 letter to the House Judiciary Committee—and later in a similar letter to the Senate Judiciary Committee—that this bill, "is designed to bring the New Hampshire statute on loitering, RSA 644:6, into conformance with a recent United States Supreme Court ruling [*Kolender*]."  *Id.* at 1985LEG 012.[14]

## III.    RSA 644:6's Aggressive Enforcement, Including Against Unhoused Individuals.

61.    New Hampshire's loitering law is an outlier.  While some municipalities throughout the country still have loitering provisions modeled on Section 250.6 of the 1962 MPC[15], it appears

---

[14] As explained below, while the New Hampshire legislature amended RSA 644:6 in response to the Supreme Court's decision in *Kolender*—which struck down as unconstitutionally vague a California stop-and-identify statute because it failed to provide any guidance to law enforcement as to what constituted "credible and reliable" identification—the 1985 amendment to RSA 644:6 did *not* cure the fatal ambiguities in the law that the Court identified in *Kolender*.  If anything, the 1985 amendment simply adopted language from the now-antiquated MPC, whose drafters—in 1962—did not have the benefit of the Court's guidance in *Kolender* (issued 21 years later in 1983), *Papachristou*, 405 U.S. 156 (issued 11 years later in 1972), and *Morales*, 527 U.S. 41 (issued 37 years later in 1999).

[15] Adopting loitering ordinances modeled after the MPC does not appear to be pervasive among New Hampshire

that only four states (excluding New Hampshire) have loitering statutes similar to Section 250.6 of the 1962 MPC—Arkansas, Delaware, Florida, and Georgia.[16]  *See* Ark. Code Ann. § 5-71-213(a)(1); Del. Code Ann. tit. 11, § 1321(6); Fla. Stat. § 856.021 (enacted in 1973 and, unlike RSA 644:6, contains "not usual for law-abiding individuals" language)[17]; Ga. Code Ann. § 16-11-36 (enacted in 1980 and, unlike RSA 644:6, contains "not usual for law-abiding individuals" language)[18].  And Delaware recently stopped enforcement of its ordinance in light of constitutional concerns.  *See Exhibit D.*

62.    Since its enactment, law enforcement officers in New Hampshire have aggressively enforced RSA 644:6.  For example, based on data from the New Hampshire court system, for the twelve years from January 1, 2013 to December 31, 2024, approximately 2,364 cases were filed in which a violation of RSA 644:6 was alleged—an average rate of approximately 197 filed cases per year.  *See Exhibits I, J, and K.*  Of these 2,364 cases, nearly 92% (2,167) were filed in New Hampshire Circuit Court System that handles violation-level and misdemeanor offenses (and, thus, where there likely was no accompanying felony charge).  *Id.*

63.    Within the last year since the Supreme Court's decision in *City of Grants Pass v.*

---

localities given the statewide existence of RSA 644:6.  However, the Town of Windham appears to have an ordinance that predates RSA 644:6 and is modeled after the MPC.  It was adopted in 1970 and recodified in 1998.  *See* https://windhamnh.gov/DocumentCenter/View/616/By-Laws-Forbidding-Loitering-at-Public-Places-PDF.

[16] More broadly, a 2021 survey conducted by the National Homelessness Law Center found that 16 states have laws restricting loitering, loafing, and vagrancy state-wide.  *See* Nat'l Homelessness L. Ctr., *Housing Not Handcuffs: State Law Supplement* 7, 10-11 (Nov. 2021), *available at* https://homelesslaw.org/wp-content/uploads/2021/11/2021-HNH-State-Crim-Supplement.pdf.

[17] *See  State v. Ecker*, 311 So. 2d 104, 109 (Fla. 1975) (holding that Fla. Stat. § 856.021—stating, in part, that "[i]t is unlawful for any person to loiter or prowl in a place, at a time or in a manner *not usual for law-abiding individuals*, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity"—was constitutional) (emphasis added), *cert. denied*, 423 U.S. 1019 (1975); *Watts v. State*, 463 So. 2d 205, 207 (Fla. 1985) (affirming *Ecker* after *Kolender*).

[18] *See Bell v. State,* 313 S.E.2d 678, 681-82 (Ga. 1984) (upholding constitutionality of Ga. Code Ann. § 16-11-36, stating, in part, that "[a] person commits the offense of loitering or prowling when he is in a place at a time or in a manner *not usual for law-abiding individuals* under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity") (emphasis added).

*Johnson*, 603 U.S. 520 (2024), from July 1, 2024 to June 30, 2025, there were approximately 243 cases filed in which a violation of RSA 644:6 was alleged—a 60-case (or over 32%) increase from the prior year. *See Exhibits K and L*.[19]   Of these 243 cases, over 86% (211) were filed in New Hampshire Circuit Court System. *Id.*

64.    These numbers represent only those instances of enforcement of RSA 644:6 that resulted in formal charges.  It is likely that this statute is used at even higher rates to stop, question, and "move along" individuals from public places without the filing of a charge. *See Exhibit M* (appearing to indicate, on July 22, 2022, at approximately 10:57 p.m., people being "mov[ed] along" off a sidewalk by the Manchester Police Department near the local shelter for the unhoused, though RSA 644:6 is not referenced).[20]

65.    The historical legacy of loitering laws is instructive in considering the constitutionality of RSA 644:6.  As described in greater detail *supra*, in addition to being rooted in English vagrancy laws, loitering laws have historically been used to discriminate against marginalized individuals, including communities of color. *See City of Akron v. Rowland*, 618 N.E.2d 138, 146 (Ohio 1993) ("As much as we would like it to be otherwise, we must acknowledge that without definite statutory language, criminal laws are susceptible to arbitrary enforcement, most often to the detriment of racial and ethnic minorities.").

66.    The broad language of loitering laws like RSA 644:6 gives police wide discretion

---

[19] From July 1, 2023 to June 30, 2024, there were approximately 183 cases filed in which a violation of RSA 644:6 was alleged. *See Exhibit J.*  Of these 183 cases, nearly 90% (164) were filed in New Hampshire Circuit Court System. *Id.*

[20] *See also* Chris Herring, *Complaint-Oriented Policing: Regulating Homelessness in Public Space*, 84 Am. Socio. Rev. 769, 792 (2019) (describing punitive and widespread process of policing unhoused individuals through move-along orders and threats of arrest and pervasive property confiscation and destruction that almost "always involved either a police presence, the threat of police being called, or leveraging anti-homeless ordinances to provide legal cover for property confiscation").

to criminalize disfavored groups, including people of color[21], poor people, and unhoused people, for simply being in public spaces.

67.    Unhoused people are also disproportionately targeted under the loitering statute. Court records reveal numerous examples of unhoused individuals being aggressively charged under RSA 644:6 while being outside—all highlighting the statute's vague language, how the statute leads to discriminatory enforcement, and the unfettered discretion officers have in deciding what circumstances "warrant alarm" and when "alarm" is dispelled:

a. On Friday, September 14, 2018, at approximately 1:47 p.m. in the afternoon, two Manchester Police Department officers arrested for loitering an unhoused man who was outside a corporate office building in Manchester.  The Department's officers were initially watching the man—who was "wearing all black"—"due to possible drug activity."  The officers lost sight of the man in the area of West Penacook Street near the Eversource Energy Building at 780 North Commercial Street.  The officers then drove by the Eversource Energy Building and observed the man on the east side of the building.  According to one of the officer's police report, when the officers approached the man on foot, "it appeared that the male was behind a small set or bushes/trees, positioned in a sitting/squatting position in the corner of the building, between the building and the fence line."  The report indicates that the man's "appearance was that of [a] disheveled man, wearing torn clothing, and sandals."  As the officers got closer, the man "immediately rose from the position he was in and exited onto the sidewalk that was in front of the entrance to Eversource."  The officers then questioned the man. The man "explained that he was not an employee of Eversource and merely observed a bench on the side of the building and sat there to eat a snack."  One of the officers then went "to the side of the building and observed a bench that appeared to be property of Eversource."  The officer also indicated that it appeared that "business was ongoing due to the lights coming from inside of the building and vehicles parked in the lot." During the interaction, the man would not give his real name and told the officers to "figure it out."  The officers arrested the man for loitering, took him to the police station, identified him, and gave him a summons to appear in court on the loitering charge.  There is no indication from the police report that this unhoused man was about

---

[21] For example, during the two-year period from July 1, 2021 to June 30, 2023, at least 11 out of 51 (over 21%) of the cases disposed of in which there was a charge by the Manchester Police Department under RSA 644:6 before the 9th Circuit Court District Division were against a Black defendant.  (Three Black individuals each had two separate cases in which this statute was charged, and 10 of these 11 cases implicated individuals who resided in Manchester.)  While Black people made up 21% of defendants in these cases, they represent only approximately 5.5% of the Manchester population. *See* U.S. Census Bureau, Manchester, New Hampshire (indicating 6,362 Black residents of 115,644 total population during 2020 census) https://data.census.gov/profile/Manchester_city,_New_Hampshire?g=160XX00US3345140 (last visited Sept. 15, 2025).

to commit any crime.   The charge later was nolle prossed.   *See Exhibit C*, at
CASES001-08.

b.   On Saturday, June 5, 2021, the Hampton Police Department arrested an unhoused man
and charged him with loitering for being out in public at approximately 3:48 a.m. with
two other individuals and then fleeing the police.   A police officer saw the three
individuals standing next to a loading area at the back of a casino in Hampton.   The
officer approached the three individuals "[d]ue to the late hour at night and suspicious
activity," though the specific nature of the suspicious activity is not described in the
police report.   Two of the individuals approached the officer, while the unhoused man
remained behind a staircase.   The officer asked the unhoused man to "come out from
behind the staircase, which he did."   When the officer asked why the man was hiding,
the unhoused man said something to the effect of "because you're the police, I don't
know."   The two other individuals told the officer that all three were in the area because
their car had been towed, and they did not know which garage had the car—an
explanation that the officer seemed to believe.   During this interaction, the unhoused
man told the officer that he needed to urinate, and he stepped away.   When the officer
then attempted to locate the unhoused man so the officer "could identify him and warn
him for loitering," the unhoused man had apparently left the area.   The officer then told
the two remaining men that they were free to go, and the officer left to search for the
unhoused man by car, indicating that the officer believed that the unhoused man had
previously been detained for loitering though there was no evidence that that a crime
had been committed.   When the officer located him, he put his police lights on and
called after him, at which point the unhoused man apparently fled.   Later that early
morning, at around 4:35 a.m., another officer found the unhoused man and arrested him
for loitering and resisting arrest.   After his arrest, the man told the officer that he fled
"because he was 'scared' of the other two males because one of them had shot his friend
in Concord."   When pressed on why he ran from the police after he was separated from
the other two males, the unhoused man continued to say that he was "scared."   The
officer apparently did not believe this explanation.   When the unhoused man fled, there
was no reason to believe that he had committed a crime.   It also seems that, though
loitering is a violation-level offense, the police department viewed this offense with a
presumption of arrest that then would justify a resisting arrest charge after the man fled.
The resisting arrest charge was subsequently converted to a disorderly conduct charge,
to which the unhoused man pled guilty.   The loitering charge was dropped.   *See id.*, at
CASES009-16.

c.   On Thursday, July 29, 2021, at approximately 2:46 a.m., the Manchester Police
Department arrested an unhoused "suspicious male in the alley" for loitering.   The man
allegedly was "looking around the area between two" "addresses on the Northern side"
of Laurel Street Southback, which the officers believed created suspicion that "he may
be committing a crime."   When confronted by the police, the man said he was "taking
a bike ride."   According to the police, the man "confirmed that he did not live in the
area and therefore had no legitimate reason to be there."   When asked why he would
be going in between houses if he was out for a bike ride, the man "said that he was
homeless and 'stashed' his two bikes and a bag full of food in between the two homes."

25

He added that "he was currently trying to find the bag of food because it had recently gone missing." This explanation did not satisfy the officers, who concluded that he was "unable to provide a legitimate reason as to why he was in between the two houses for a few moments," and proceeded to charge him with loitering even though there was no evidence that he was about to commit a crime or that the bicycles did not belong to him. The man was initially reluctant to identity himself. However, he did identify himself and the police, after running his name and discovering that the man had a warrant for missing a court date, arrested him. He was charged with loitering—a charge the State later dropped. *See id*., at CASES017-21.

d. On Friday, November 19, 2021, at around 12:06 a.m., the Manchester Police Department issued a loitering summons to two unhoused people who were sleeping in front of an entryway of a church that had a "no loitering" sign. After being issued summonses under RSA 644:6, they were "moved along and warned for trespassing." There is no indication in the police report that the officers asked the two for an explanation for their presence or conduct, or that their presence warranted alarm for the safety of persons or property in the vicinity under RSA 644:6. *See id*., at CASES022-40.

e. On Thursday, March 31, 2022 at around 2:42 p.m. in the afternoon, the Manchester Police Department arrested for loitering an unhoused man who was "rustling around in a pile of blankets on the front steps of New Hampshire Fire Insurance Company, which is located at 156 Hanover St," and who appeared to bury himself in his blankets when he saw three police officers, and then "abruptly ducked his head and crawled behind a stone pillar." The officers then approached the man and made verbal contact, at which time the man "sprung to his feet and let out a frustrated sigh." The man allegedly turned in the direction of one of the officers "and tried to flee away" from the officers. When the man "attempted to hastily walk between" two of the officers, one of the officers placed his hand on the man's chest and told him to stop. The man's response was "get your f***ing hands off me!" One of the officers concluded that the man's "behavior was loud and boisterous, and his posture towards me was aggressive, so" two of the officers "grabbed a hold of him," spun him around, handcuffed him, and arrested him for loitering. The police report suggests that officers handcuffed the man before asking him to give an account for his presence and conduct, as required under RSA 644:6. At the scene, the officers were advised by dispatch that the man has mental health issues, is unhoused, uses drugs, and had been "no-trespassed" from several places in the City. The arresting officer's report indicates that, despite apparently not asking him to account for his presence, the man "was given ample time to give a valid reason as to why he was there, but failed to do so," and that he was charged with loitering for "knowingly appearing in a place under circumstances that warrant alarm for the safety or persons or property in the vicinity, and after attempting to take flight upon the appearance of three law enforcement officers." The officers released the man at the scene and issued him a summons. The loitering charge was later dropped. *See id*., at CASES041-45.

f. On Saturday, July 23, 2022, at around 2:25 a.m., the Manchester Police Department

arrested a man for loitering who was sleeping close to another person near the stairs at the Victory Parking garage. The officer was patrolling the garage "due to recent vehicle break-ins in the area," though there was no indication that the sleeping man was breaking into cars. After the officer woke up the man and his companion and asked them "what their business was," the man told the officer that he had been told that he could sleep in the lot and would not be bothered. The officer rejected this explanation, saying that he "had no business being in the parking lot if he did not park a vehicle in the lot." When the officer asked for the man's full name and date of birth, the man was apparently reluctant and asked why this information was necessary. The officer "stated he is being investigated for loitering and prowling and he needed to provide his given name to [the officer] and he would be allowed to leave, barring any warrants attached to his name." The man apparently declined to provide more information, at which time the officer stated that "he would be placed under arrest unless he gives me the information I was asking for." The man again declined to provide more information, and the officer then arrested him. *See id*., at CASES046-51.

g. On Wednesday, July 12, 2023, at approximately 3:00 a.m., two Manchester Police Department officers arrested for loitering an unhoused man who was "wearing all black," "peer[ed] into" an unoccupied vehicle that was parked "in the parking lot slightly West of 275 Hanover Street (Cumberland Farms)," and walked away after noticing the officers' cruiser. The unhoused man was initially outside the parked vehicle, on its passenger side. According to one of the officer's police report, the man, upon noticing the police cruiser, "put his head down and began walking South through the parking lot towards Londonderry Lane." One of the officers then exited the cruiser and "observed that the individual changed his course of direction and was now walking Westbound on Hanover Street towards Phaneuf's Funeral Home (243 Hanover Street)." As the officer on foot exited the parking lot, he "observed that the individual increased his speed and made an abrupt turn into the parking lot of Phaneuf's." That officer "then began running and located the individual in the parking lot of Phaneuf's Funeral Home." The officer instructed the man to remove his hand from his left pocket and "to walk to the brick wall to his immediate right and to place his hands on the wall." The officer apparently detained the man before asking the man any questions, or before giving the man an opportunity to dispel any alarm. Though the man initially began walking in the right direction toward the wall per the officer's instruction, he allegedly walked past the wall and placed his right hand in his pocket. The officer "immediately drew [his] department issued firearm and commanded him to remove his hand from his pocket, which he did." The officer then ordered the man "to the ground and secured his hands behind his back while [he] conducted a pat frisk for weapons." The search yielded a knife in the pocket that the man allegedly had his hand in. After the man provided verbal consent to a search of his person, the officer "located numerous items that were consistent with drug paraphernalia, but no product was located." After the search, the man informed the officers that "he was cutting through the parking lot to get to Hanover Street. He stated he was near the car because he was looking at a T.V. and stated the vehicle did not belong to him." The officers then went back to the parking lot and confirmed that no cars appeared to have been tampered with. The officers then arrested the unhoused man for loitering without any indication that they

considered the man's explanation or had evidence that a crime was about to be committed. This was the only charge filed, and it was later nolle prossed. *See id.*, at CASES052-67.

h. On Tuesday, August 1, 2023 at approximately 1:35 a.m., the Plaistow Police Department stopped and detained an unhoused man for loitering/prowling after "leaning against a fence" of a storage facility that was located at 212 Plaistow Road and was directly adjacent to an autobody shop where the man was being allowed to work and stay at night. According to the police report, when police approached and detained the man, the man "began making statements about us harassing him and he 'didn't do anything.'" The man told the police that he worked at the directly adjacent autobody shop and that his boss could confirm his employment there. However, the boss could not be located at that hour, and the man said again that "he feels like he is being harassed for no reason." Apparently the police did not believe his explanation that he was in the area because his boss was allowing him to stay there at night, and arrested the man for loitering/prowling because "he has a history of theft of property, auto parts, which further caused suspicion regarding walking the fence line to a storage facility and now in an autobody parking lot with only a backpack to his name." The officers also were suspicious and detained the man because he—when initially approached by the police—backed away from the fence and tried to walk away before complying with the detention, and did not spell his last name correctly. In addition to loitering/prowling, the man was charged with making a false report to law enforcement for providing a misspelled last name. However, during the booking process, a police officer "found a W2 . . . that confirmed that he did work for" the adjacent autobody shop. After the booking, the police "provided a ride back to [the autobody shop] as he is homeless, and the owner allows him to stay there at night." In other words, despite the fact that the man's explanation for his presence near the autobody shop was true and eventually confirmed, the officers' rejection of this explanation provided a basis for his arrest and loitering charge. Despite all this, the loitering charge was not dropped, and an arraignment date was set for August 23, 2023 (he was in default on this charge as of October 24, 2024, as the man passed away in March 2024). *See id.*, at CASES068-76.

i. On Sunday, August 27, 2023, at approximately 11:48 a.m., the Dover Police Department issued a loitering summons to an unhoused man for "trying to gain access to the management building of Farmwood Village," which is a community of manufactured homes. A witness reported that the unhoused man was "hanging around Sun Communities [Farmwood Village] structure, looking like he was ready to breakin [sic]. He had a black back pack and was dressed in black. He had a top knot pony tail." When the officer approached the man, the officer asked whether he was trying to gain access to the building. The man said "nope," but that apparently was not enough to dispel the officer's alarm though there is no indication that the officer asked any follow-up questions. The officer then issued a summons for loitering. The charge was ultimately dismissed. *See id.*, at CASES077-84.

j. On Friday, September 8, 2023 at around 1:30 a.m., the Hudson Police Department

arrested and charged an unhoused woman with loitering after an officer observed her walking in front of a closed bank "with a large pile of trash and a small white dog," in apparent distress.  There was no indication that she had committed or was about to commit a crime.  She told the officers that "she was dropped off by her boyfriend after a verbal argument ensued inside [a] vehicle" and that the trash and food she had "was from the vehicle."  After initially resisting providing information to the officers, she gave her name and an incorrect birth year.  The officers then told her to pick up her garbage and toss it into the dumpster.  She asked the officers to clarify why she had to do this (the report alleges that she was "argumentative about asking why she had to"), but she complied.  The officers then told her that she "was under arrest for loitering and prowling by the bank after hours."  Upon being told that, the woman allegedly resisted according to the police.  She was charged with loitering.  She also was charged with three separate counts of resisting arrest, and a charge of criminal mischief.  *See id.*, at CASES085-103.

k.  On Monday, February 19, 2024 at 11:15 p.m., the Nashua Police Department arrested a man who likely was unhoused at the time[22] for loitering after the man—who was "wearing a black hooded sweatshirt and work boots"—was "pacing back and forth on the sidewalk" near Spring Street, "crossed the roadway multiple times, without utilizing the crosswalk nearby," and then ran away towards a nearby post office at 38 Spring Street when an officer attempted to contact him.  When the man ran toward the post office, he said "stop harassing me."  The officer pulled into the post office and observed the man "hiding behind the tree, next to the right side of the business."  When the officer attempted to contact the man, the man fled again but was quickly apprehended outside a nearby bank.  There is no indication that the man had any intention of committing any crime at the post office or anywhere else.  After his arrest, the man told police that he did not stop "because he believed he had [an] arrest warrant issued for him and did not want to be arrested," though there is no indication from the police report that there was an active warrant for his arrest.  There also is no indication that the officer asked the man why he was walking the sidewalk that night.  In other words, the man was only arrested for loitering because he did not want to engage with police officers he believed were harassing him, and fled when they attempted to make contact with him.  In addition to loitering, the man was also charged with resisting arrest.  One of his bail conditions was refraining from excessive alcohol use and any drugs, even though this condition has nothing to do with the charges against him.  In the criminal case, the prosecution sought to impose Class A misdemeanor penalties.  Trial is scheduled for October 28, 2025.  *See id.*, at CASES104-126.

l.  On Thursday, August 1, 2024, at approximately 12:19 a.m., the Nashua Police Department arrested for loitering a deaf, unhoused woman who had been sleeping in a tent on a sidewalk in front of several closed businesses.  The officer's police report states that "[t]he businesses were clearly closed and it appeared that the tent and its

---

[22] The complaint submitted by the City of Nashua under New Hampshire's Right-to-Know Law does not list an address for the man.  However, the bail order lists the man's address at "29 Spring St Nashua, NH 03060," which is the Saint Patrick Parish in Nashua and near where this encounter took place.

possible occupant did not serve a legitimate purpose for being there given the hour of night." The officer "attempted to make contact with the occupant by calling out and shining [his] light on the tent." The officer "observed a middle aged female inside of the tent who was highly animated," and the officer noted in his report that, "[b]ased on the hour of night, … I could plainly see she was attempting to camp in full view within a private lot, and that she had no other legitimate purpose for being there." After the officer "encouraged her to move along" and explained by writing in his notebook that she needed to leave—which she allegedly refused to do in a "hostile" manner—the officer arrested her for loitering. Beyond the woman's mere presence on a sidewalk in front of several closed businesses, the officer did not establish any facts showing "alarm for the safety of persons or property." *See id*., at CASES127-130.

m. On Tuesday, September 24, 2024, at approximately 9:50 a.m., the Manchester Police Department arrested an unhoused man "sleeping under the Bridge Street Bridge in the parking lot of the Tru Hotel (135 Spring Street)" where he allegedly was "concealed behind a large pillar with a posted 'No Loitering' sign." The officers informed him that he was trespassing and loitering on private property, and the officers requested his name, which he twice refused to provide. "When informed [that] he would be arrested if he did not provide his name," the man "voluntarily turned around and placed his hands behind his back [and] was subsequently arrested for loitering." *See id*., at CASES131-138.

68. In the City of Manchester in particular, RSA 644:6 has been frequently used to cite or arrest unhoused individuals. During the period from July 1, 2021 to December 31, 2024, there were approximately 89 cases disposed of in the 9th Circuit Court District Division in which the Manchester Police Department charged a violation of RSA 644:6. Of these 89 cases, at least 50 involved unhoused defendants (or 56% of these cases). However, unhoused people make up only around 0.5% of Manchester's population.[23]

69. In Concord, during the two-year period from July 1, 2021 to June 30, 2023, there were approximately 23 cases disposed of in the 6th Circuit Court District Division in which the

---

[23] According to the January 2024 point-in-time count, there were 627 "homeless persons" living in Manchester as of January 24, 2024, 159 of whom were completely unsheltered. *See* U.S. Dep't of Hous. & Urban Dev., *HUD 2024 Continuum of Care Homeless Assistance Programs Homeless Populations and Subpopulations: NH 501 Manchester CoC* at 1 (Nov. 19, 2023), https://files.hudexchange.info/reports/published/CoC_PopSub_CoC_NH-501-2024_NH_2024.pdf; U.S. Census Bureau, Manchester, New Hampshire (noting 115,644 population in the 2020 census), https://data.census.gov/profile/Manchester_city,_New_Hampshire?g=160XX00US3345140 (last visited Sept. 15, 2025).

Concord Police Department charged a violation of RSA 644:6.  Of these 23 cases, around ten cases concerned unhoused individuals (or 43% of these cases).  However, unhoused people make up only around 0.7% of Concord's population.[24]

70.    The arbitrary and problematic enforcement permitted by RSA 644:6's vague terms is not limited to unhoused individuals.  Police records show that officers often fail to meaningfully inquire as to the reasons a person is present at a particular location, depriving them of the opportunity to dispel alarm.  And even when an explanation is given, officers regularly exercise their unfettered discretion to arbitrarily reject suspects' explanations for their conduct and presence.  For example:

    a.  On Thursday, May 27, 2021, the Salem Police Department stopped and arrested a woman for loitering for walking outside at 2:55 a.m. behind a "Cash for Gold" store because the officer found this "to be unusual behavior given the time of day."  The Department was monitoring her through a traffic camera, and she seemed to be distressed and possibly intoxicated, as she "kept looking behind her and throwing her hands up in the air" and "appeared to be unsteady on her feet."  She was stopped after leaving the "Cash for Gold" location, and there was no evidence that she had any intention of breaking into the property. The conduct that aroused suspicion appears to be that she went behind the "Cash for Gold" building, where she could not be seen by the police through the traffic camera.  The Department arrested her for loitering even though she explained to the officers on the scene that, "while she was on her way to over to the store [to purchase food], she made a phone call to one of her friends and was walking around," and that "a friend had just passed away recently, and she was upset so she needed to go for a walk."  The officer rejected this explanation because "Cash for Gold" was closed, the officer believed that she was walking in the wrong direction if she was heading to the store to purchase food, and she apparently provided another person's driver's license and name upon request.  After further questioning in which the woman indicated her nervousness and "was visibly shaking," the officers decided to arrest her for loitering/prowling.  During this arrest, she then became "hysterical" and threw herself on the ground and tensed up in an alleged effort to resist arrest.  She was charged with loitering, resisting arrest, and making a false report to law enforcement.  After failing to appear at her arraignment, an electronic bench warrant was issued.  *See Exhibit C*, at CASES139-148.

---

[24] *See* Michaela Towfighi, *While City Committee Looks to Hire Homelessness Manager, Frustration Rises About Lack of Accountability*, Concord Monitor (Oct. 16, 2024), https://www.concordmonitor.com/Concord-homeless-steering-committee-partnership-update-57502776 (316 people were identified as actively homeless in the month of September 2024); *See* U.S. Census Bureau, Concord, New Hampshire (noting 43,976 population in the 2020 census), https://data.census.gov/profile/Concord_city,_New_Hampshire?g=160XX00US3314200 (last visited Sept. 15, 2025).

b. On Wednesday, July 7, 2021, at around 1:40 a.m., the Hampton Police Department arrested a man who allegedly fit the description of a man accused by a restaurant owner of being in the restaurant's patio area while it was closed. The officer arrested the man principally for swearing at the officer and exercising his right to not answer the officer's questions about whether he was the man on the patio, including saying "I don't have to f***ing talk to you." The officer's report states that, [a]t this point in time due to the fact that the male had not explained his reasoning for being on [the restaurant's] property I made the decision to place him under arrest for Loitering or Prowling." During the arrest, the man said that the officer had no authority to arrest him. The Department charged the man with loitering and disorderly conduct, with the latter charge filed seemingly for swearing and not responding to the officer's questions. The man eventually resolved the charges by pleading guilty to a town ordinance violation. *See id.*, at CASES149-156.

c. On Friday, December 17, 2021, the Concord Police Department arrested a man for loitering after a hotel employee called the police around 6:39 p.m. to report a "white man with a black vest and light-colored pants . . . acting suspiciously in the parking lot." The hotel also reported that the man had wandered inside the hotel at some point. When an officer arrived on the scene, the officer observed a man matching the description in the hotel parking lot. The officer approached the male and told him to stop walking away. The male kept walking away and turned his head to say "I didn't do anything wrong." The man then started running away. Eventually officers located the man, and he was arrested for loitering and resisting arrest. While the officers were booking the man, the man said "he was hanging around the parking lot to ask people for cigarettes," he had no drugs on him, and he was "pissed off" at himself for running. The man was found guilty of resisting arrest, and the loitering charge was placed on file without a finding. *See id.*, at CASES157-163.

d. On Saturday, June 11, 2022, at approximately 12:34 a.m., the Manchester Police Department arrested a Black man for loitering who was wearing a black jacket, pants, and shoes and who, according to the arresting officer, "conceal[ed] himself in the dark after spotting the presence [of a] marked police cruiser." The officer also believed that the man matched the description of a man who had run away from the officer earlier that night "after being seen looking into motor vehicles parked along the curb." The man was, according to the officer, "tucking in a corner to the address." The man then sprinted away and did not respond to orders to "stop." He was quickly apprehended, and there is no indication he was asked why he was in the area. He was charged with loitering and resisting arrest. While the resisting arrest charge was dropped, he was convicted of loitering. *See id.*, at CASES164-168.

e. On Sunday, June 19, 2022, at approximately 8:15 p.m., the Manchester Police Department arrested a man for loitering after observing the man "wearing all white clothing walking through the parking lot" of 25 Brock Street, and then running through the parking lot after seeing the police cruiser and continuing to run after being told to stop. The man was quickly apprehended after being found "crouched down concealing

himself behind a bush on the left side of [an] alleyway." The officer drew his firearm during the arrest. The man was charged with resisting arrest and loitering. The loitering charge was dropped, while the resisting arrest charge resulted in a conviction. *See id.*, at CASES169-174.

f. On Thursday, June 16, 2022 at approximately 12:21 a.m., the Concord Police Department arrested a person simply for being outside a closed business late at night and then leaving at the sight of police. That night, while passing a pharmacy on North State Street, a police officer saw a male figure wearing what appeared to be a red-hooded sweatshirt in a shadowy area in front of the closed pharmacy. When the officer drove into the parking lot, the man saw the officer's patrol car and fled. The officer quickly apprehended the man in a nearby lot after the man put his hands up and came to a stop. The man identified himself. When the officer asked why he ran, the man that "cops make him nervous." This explanation apparently did not satisfy the officer, who proceeded to arrest the man for prowling, resisting arrest for fleeing after the officer yelled "stop," and because he had an outstanding bench warrant for a previous resisting arrest charge that was uncovered after the stop. *See id.*, at CASES175-182.

g. On Friday, July 8, 2022, the Hampton Police Department arrested three individuals for loitering for walking onto a residential driveway in the early morning and then fleeing upon seeing police, without any indication that they were committing, or about to commit, a crime. An officer observed the three individuals "walking in the roadway" and then saw "one of the males walk[ed] down [a] driveway" that led to several homes as well as a courtyard-type area. The second man followed him, and the third stood on the side of the road where it meets the driveway. When the officer backed up his car to get another look, the man on the side of the road ran down the driveway, and the two men in the driveway jumped a fence and headed toward a state park parking lot. The three men were quickly apprehended. When an officer asked one of the men who fled what he was doing, the man responded that they were staying at the residential address where they were observed walking up the driveway. After searching the man's pockets and finding a motel room key, the officer asked why he would have a motel key if he was staying at the residential address. The man did not reply and the officer proceeded to arrest him and his two companions for loitering and an ordinance violation. Two of three men pled guilty to the ordinance violation, and the loitering charge was dropped in each case. The third man defaulted on the charges. *See id.*, at CASES183-188; *see also id.*, at CASES189-200 (reports for co-defendants).

h. On Tuesday, November 22, 2022, the Nashua Police Department cited a man for loitering in response to a complaint about the man's alleged entry into a nearby driveway. The complainant called the police at around 7:02 p.m., reporting that this man, who looked Hispanic, was suspicious because he was "also digging into his pockets while in the area." At 7:38 p.m., the complainant called again, "this time reporting the male circling the area but now [with] a pink item which he did not have before." When an officer arrived at the scene, he saw the man and activated his lights, after which the officer lost track of the man and concluded that the man "took flight upon the appearance of my cruiser." The officer later found the man and noted that,

upon initial contact, the man "was uncooperative and refused to identify himself." After the officer informed the man that he was being detained for loitering, the man "continued stating [the stop] was illegal." After the officer learned that the man had an electronic bench warrant for non-payment of fines, the man was handcuffed and placed in a cruiser. In short, this man seems to have been stopped for and charged with loitering simply because someone reported that he was "going in a driveway in the area of" a particular address and because he did not cooperate with requests to account for himself. This charge was placed on file without a finding. *See id.*, at CASES201-207.

   i.    On Saturday, October 14, 2023, at approximately 1:50 am, the Manchester Police Department arrested a man who was walking through the driveway and parking lot of a closed Burger King. When the officer first approached him, the man explained that "he was out for a walk due to being locked out of his sober living house for the night for missing curfew hours." When asked why he was walking around Burger King, the man stated "that he has the right to walk where ever he wants to." The man refused to produce identification when requested, maintaining that he "had done nothing wrong" and had "no legal obligation to produce identification." According to his report, the officer then "continued to explain that he had failed to dispel suspicion for being in area and is committing a violation by loitering or prowling. Based on these circumstance[s], he shall provide identification upon request. The subject continued to refuse and was subsequently placed under arrest." After being transported to the police headquarters and identified, the man was further detained on an outstanding warrant. *See id.*, at CASES208-221.

   j.    On Wednesday, March 20, 2024, at approximately 1:13 p.m. in the afternoon, a state police trooper arrested a disheveled man for loitering who allegedly "peered into a parked car" in the parking lot at the Concord bus station and was not a customer of the bus station. The state trooper was driving onto Stickney Avenue from Route 393 Eastbound in Concord. The trooper headed towards the multiple parking lots near the Concord Coach Bus station. There, the trooper observed a disheveled man with a backpack "in the far corner of a parking lot walking very slowly and peering into a parked car." The trooper then approached the man and asked what he was doing. The man stated that he was smoking a cigarette, and the trooper observed that the man "had an unlit cigarette in his hand that he was attempting to light." After being asked if he was taking a bus and had a car in the lot, the man said "no." The man "repeated that he was smoking," and that he "goes here" sometimes to smoke. After running the man's information through dispatch, the trooper learned that the man had an electronic bench warrant for criminal trespass out of the Concord District Court. The trooper then arrested and searched the man. The search yielded "a rock that was just small enough to be covered in one's hand." The loitering charge was later dismissed apparently for competency reasons. *See id.*, at CASES222-228.

   71.    Arbitrary and problematic enforcement of RSA 644:6 is rarely challenged because individuals charged under this statute—especially those who are poor or unhoused—often do not

have access to counsel.  This is because "loitering or prowling" is a civil violation-level offense, which carries a maximum penalty of a fine up to $1,000, *see* RSA 651:2, IV(a), plus a 24% penalty assessment (for a total $1,240.00).  Because this charge does not lead to a term of imprisonment, people charged only under RSA 644:6 are not entitled to court-appointed counsel if they are indigent.

72.    Police departments are also permitted to initiate prosecutions under RSA 644:6 in New Hampshire Circuit Courts on their own initiative, without input from a prosecutor or other attorney.  As a result, a loitering/prowling charge might be filed in circuit court without any attorney ever evaluating the validity of the charge.

73.    Notwithstanding RSA 644:6's status as a violation-level offense imposing civil penalties, law enforcement's use of this statute, on information and belief, can be pretextual, including to stop and detain people for warrant checks and to search them for contraband.  *See, e.g.*, *Exhibit C*, at CASES020 (conducting warrant check after detention of unhoused, "suspicious male in the alley"); *id.*, at CASES051 (conducting warrant check after detention of two unhoused individuals sleeping in the stairs of a parking garage); *id.*, at CASES097 (noting unhoused woman "was eventually searched for weapons and means of escape with none being found"); *id.*, at CASES015 (conducting weapons check after detention of unhoused person); *id.*, at CASES109 (with respect to an unhoused person, noting "I checked [his] person for weapons, to which none were found"); *id.*, at CASES181 (conducting warrant check); *id.*, at CASES204 (detaining for warrant check); *id.*, at CASES219 (detaining for warrant check); id., at CASES224 (detaining for warrant check).[25]  And when a defendant "[t]akes flight upon appearance of a law enforcement

---

[25] *See* Nirej Sekhon, *Dangerous Warrants*, 93 WASH. L. REV. 967, 997 (2018) (arguing that bench warrants create an incentive for police to engage in unconstitutional stops).

official or upon questioning by such an official" under RSA 644:6, I(a), it is not uncommon for

that act to be used by law enforcement to justify a separate misdemeanor charge of resisting arrest.

*See, e.g.*, *id.*, at CASES104-26 (likely unhoused man charged with resisting arrest who was

"pacing back and forth on the sidewalk" and who then, when an officer attempted to make contact

with him, yelled "stop harassing me" and ran away); *id.*, at CASES157-156

(man charged with resisting arrest when he walked and then ran away after an officer approached

him in a hotel parking lot); *id.*, at CASES164-168 (man charged with resisting arrest when he ran

away from the officer's position); *id.*, at CASES169-174 (man charged with resisting arrest when

he ran away after seeing a police cruiser); *id.*, at CASES175-82 (man charged with resisting arrest

where an officer in a police car "noticed that in the shadowy area in front of the closed [CVS] store

stood a male figure wearing what appeared to be a red hooded sweatshirt" who then began "to run

in the opposite direction of" the officer after the officer "drove into the parking lot"; when the

officer asked the man why he ran, he "said that cops make him nervous"); *id.*, at CASES169-174

(man charged with loitering and resisting arrest after running through the parking lot after seeing

the police cruiser and continuing to run after being told to stop); *id.*, at CASES157-163 (man

charged with loitering and resisting arrest after he fled and saying that he "didn't do anything

wrong" when police arrived on scene in response to a report of a suspicious person in a hotel

parking lot and asked him to stop running away).

74. Stopping people in order to run warrant checks is particularly harmful for unhoused

people. Because of the prevalence of low-level offenses that criminalize the unhoused by attaching

civil and criminal penalties to a wide range of essential behaviors associated with those who are

unhoused—including sitting and sleeping outside—unhoused people are frequently issued

citations or summonses. Most unhoused people are unable to pay even relatively low fines and

fees, and they face unique difficulties in contesting citations and appearing for court.  For example, because they usually do not have a fixed address, an unhoused person may not be able to timely receive court date notifications.  *See, e.g., id.*, at CASES078 (court notice to unhoused defendant returned as undeliverable); *id.*, at CASES041(court notice "unable to forward" for unhoused defendant).  It also may be difficult to hold on to sensitive documents, like citation paperwork, while living outside, including because encampment "sweeps" often result in the loss and destruction of property.  They also may miss court dates because they lack access to transportation. *See* Madeline Bailey, Erica Crew, & Madz Reeve, Vera Institute of Justice, *No Access to Justice: Breaking     the     Cycle     of     Homelessness     and     Jail* (2020), https://verainstitute.files.svdcdn.com/production/downloads/publications/no-accessto-justice.pdf. When these challenges result in a person failing to pay a fine or appear in court, judges may issue bench warrants for their arrest.[26]

75.    And the consequences for even a violation-level offense, like RSA 644:6 can be severe—including handcuffing and arrest[27], imposition of bail conditions that are often unrelated

---

[26] Studies across the country demonstrate the prevalence of this practice. *See* Andrew Weber, *Most Tickets for Homelessness Result in Arrest Warrants. That Can Make Finding Housing Hard*, KUT (June 20, 2019), https://perma.cc/Q5AU-M7GK (study showing that from 2015 to 2018 in Austin, Texas, almost 60% of citations issued for sitting or lying down, camping, or panhandling in public resulted in the issuance of a bench warrant); Paul Boden, *Criminalizing     the     Homeless     Costs     Us     All* (Mar. 1, 2012), https://www.streetroots.org/news/2012/03/01/criminalizing-homeless-costs-us-all (in survey of over 600 unhoused people across eight cities, 57% of respondents "reported having bench warrants issued for their arrest as the result of minor 'quality of life' offenses"); Luci Harrell and Brian Nam-Sonestein, *Unhoused and under arrest: How Atlanta polices poverty*, PRISON POL'Y INITIATIVE (June 8, 2023), https://www.prisonpolicy.org/blog/2023/06/08/atlanta-poverty/ (in Atlanta, 86% of unhoused people who had been incarcerated at the city jail also had bench warrants for failure to appear in court ); Eisha Jain, *Policing in the Age of Criminal Records*, 103 N.C. L. REV. 1441, 1452 (2025) ("in certain jurisdictions, the rate [of warrants] is staggeringly high, particularly among racial minorities, and reflects the criminalization of poverty through petty offenses that trigger warrants for unpaid fines").

[27] Under RSA 594:10, I(a) & (c), warrantless arrests can occur for violation-level offenses when, for example, the officer "has probable cause to believe that the person to be arrested has committed a misdemeanor or violation in his presence" or if the officer "has probable cause to believe that the person to be arrested has committed a misdemeanor or violation, and, if not immediately arrested, such person will not be apprehended, will destroy or conceal evidence of the offense, or will cause further personal injury or damage to property."  There are numerous examples of individuals who are arrested for loitering, as opposed to merely being issued a summons to later appear in court. *See,*

to the offenses charged,[28] and fines and bench warrants that can lead to arrest if a person does not appear in court.[29]

## THE UNCONSTITUTIONALITY OF RSA 644:6

76.     The New Hampshire Supreme Court has not addressed the constitutionality of RSA 644:6.  This is perhaps because this charge is a violation-level offense where defendants are often unrepresented and thus unlikely to have the resources or ability to challenge the constitutionality of this statute.  And if a defendant does have a court-appointed lawyer, this means that the loitering charge is a lesser charge among other more serious criminal charges.

77.     If a constitutional challenge is raised, the state also can drop a charge under RSA 644:6 to avoid judicial review of the statute's constitutionality.  This appears to be what occurred in one recent case, where a constitutional challenge was raised in Circuit Court, and then that charge was dropped.[30]

78.     A constitutional challenge also was previously raised at the New Hampshire Supreme Court, but that Court declined to address the statute's constitutionality.  *See State v. Jaroma*, 137 N.H. 562 (1993) (finding the constitutionality of RSA 644:6 irrelevant when a defendant was initially arrested for loitering, but that charge was dismissed and his subsequent

---

*e.g. Exhibit C*, at CASES001-08; *id.*, at CASES009-16; *id.*, at CASES052-67; *id.*, at CASES127-130; *id.*, at CASES183-188; *id.*, at CASES201-07.

[28] *See, e.g. Exhibit C*, at CASES117 (unhoused defendant must refrain from excessive use of alcohol, though this bail condition is unrelated to the loitering charge); *id.*, at CASES073 (same bail condition imposed on unhoused defendant).

[29] *See, e.g. Exhibit C*, at CASES033 (bench warrant issued for unhoused woman's failure to appear at Dec. 10, 2024 plea).

[30] *See* Mara Hoplamazian, *Facing Constitutional Questions, NH Prosecutors Drop 'Loitering and Prowling' Case Against Climate Activist*, NHPR (Sept. 28, 2023) ("Environmental justice activist Jess Mills was set to stand trial this week in New Hampshire. But days after his lawyer challenged the constitutionality of the law he was charged under, the Concord City Prosecutor's office dropped the case."), https://www.nhpr.org/nh-news/2023-09-28/loitering-prowling-climate-activist-protest-law-constitutionality.

trial and conviction were based on a wholly distinct statute).[31]

## I.    Vagueness Under the Fourteenth Amendment's Due Process Provisions.

79.    The due process protections found in the Constitution's Fourteenth Amendment require criminal laws to provide fair notice of what conduct is prohibited and to establish minimal guidelines for law enforcement.  Laws whose terms are too vague and standardless to enable ordinary citizens to understand what is prohibited and to conform their conduct to the laws violate due process.  Likewise, laws that use vague language that authorizes or invites arbitrary and discriminatory enforcement are unconstitutional.  *See Morales*, 527 U.S. 41, 56 (plurality op.);

---

[31] In *State v. Jaroma,* the defendant argued that evidence obtained pursuant to a search conducted after he was arrested under RSA 644:6 should be suppressed because the statute is unconstitutional.  137 N.H. 562, 568-69 (1993).  The Court concluded that, even if the statute were unconstitutional, the search would not violate the New Hampshire Constitution.  *Id.* at 569.

Indeed, the limited case law in New Hampshire applying and interpreting RSA 644:6 demonstrate the unfettered discretion the police believe they have under this law.  In *Jaroma*, a police officer believed there was probable cause to arrest a person for loitering where the person "quickly depart[ed] from [a] parking lot of a commercial building at 4:30 a.m., a time at which all the businesses were closed," where "[t]he officer knew that there had been several burglaries in the area during the past several months," where, upon stopping the vehicle, the officer "learned that the defendant was not an owner or employee of any of the businesses," and where the officer, shortly after stopping the person, became "aware that the defendant had a reputation as a burglar."  *Id.* at 568 (holding that the "officer reasonably believed that the defendant's presence in the parking lot warranted alarm for the safety of property in the vicinity," and "the defendant's answers did not dispel the officer's alarm . . . for the safety of property).

In *State v. Dodier*, 135 N.H. 134 (1991), police argued that the loitering statute provided a justification to search the passenger compartment of a pick-up truck occupied by two men and parked in a parking lot at 1:00 a.m., even though passenger made a furtive gesture in placing an object in his hand beside the seat.  *Id.* at 137 (holding that this furtive gesture alone did not warrant alarm "for the safety of persons or property," as there was no indication that the two men intended to commit a crime which threatened public safety, nor was there any indication they intended to leave the truck).

In *State of New Hampshire v. Gaynor*, No. 217-2024-cr-907 (Merrimack Cty. Super. Ct. Mar. 31, 2025) (Edwards, J.) (attached as *Exhibit P*), the State argued that Concord Police Department officers had reasonable suspicion that a defendant was loitering because the defendant ran away from the officers in the middle of the day when it was bright out.  The Superior Court rejected this conclusion.  *Id.* at *8.

And in another case—*Toney v. Perrine*, No. 06-cv-327-SM, 2007 U.S. Dist. LEXIS 67255 (D.N.H. Sept. 10, 2007)—an officer arrested a person for loitering when the person was having a loud argument while on a pay phone, had been "conceal[ing] his presence in the darkened area adjacent to the auto parts store (albeit perhaps for an innocent reason)" and was holding his back to the wall and peeking around the corner as he walked, and then "t[ook] flight when he saw [the officer]." *Id.* at *10.  Although the officers gave the person "an opportunity to explain his suspicious behavior (as required by the statute), based upon their observations, they did not believe him."  *Id.*  There, the Court concluded that "defendants' determination that there was probable cause to arrest Toney for loitering was entirely reasonable."  *Id.* at *13.

*Kolender*, 461 U.S. 352, 357-58.

80.    To provide fair notice, as required by due process, a statute must define criminal conduct in a way that is clearly distinguishable from innocent conduct.  Laws that are written so broadly as to prohibit everyday behavior, regardless of a person's intent to commit a criminal act, unconstitutionally permit police to criminalize those deemed undesirable, but who are not chargeable with any specific offense.  *See Papachristou*, 405 U.S 156, 166-68.  Similarly, laws that define criminal activity in "inherently subjective" terms, leaving it to police officers to determine what conduct is criminal, do not comport with due process.  *See Morales*, 527 U.S. 41, 62 (majority op.).

81.    RSA 644:6 violates these principles. It fails to provide notice to ordinary New Hampshire residents of what circumstances would "warrant alarm" and of what explanations could dispel it.  RSA 644:6 does not require an overt act towards a crime or even any intent to commit a crime.  Rather, violation of the statute turns entirely on police officers' subjective determination of whether "circumstances … warrant alarm for the safety of persons or property in the vicinity" and whether a suspect's explanation adequately "dispels" that alarm.

82.    RSA 644:6 is unconstitutionally vague in at least the following ways:

**A.     "Appear[ing] at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity."**

83.    The statute's prohibition against "appearing," "at a place, or at a time," "under circumstances that warrant alarm for the safety of persons or property in the vicinity" is imprecise and requires neither an overt act of criminal conduct nor an intent to commit a crime.

84.    The phrase "appearing . . . at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity" is undefined, and its imprecise language fails to inform ordinary people of what is prohibited.  It could be interpreted, for example, as prohibiting

simply being out late at a night or in an area that an officer perceives as a "high crime area."

85.    "Alarm," too, is undefined. What—or who—alarms one person may be unremarkable to another. "Alarm" is commonly defined as a "sudden sharp apprehension and fear resulting from the perception of imminent danger"[32] —a definition that highlights the inherent subjectivity of the statute. Under this definition, it is not what a person does—but rather the "apprehension and fear" that they (or their circumstances) instill in some undefined other person— that matters. This vague term also invites bias against groups of people who are perceived to be out of place, threatening, or dangerous, including unhoused individuals.

86.    The statute similarly does not define "safety" or explain what "safety" threats may exist to persons or property. It also does not define "vicinity," or elaborate on how large of a geographic region may be considered "in the vicinity."

87.    Because the statute lacks definitions of these terms, an ordinary person in New Hampshire cannot know whether, at any given moment, they are "appearing in a place or at a time under circumstances that warrant alarm for the safety of persons or property in the vicinity."

88.    Significantly, RSA 644:6 does _not_ require loitering with an intent or purpose to commit a specific crime—*e.g.*, to solicit gambling or prostitution, or to sell illicit drugs—which was a trend that some states and municipalities embraced after various United States Supreme Court cases, including *Kolender*. *See* William Trosch, Comment, *The Third Generation of Loitering Laws Goes to Court: Do Laws That Criminalize "Loitering With the Intent to Sell Drugs" Pass Constitutional Muster?*, 71 N.C. L. Rev. 513, 517 (Jan. 1993) ("Lawmakers responded to the Supreme Court's admonition by requiring a specific intent to engage in an

---

[32] *Merriam-Webster* Dictionary, *Alarm*, https://www.merriam-webster.com/dictionary/alarm (last visited Sept. 30, 2025).

unlawful activity.  By adding a mens rea element, legislators hoped to wrap the same unconstitutional law in a prettier package that was more likely to receive judicial sanction."); *see also Local 8027, AFT-N.H. v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052, at *40 (D.N.H. May 28, 2024 ("Because teachers can be found to have crossed that indistinct line without any finding of scienter, the vagueness of the Amendments is compounded rather than mitigated."); *Nat'l Educ. Ass'n-New Hampshire v. N.H. Attorney Gen.*, No. 25-cv-293-LM, 2025 U.S. Dist. LEXIS 172056, at *7 (D.N.H. Sep. 4, 2025) (granting temporary restraining order where law challenged on vagueness grounds imposed "crippling penalties" even for "'unknowing' noncompliance").[33]

89.      RSA 644:6 even goes so far as to omit the MPC's "or in a manner not usual for law-abiding individuals" language—language the MPC believed was critical to ensuring its constitutionality.  *See* Model Penal Code § 250.6, cmt. 3, p. 390 (A.L.I. 1980), attached as <u>Exhibit E</u> (noting in 1980 comments to the MPC that, "[a]s a threshold matter, the section requires at least some manifestation of abhorrent behavior.  Specifically, the actor must loiter or prowl "in a place, at a time, or in a manner *not usual for law-abiding individuals*"; adding that this language was added to the MPC to "save the section from attack and invalidation as a subterfuge for authorizing arrest without probable cause") (emphasis added).

## B.      Four Nonexhaustive Factors.

90.      The four circumstances that the New Hampshire legislature added to the statute in 1985 that "may be considered" in determining whether a person "appears at a place, or at a time,

---

[33] And even still, many of those types of laws that prohibit loitering with a specific purpose too have been struck down. *See, e.g., Brown v. Municipality of Anchorage*, 584 P.2d 35, 36 (Alaska 1978); *City of Akron v. Rowland*, 618 N.E.2d 138, 143 (Ohio 1993); *Wyche v. State*, 619 So. 2d 231, 235–36 (Fla. 1993); *Coleman v. Richmond*, 364 S.E.2d 239, 243-44 (Va. Ct. App. 1988); *Silvar v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 129 P.3d 682, 685 (Nev. 2006).

under circumstances that warrant alarm for the safety of persons or property in the vicinity" do not cure the statute's vagueness.

91.    The statute's language makes clear that the existence of one or more of these circumstances is not necessary to find a violation of the RSA 644:6.   Rather, they "*may*" (but need not) be considered.

92.    In keeping with the rest of the statute's imprecision, this subsection also fails to indicate *how* these circumstances should be considered.  For example, the statute provides that an officer may consider whether an actor "takes flight upon appearance of a law enforcement official" in determining whether alarm is warranted, but it does not explain how this circumstance should weigh in that determination.

93.    The four examples of circumstances that may be considered also fail to cabin the discretion of law enforcement because they are explicitly non-exhaustive ("circumstances that may be considered . . . *include, but are not limited to*"), and thus, like in *Kolender*, still allow for unfettered discretion.  In other words, the existence of one of these four specific circumstances is not necessary to support an arrest or conviction under this statute.   Because these four circumstances are merely illustrative, "the reach of" this statute "remains essentially unbounded and indeterminate."  *See Bellevue*, 536 P.2d at 607.

### C.    Identify and Explain Presence Requirement.

94.    While Paragraph II of RSA 644:6 provides that a person—absent "flight or other circumstances [that] make it impossible"—cannot be arrested unless he is afforded the opportunity to dispel any alarm which would otherwise be warranted, this provision too is vague because it contains no standard for determining what a suspect has to do in order to satisfy the requirement.

95.    The statute provides no guidance[34] on how to "identify [oneself] and give an account of his presence and conduct" in a way that "dispels any alarm which would otherwise be warranted," thereby "vest[ing] virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute." *See Kolender*, 461 U.S. at 358. Thus, like the California stop-and-identify law at issue in *Kolender*, RSA 644:6 allows an individual to walk the public streets "only at the whim" of any police officer who happens to stop that person and demand identification. *Id.* (citation omitted).

96.    Indeed, highlighting how this provision provides the police with unfettered discretion, in one documented instance, the police arrested an unhoused man for loitering after rejecting the man's explanation that he was in the area because he was staying the night at an adjacent autobody shop where he worked—an explanation that apparently turned out to be true (and which the officers later seemed to accept, dropping him off at the autobody shop after arresting, charging, and booking him because he was outside near that location). *See Exhibit C*, at CASES068-76. In another case, an officer appears to have rejected the explanation of an unhoused man who asserted that he had been sitting on a bench outside of the building of a business "to eat a snack." *See id.*, at CASES001-08. One officer seems to have rejected the explanation of an unhoused man that he was in an alley because he was "stashing" his two bikes and a bag full of food in between two homes in the alley, and that he was trying to find the bag of food. *See id.*, at CASES017-21. One officer seems to have rejected the explanation of an unhoused man—who

---

[34] As to the guidance that has been provided to law enforcement on the loitering statute, the New Hampshire Department of Justice ("DOJ") conducts trainings on criminal laws for police officers at the Police Standards and Training Council ("PSTC"). At those trainings, the DOJ has given instructions on how to enforce RSA 644:6, which has included the depiction of a person in a dark hoodie. These trainings appear to recite the statute's elements, as well as the New Hampshire Supreme Court's decision in *State v. Jaroma*, 137 N.H. 562, 568 (1993), where the Court held that the officer in that case justifiably found reason for alarm for the safety of property under RSA 644:6.[34] *See* N.H. D.O.J. Resp. to RSA ch. 91-A Request, attached as *Exhibit N*. Similarly, training conducted by the PSTC for local law enforcement on laws authorizing arrest cite the loitering statute's terms elements. *See Exhibit O* (PSTC Slides).

was "wearing all black" and allegedly "peer[ed] into" an unoccupied, parked vehicle—that "he was cutting through the parking lot to get to" a certain street and that "he was near the car because he was looking at a T.V." *See id*., at CASES052-67.  One officer appeared to reject the explanation of an unhoused man that he was not trying to access a building in the afternoon.  *See id*., at CASES077-84.  Another officer rejected the explanation of a man—who walking along the drive through lane towards the rear of a closed Burger King late at night—that "he was out for a walk due to being locked out of his sober living house for the night for missing curfew hours."  *See id*., at CASES208-221.  Another officer rejected the explanation of a disheveled man—who allegedly "peered into a parked car" at a bus station parking lot—that he was in the lot to smoke a cigarette. (The man had a cigarette in his hand.).  *See id*., at CASES222-228.

97.    Relatedly, the statute allows for arbitrary and discriminatory enforcement by failing to require law enforcement officers to even identify specific and articulable facts indicating that a person is engaged in prohibited conduct before ordering him to stop and "requesting him to identify himself and give an account for his presence and conduct."  *See* RSA 644:6, II.

98.    This vagueness is made even worse by the fact that RSA 644:6 sweeps within its scope innocent and constitutionally protected conduct and expression.   RSA 644:6's broad language, allowing enforcement in any circumstance "that warrant[s] alarm for the safety of persons or property in the vicinity," "can easily implicate a person's status, associates, mere presence, or otherwise innocent behavior"—thereby infringing core constitutional rights like the right to free association, the right to travel, and the freedom to loiter for innocent purposes.  *See City of Akron*, 618 N.E.2d at 149; *Morales*, 527 U.S. at 53.  "The case law is legion that people cannot be punished because of their status, the company they keep, or their presence in a public place." *Akron*, 618 N.E.2d at 149 (citing cases).  This concern is especially acute here where RSA

644:6 requires no specific act in furtherance of any crime (let alone behavior "not usual for law-abiding individuals"), nor any specific intent to engage in criminal activity.

99.    The end result is that RSA 644:6 can prohibit anything that might seem "alarming," including telling a police officer to go away, wearing clothes that are unusual or perceived to be associated with a local gang, walking in a perceived "high crime" area while late at night, being of a different race or socioeconomic status than most residents in the area, or engaging in constitutionally-protected protests designed to evoke a provocative or even alarming message to make a point.

100.    RSA 644:6 further risks chilling protected expression by listing "conceal[ing] himself" as a circumstance that may be considered in determining whether alarm is warranted. This could apply to any protester who may wish to wear a mask to ensure their own safety and to avoid the prospect of doxing.  Ironically, RSA 644:6 makes this a potential ground for stopping and arresting a person, even as some in federal immigration law enforcement have been concealing their faces in performing their duties.[35]

101.    RSA 644:6 even begs the question whether "alarm for the safety" language could implicate protests themselves whose message are viewed as implicating "safety"—for example, racial justice protesters (whose speech advocating for reducing the presence of local law enforcement on the streets could be perceived by some as causing "alarm" to public safety) or those protesting vaccination requirements (whose speech could be perceived as promoting the spread of infectious disease, thereby causing "alarm" to the safety of persons).

102.    With this unfettered discretion, the statute provides law enforcement with a catch-

---

[35] *See* Taylor Robinson, *Nassau County Will Let Officers Wear Masks When Working With ICE*, N.Y. Times (July 11, 2025), https://www.nytimes.com/2025/07/11/nyregion/nassau-county-police-officers-ice-masks.html.

all provision through which they can allow "desirables" to use the streets and speak freely, while "moving along" (or, worse, citing or arresting) individuals who are perceived to be less desirable or whose messages are disfavored—all without specifying what criteria is being used in making this distinction.

103.    Not only does the vagueness of RSA 644:6 risk impinging constitutionally protected speech and liberties and contribute to Fourth Amendment violations for the reasons explained in Section II *infra*, but its ambiguities contribute to compelled speech and likely lead to violations of the Fifth Amendment right against self-incrimination.  This is because RSA 644:6 requires law enforcement to solicit communication that is both compelled and testimonial.

104.    Officers must request that a suspected loiterer "*give an account for his presence and conduct*." RSA 644:6, II (emphasis added).  The statute requires release, and prohibits subsequent conviction, if the loiterer gives a satisfactory answer.  But giving "an account" requires a factual assertion and is thus inherently testimonial.

105.    While the statute claims at RSA 644:6, II not to deem illegal the act of "fail[ing] to identify or account for oneself" in response to this request, this protection does little—if anything—to protect against compelled speech and the right against self-incrimination.  This is because, per the terms of the statute, failure to identify or account for oneself cannot be grounds for an arrest only "*absent other circumstances*." (emphasis added).  This vague phrase provides a standardless catch-all that allows a suspect's failure to respond to lead to arrest.  The statute provides no explanation of what "other circumstances" must be present for police to consider a failure to respond as part of the grounds for arrest.  And, because (again undefined) "circumstances that warrant alarm" are already required under the statute, it is impossible to imagine a scenario where a suspect's failure to respond would not be coupled with "other circumstances."

47

106.    The reality is that a person who chooses not to respond likely faces a charge and possible arrest for that choice.  Absent a response, a suspect with a lawful explanation for their presence has no ability to dispel the "alarm" that prompted the officer to stop the suspect in the first place.  And whatever "other circumstances" caused that "alarm" may, in combination with the failure to respond, justify a charge and/or arrest.

107.    This is not merely a hypothetical possibility.  There are multiple examples of officers arresting people because they declined to respond.[36]  *See, e.g. Exhibit C*, at CASES001-08 (unhoused man arrested for loitering after declining to give real name); *id.*, at CASES041-45 (unhoused man arrested for loitering where the man "was given ample time to give a valid reason as to why he was there, but failed to do so"); *id.*, at CASES046-51 (officer stating to unhoused man sleeping in a parking garage late at night that he "needed to provide his given name," and that "he would be placed under arrest unless he gives me the information I was asking for," and where the man was ultimately arrested for not providing a full name and date of birth); *id.*, at CASES131-138 (unhoused man arrested for loitering after refusing to provide name and after being informed that "he would be arrested if he did not provide his name"); *id.*, at CASES149-156 (man arrested principally for using colorful language in exercising his right to not answer officer's questions about whether he was on a patio; noting that the man "had not explained his reasoning for being" on the patio); *id.*, at CASES184-189 (man charged with loitering because of silence when questioned why he would have a key for a motel 100 yards away if he was staying at a residential property, as the man was unable to "dispel any suspicion about what he was doing" at the

---

[36] These arrests also occur even where RSA 594:2 was amended in 2019 to state that "[a]n officer may request the person's name and address, but the officer shall not arrest the person based solely on the person's refusal to provide such information."  This change was made through 2019's House Bill 491.  *See* https://gc.nh.gov/bill_status/legacy/bs2016/bill_docket.aspx?lsr=0520&sy=2019&sortoption=billnumber&txtsession year=2019&txtbillnumber=HB491.

residential location); *id.*, at CASES201-207 (officer noting that, upon initial contact, the man allegedly "was uncooperative and refused to identify himself" because the man thought the stop was illegal); *id.*, at CASES208-221 (man arrested for loitering where, after the officer requested identification, the man refused, "stating that he had done nothing wrong and has no legal obligation to produce identification"; officer's police report further states: "I continued to explain that he had failed to dispel suspicion for being in area and is committing a violation by loitering or prowling. Based on these circumstance[s], he shall provide identification upon request.  The subject continued to refuse and was subsequently placed under arrest.").  Thus, RSA 644:6's ambiguities and bestowal of discretion effectively compel those approached or detained by law enforcement to engage in speech with law enforcement or face punishment.

108.    Moreover, even if the statute does not require a response, many people will feel compelled to respond to a police request to identify themselves and account for their presence.  As social science has demonstrated, when stopped by police, most people do not behave as if they have a choice not to comply with requests.  *See* Janice Nadler & J.D. Trout, *The Language of Consent in Police Encounters*, 33 The Oxford Handbook of Language and Law 326, 332 (2012) ("[W]hen the police use request language, [people] hear it as a command and similarly assume this is backed by force."); Roseanna Sommers & Vanessa K. Bohns, *The Voluntariness of Voluntary Consent: Consent Searches and the Psychology of Compliance*, 128 Yale L.J. 1962, 1987 (2019) (finding that 97% of study participants acceded to a request to hand over their smartphone to be searched).

109.    Unhoused individuals may feel especially compelled to comply with police requests.  *See, e.g.*, *Cmty. for Creative Non-Violence v. Unknown Agents of U.S. Marshals Serv.*, 797 F. Supp. 7, 16 (D.D.C. 1992) (discussing the "realities of homelessness" that caused unhoused

people to feel particular pressure to consent to police requests).  Laws criminalizing the unhoused are ubiquitous, and unhoused people are up to eleven times more likely to be arrested than those who are housed and are disproportionately likely to be assaulted by police.[37]  And, since the Supreme Court's *Grants Pass*, decision, unhoused communities have faced a sharp increase in laws criminalizing homelessness and related police encounters, including arrests.[38] This reality often leads to a unique fear of police encounters and a perception that they must comply with police demands or face punishment.  This power dynamic resulting in fear can especially occur when law enforcement officers interact with Black and Brown people.[39]

## II.    The Fourth Amendment's Right Against Unreasonable Seizures.

110.    RSA 644:6 is unconstitutional in another way that is intertwined with the law's unconstitutional ambiguity: it independently violates the Fourth Amendment.  The statute violates the Fourth Amendment in two separate ways.

111.    *First*, it eliminates the constitutional requirement that law enforcement must have reasonable and articulable suspicion of criminal activity to stop people, instead allowing a "stop-and-identify" based solely on undefined "circumstances that warrant alarm," which need not be articulated, based on specific facts, or related to criminal activity.  *See Terry v. Ohio*, 392 U.S. 1

---

[37] *See* Tanya L. Zakrison, Paul A. Hamel, & Stephen W. Hwang, *Homeless People's Trust and Interactions with Police and Paramedics*, 81 J. of Urb. Health 596 (2004); Nat'l L. Ctr. on Homelessness & Poverty, *Housing Not Handcuffs 2019: Ending the Criminalization of Homelessness in U.S. Cities* (2019), https://homelesslaw.org/wp-content/uploads/2019/12/HOUSING-NOT-HANDCUFFS-2019-FINAL.pdf.

[38] *See, e.g.*, *One Year Since Grants Pass: Tackling the Criminalization of Homelessness*, Am. C.L. Union (June 23, 2025), https://www.aclu.org/one-year-since-grants-pass-tracking-the-criminalization-of-homelessness; Sadaf Tokhi, *Some Changes Evident as Manchester Enforces New Camping Ban*, NHPR (Aug. 8, 2024), https://www.nhpr.org/nh-news/2024-08-08/some-changes-evident-as-manchester-enforces-new-camping-ban; Stephen Przybylinski, *San Francisco and Other Cities, Following a Supreme Court Ruling, are Arresting More Homeless People for Living on the Streets*, THE CONVERSATION (Aug. 12, 2024, 8:27 AM), https://theconversation.com/san-francisco-and-other-cities-following-a-supreme-court-ruling-are-arresting-more-homeless-people-for-living-on-the-streets-262664.

[39] *See* Final Amended Brief of the American Civil Liberties Union of New Hampshire as Amicus Curiae in Support of Defendant Ernest Jones in *State v. Jones*, 172 N.H. 774 (2020), at pp. 21-26, *available at* https://live-awp-new-hampshire.pantheonsite.io/app/uploads/2019/06/final_amicus_brief_6.13.19.pdf.

(1968); *see also Brown v. Texas,* 443 U.S. 47, 52 (1979) ("The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it. When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.").

112. *Second*, under RSA 644:6, if a person fails to respond or his response is deemed inadequate, mere suspicious conduct can serve as a predicate for arrest, conviction, and punishment. In other words, the statute exceeds the bounds of the Fourth Amendment because it allows an officer to conduct an arrest where the officer merely observes suspicious conduct not amounting to probable cause.

113. As discussed *supra*, RSA 644:6 allows an officer to stop and question a person based on vague and undefined "circumstances that warrant alarm," without any specific basis for believing that person is engaged in—or intends to engage in—criminal activity. This contravenes the Fourth Amendment's requirement, articulated in *Terry*, that an officer must have a reasonable suspicion that a person has committed or is about to commit a crime, based on specific and articulable facts that objectively indicate criminal activity, before they may initiate an investigatory stop. RSA 644:6 circumvents this requirement because conviction under the statute does not require any articulable facts suggesting criminal activity. How can a stop based on an officer's suspicion that a person is violating the loitering statute be based on articulable facts and objective indicia of criminal activity, when the statute itself permits conviction based on nothing more than unarticulated and subjective "circumstances that warrant alarm"?

114.    Worse, by allowing arrest and conviction based on "alarm for the safety of persons or property" the statute violates the Fourth Amendment's requirement that arrests must be predicated on probable cause, not mere suspicion.  The statute effectively acts as a "catch all" basis for arrest where—even if a police officer does *not* have independent probable cause to believe that a crime is being (or has been) committed—the officer can conclude that probable cause exists for a loitering charge based on the *mere suspicion* of criminality predicated on circumstances that an officer deems questionable, including when the person "[t]akes flight upon appearance of a law enforcement official or upon questioning by such an official" or "[m]anifestly endeavors to conceal himself or any object."  *See* RSA 644:6, I(a)-(b).  But the mere act of evading police or walking away is not sufficient, by itself, to conclude that there is probable cause to believe that a crime has been committed.

115.    The statute's unconstitutional conversion of suspicion created by flight or efforts to conceal oneself into probable cause for an arrest is not merely hypothetical.  Multiple cases show arrests based solely on individuals' attempts to avoid or flee from the police, absent any facts to suggest that genuine criminal activity is underway.  *See Exhibit C*, at CASES0009-16 (unhoused man arrested and charged for hiding and fleeing from the police, after police rejected his explanation that he was scared of one of the men he previously was with); *id.,* at CASES041-45 (unhoused man with mental health issues who was "rustling around in a pile of blankets on the front steps of New Hampshire Fire Insurance Company, which is located at 156 Hanover St." charged with loitering after trying to "flee away from" the police); *id.,* at CASES052-67 (unhoused man charged with loitering after allegedly "peering into a parked vehicle," noticing a law enforcement cruiser, and then "put[ting] his head down and … walking" in a different direction); *id.*, at CASES104-126 (unhoused man who was observed "pacing back and forth on the sidewalk"

and crossing a road without using a crosswalk arrested and charged with loitering because he ran away and hid from the police and told them to "stop harassing me"); *id.*, at CASES164-168 (man who matched the description of someone who allegedly looked into parked cars and ran away several hours earlier was charged with loitering when he later concealed himself and then fled police without first being provided an opportunity to dispel alarm); *id.*, at CASES175-182 (man previously in front of a closed CVS charged with loitering after fleeing at sight of police; police rejected his explanation that he fled because "cops make him nervous").

## CLASS ALLEGATIONS

116.    Proposed class representative Plaintiff Robert Clark brings this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of himself and a class of all other persons similarly situated. *See Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2555 (U.S. June 27, 2025) (noting that a "properly conducted class action" may provide relief beyond individual plaintiffs); *Barbara v. Trump*, No. 25-cv-244-JL-AJ, 2025 U.S. Dist. LEXIS 130805, at *8-9 (D.N.H. July 10, 2025) (granting provisional class certification in facial challenge to birthright citizenship executive order to provide preliminary injunctive relief beyond individual plaintiffs) (petition for writ of certiorari pending).

117.    In this action, the proposed class representative seeks to represent the following Proposed Class: All persons against whom Defendant—including all of Defendant's officers, troopers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendant, including but not limited to every New Hampshire County Attorney, municipal prosecutor, police prosecutor, or peace officer—is enforcing, or will enforce, RSA 644:6.

118.    The proposed class satisfies the prerequisites of Rule 23(a).

119.    The proposed class satisfies the numerosity requirements of Fed. R. Civ. P. 23(a)(1) because the proposed class is so numerous that joinder of all members is impracticable.   For example, based on data from the New Hampshire court system, for the twelve years from January 1, 2013 to December 31, 2024, approximately 2,364 cases were filed in which a violation of RSA 644:6 was alleged—an average rate of approximately 197 filed cases per year.   *See Exhibits I, J, and K*.

120.    Joinder also is impracticable because of the sheer number of proposed class members and because membership in the class will be constantly changing as more people are subjected to RSA 644:6's facially unconstitutional provisions throughout New Hampshire, with many of those impacted being poor, unhoused, and unrepresented, with little ability to contest the enforcement.

121.    The class meets the commonality requirements of Fed. R. Civ. P. 23(a)(2).  The members of the proposed class are subject to a common practice: the enforcement of RSA 644:6's facially invalid provisions.  If Defendant and his agents are permitted to enforce RSA 644:6, all members of the class will be subject to a common harm through the enforcement against them of a facially unconstitutional law.  This suit also raises questions of law common to the proposed class, including whether RSA 644:6 facially violates the United States Constitution. And all members also seek the same relief: a declaratory judgment that RSA 644:6 is facially unconstitutional and an injunction against enforcement of this statute.

122.    The proposed class meets the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the claims of the proposed class representative are typical of the claims of the class.  The proposed class representative and the proposed class are all persons who are subjected, or will be subjected, to the facially unconstitutional provisions of RSA 644:6.  Each class member who is

having RSA 644:6 enforced against them, or will have RSA 644:6 enforced against them, faces the same injury based on the same government practice—namely, the enforcement as to them of a facially unconstitutional statute.

123.    The adequacy requirements of Fed. R. Civ. P. 23(a)(4) also are met.  The proposed class representative seeks the same relief as the other members of the class—among other things, a declaratory judgment that RSA 644:6 is facially unconstitutional and an injunction against enforcement of this statute.  In defending his rights, the proposed class representative will defend the rights of all proposed class members fairly and adequately.  The proposed class representative is a member of the class, and his interests do not conflict with those of the other class members. The proposed class is represented by experienced attorneys from the American Civil Liberties Union of New Hampshire.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court and representing individuals challenging government actions.  Accordingly, the interests of the members of the class will be fairly and adequately protected by the proposed class representative and his attorney.

124.    The proposed class also satisfies Fed. R. Civ. P. 23(b)(2). Defendant and his agents have acted (or will act) in the same unconstitutional manner with respect to all class members by enforcing RSA 644:6 in violation of the Constitution.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### COUNT I

**42 U.S.C. § 1983 – FOURTEENTH AMENDMENT
VIOLATION OF LIBERTY WITHOUT DUE PROCESS OF LAW**

125.    All prior paragraphs are incorporated.

126.    Section 1 of the Fourteenth Amendment states that no state shall "deprive any

person of life, liberty, or property, without due process of law."

127.    RSA 644:6 is unconstitutionally vague under the Fourteenth Amendment's Due Process clause.

128.    The United States Supreme Court has held that laws are unconstitutionally vague when they do not give adequate notice of the prohibited conduct or would allow for arbitrary enforcement thereby denying personal liberty. *See City of Chicago v. Morales*, 527 U.S. 41 (1999) (holding that an ordinance requiring police officers to order loitering people to disperse and making failure to obey such an order a violation was unconstitutionally vague). "Vagueness may invalidate a criminal law for either of two independent reasons.  First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Id.* at 56.

129.    RSA 644:6 satisfies either definition of vagueness.  This law is unconstitutionally vague because it does not provide fair notice by properly defining the prohibited conduct of "loitering or prowling," fails to define key terms and phrases, and permits arbitrary enforcement by law enforcement officers.  RSA 644:6 is just as ambiguous as the statute struck down in *Kolender*.

130.    Defendant's failure to adequately define the prohibited conduct in RSA 644:6 deprives Plaintiff and the proposed class of adequate notice, renders the statute unconstitutionally vague, and infringes on the constitutional right to personal liberty held by Plaintiff and the proposed class.

131.    RSA 644:6 is unconstitutionally overbroad in that it prohibits unavoidable, harmless, innocent conduct that all people engage in within public spaces, such as standing, sitting, or congregating in a way a police officer arbitrarily determines "warrant[s] alarm for the safety of

persons or property in the vicinity." *See* RSA 644:6, I.  It also is unconstitutionally overbroad because it impinges on constitutional rights, including the freedom to "loiter" for innocent purposes, the right to travel, freedom of expression and speech, and the right against self-incrimination.

132.    As such, this overbroad statute, preventing Plaintiff and the proposed class from innocently existing in public spaces and deeming illegal otherwise innocent conduct, violates the liberty of Plaintiff and the proposed class protected by the Due Process Clause of the Fourteenth Amendment.

133.    Without a well-defined standard of responsibility, law enforcement officials and judges are given nearly unfettered discretion to apply their own standards.  RSA 644:6 is, thus, susceptible to arbitrary, uneven, and selective enforcement.

134.    The State's interest in preventing ambiguous "loitering or prowling" is insufficient to justify the repressive effects that RSA 644:6 imposes.  If a person is engaging in behavior that gives law enforcement reason to believe that the person may have committed some other crime (or attempted crime)—such as trespass, theft, burglary, etc.—then law enforcement can use those articulable facts to support further investigation, detention, and arrest for whatever the underlying offense may be.

135.    As such, RSA 644:6 is unconstitutionally vague on its face and violates the Fourteenth Amendment rights of Plaintiff and the proposed class.

136.    The violation of the rights of Plaintiff and the proposed class was caused by the policy, practice, and/or custom of the Defendant in enforcing RSA 644:6 that contains vague and arbitrary provisions.

137.    The policies, practice, and/or customs of the Defendant in enforcing RSA 644:6

violated the United States Constitution and were a significant factor behind the injuries of Plaintiff and the proposed class.

138.    Plaintiff and the proposed class have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law, and have been directly damaged as a result of the Defendant's conduct.

## COUNT II

### 42 U.S.C. § 1983 – FOURTH AMENDMENT VIOLATION

139.    All prior paragraphs are incorporated.

140.    The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures.

141.    The Fourth Amendment is applied to the states through the Fourteenth Amendment.

142.    Under RSA 644:6, a police officer may stop and question a person based solely on undefined and subjective "circumstances that warrant alarm." This statute violates the Fourth Amendment because it permits investigatory stops absent reasonable and articulable suspicion of criminal activity.

143.    Furthermore, under RSA 644:6, if a person fails to respond or his response is deemed inadequate, this mere suspicious conduct can serve as a predicate for arrest, conviction, and punishment.  The statute exceeds the bounds of the Fourth Amendment because it allows an officer to conduct an arrest where the officer merely observes suspicious conduct not amounting to probable cause.

144.    As such, RSA 644:6 is unconstitutional on its face and violates the Fourth and Fourteenth Amendment rights of Plaintiff and the proposed class.

145.    The violation of the rights of Plaintiff and the proposed class was caused by the

policy, practice, and/or custom of the Defendant in enforcing RSA 644:6 that allows law enforcement officers to stop any individual in New Hampshire without first having the requisite reasonable and articulable suspicion of criminal activity, and to arrest individuals without probable cause.

146.    The policies, practice, and/or customs of the Defendant in enforcing RSA 644:6 violated the United States Constitution and were a significant factor behind the injuries of Plaintiff and the proposed class.

147.    Plaintiff and the proposed class have suffered and continue to suffer irreparable harm for which there is no adequate remedy at law, and have been directly damaged as a result of the Defendant's conduct.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.    Provisionally or permanently certify this matter as a class action, appoint proposed class representative Plaintiff as class representative, and appoint his counsel from the ACLU of New Hampshire as class counsel;

B.    Declare that RSA 644:6 is unconstitutional on its face in violation of the Fourteenth and Fourth Amendments to the United States Constitution;

C.    Enjoin the Defendant—including all of Defendant's officers, troopers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendant, including but not limited to every New Hampshire County Attorney, municipal prosecutor, police prosecutor, or peace officer—from enforcing RSA 644:6 against Plaintiff and against the class;

D.    Award Plaintiff attorneys' fees in this action pursuant to 42 U.S.C. § 1988(b);

E.    Award Plaintiff the costs of suit; and

F.    Grant such other and further relief as this Court deems just and proper in the circumstances.

Respectfully submitted,

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
AMERICAN CIVIL LIBERTIES UNION OF NEW
  HAMPSHIRE
Concord, NH  03301
Tel.: 603.224.5591
gilles@aclu-nh.org
henry@aclu-nh.org

Date:   September 30, 2025