### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ROBERT CLARK, individually and on behalf of himself and all others similarly situated, | |
| Plaintiff, | |
| v. | Case No.: 1:25-cv-00379-PB-AJ |
| JOHN M. FORMELLA, in his official capacity only as Attorney General of the State of New Hampshire, | |
| Defendant. | |

### PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS

## TABLE OF CONTENTS

Introduction…………………………………………………………………………..1

Argument………………………………………………………………………….6

I.    Plaintiff Has Sufficiently Pled Standing…………………………………………..6

II.    Plaintiff's Claims Survive Under Fed. R. Civ. P. 12(b)(6)………………………….12

    A.    Plaintiff Has Sufficiently Pled a Vagueness Claim Under the Fourteenth Amendment's Due Process Provisions……………………………………..13

        1.    "Under circumstances that warrant alarm for the safety of persons or property in the vicinity"…………………………………………………..14

            a.    This Phrase's Ambiguity……………………………………14

            b.    This Phrase's Failure to Require Criminality, and Defendant's Improper Narrowing Constructions………………………………18

        2.    Four Nonexhaustive Factors…………………………………………...23

        3.    Identify-and-Explain-Presence Requirement…………………………..24

        4.    Heightened Vagueness Scrutiny Applies……………………………...28

    B.    Plaintiff Has Sufficiently Pled a Claim Under the Fourth Amendment's Right Against Unreasonable Seizures………………………………………………..32

        1.    RSA 644:6 Improperly Allows an Arrest For Mere Suspicious Conduct Not Amounting to Probable Cause that a Crime Has Been, or Will Be, Committed……………………………………………………………..33

        2.    RSA 644:6 Violates *Terry v. Ohio*, 392 U.S. 1 (1968)…………………..38

**INTRODUCTION**

This lawsuit is a facial challenge to New Hampshire's "Loitering or Prowling" statute at N.H. Rev. Stat. Ann. § ("RSA") 644:6, which was enacted in 1971 as part of a larger effort to codify the criminal laws in New Hampshire and amended to its current form in 1985.  Under this statute, ordinary conduct—including standing, walking, or congregating in public—becomes unlawful if a police officer arbitrarily determines that this conduct is occurring "under circumstances that warrant alarm for the safety of persons or property in the vicinity."  *See* RSA 644:6, I.  Rather than articulate specific prohibited conduct, the statute defers almost entirely to a police officer's subjective view of what "warrants alarm."  "Loitering or prowling" is a violation-level offense, which carries a maximum penalty of a fine up to $1,000, *see* RSA 651:2, IV(a), plus a 24% penalty assessment (for a total $1,240.00).[1]  Police officers in New Hampshire aggressively enforce RSA 644:6.  Based on data from the New Hampshire state court system, for the 12 years from January 1, 2013 to December 31, 2024, approximately 2,364 cases were filed in which a violation of RSA 644:6 was alleged—an average rate of approximately 197 filed cases per year. *Exhibits I, J, and K*; Compl. ¶ 62.  These numbers represent only those instances of enforcement that resulted in charges, and not those instances in which enforcement of RSA 644:6 was threatened by police.

Loitering statutes and other vagrancy laws have historically been used in the United States to discriminate against marginalized communities.  Their broad prohibitions on innocent behaviors (like standing or congregating in public) have allowed police to target and arrest those deemed undesirable.  *See City of Akron v. Rowland*, 618 N.E.2d 138, 67 Ohio St. 3d 374, 377-80 (Ohio

---

[1] The full text of this challenged statute is attached to the Complaint as *Exhibit A*.  Further, all exhibits referenced herein are attached to Plaintiff's Complaint.

1993) (describing history); Compl. ¶¶ 39-49 (same).  RSA 644:6 is no exception.  Unhoused people are disproportionately targeted under the loitering statute.  Compl. ¶ 66.  State court records reveal numerous examples of unhoused individuals being aggressively charged under RSA 644:6 while being outside.  *Id.* ¶¶ 3, 67.  These examples highlight how the statute bestows on law enforcement the unfettered discretion to decide what circumstances "alarm" and when "alarm" is dispelled.  *Id.* ¶ 67.  Of the approximately 89 cases disposed of in the 9th Circuit Court District Division from July 1, 2021 to December 31, 2024 in which the Manchester Police Department charged a violation of RSA 644:6, at least 50 involved unhoused defendants (or 56% of these cases).  *Id.* ¶ 68.  Similarly, in the City of Concord, of the approximately 23 cases disposed of in the 6th Circuit Court District Division from July 1, 2021 to June 30, 2023 in which the Concord Police Department charged a violation of RSA 644:6, around ten cases concerned unhoused individuals (or 43% of these cases).  *Id.* ¶ 69.[2]  As described in detail in the Complaint, the arbitrary and problematic enforcement permitted by RSA 644:6's vague terms is not limited to unhoused

---

[2] The unhoused community has been aggressively targeted by governments since the United States Supreme Court's June 28, 2024 decision in *City of Grants Pass v. Johnson*, 603 U.S. 520 (2024), which held that the Eighth Amendment's Cruel and Unusual Punishments Clause did not prevent an Oregon city from enforcing an ordinance restricting camping in public spaces against unhoused individuals, even where they had no alternative place to sleep. For example, in the year that followed the Supreme Court's decision, the President issued an executive order seeking to "fight[] vagrancy" by "[s]hifting homeless individuals into long-term institutional settings for humane treatment through the appropriate use of civil commitment."  Compl. ¶ 6; *see also* Exec. Order "Ending Crime and Disorder on America's Streets," (July 24, 2025), https://www.whitehouse.gov/presidential-actions/2025/07/ending-crime-and-disorder-on-americas-streets/; *see also* Exec. Order No. 14252, 90 Fed. Reg. 14559 (Mar. 27, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/making-the-district-of-columbia-safe-and-beautiful/.  This targeting also has occurred in the states and in municipalities, including in New Hampshire. *See, e.g., One Year Since Grants Pass: Tackling the Criminalization of Homelessness*, Am. C.L. Union (June 23, 2025), https://www.aclu.org/one-year-since-grants-pass-tracking-the-criminalization-of-homelessness; Sadaf Tokhi, *Some Changes Evident as Manchester Enforces New Camping Ban*, NHPR (Aug. 8, 2024), https://www.nhpr.org/nh-news/2024-08-08/some-changes-evident-as-manchester-enforces-new-camping-ban; Ethan Dewitt, *In Wake of Supreme Court Homelessness Decision, NH Advocates Say Fight Not Over*, N.H. Bulletin (July 9, 2024) ("On July 2, the Manchester Board of Mayor and Aldermen voted to strengthen a ban on camping on city property, subjecting people to fines. And the board removed an exception that had allowed camping during evening hours if there were not enough shelter beds available.  The vote, which will make it easier for city officials to remove encampments on public sidewalks and parks, was a priority for Mayor Jay Ruais, a Republican who was elected in November. And it heralds a potential shift in the way New Hampshire cities and towns approach homelessness after the Supreme Court ruling, critics say."),  https://newhampshirebulletin.com/2024/07/09/in-wake-of-supreme-court-homelessness-decision-nh-advocates-say-fight-not-over/.

2

individuals. *Id.* ¶ 70.    Moreover, notwithstanding RSA 644:6's status as a violation-level offense, law enforcement's use of this statute, on information and belief, also can be pretextual, for example to justify the stop and detention of people to investigate criminal behavior, to engage in warrant checks, and to search people and their belongings for contraband. *Id.* ¶ 73.[3]

To date, the New Hampshire Supreme Court has not addressed the facial constitutionality of RSA 644:6. *See State v. Jaroma*, 137 N.H. 562, 568 (1993) (declining to address claim that "RSA 644:6 is unconstitutionally vague on its face"). Despite the large volume of loitering cases, RSA 644:6 rarely has been the subject of a facial challenge. This may be because individuals charged under this statute—especially those who are poor or unhoused—often do not have access to counsel, let alone the means, experience, and motivation to develop a record to litigate facial constitutional claims such as those brought here. Because a loitering conviction, by itself, does not lead to a term of imprisonment, people charged only under RSA 644:6 are not entitled to court-appointed counsel if they are indigent. Compl. ¶ 71. And if a facial constitutional challenge is raised, the State can dismiss a charge under RSA 644:6 to avoid judicial review of the statute's constitutionality. This appears to be what occurred in one case where a facial constitutional challenge was raised in Circuit Court, and then that charge was dropped. *Id.* ¶ 77; *see also Kolender v. Lawson*, 461 U.S. 352, 368 (1983) (Brennan, J., concurring) ("Such case-by-case scrutiny cannot vindicate the Fourth Amendment rights of persons like appellee, many of whom

---

[3] *See also* <u>Exhibit C</u>, at CASES020 (conducting warrant check after detention of unhoused, "suspicious male in the alley"); *id.*, at CASES051 (conducting warrant check after detention of two unhoused individuals sleeping in the stairs of a parking garage); *id.*, at CASES097 (noting unhoused woman "was eventually searched for weapons and means of escape with none being found"); *id.*, at CASES015 (conducting weapons check after detention of unhoused person); *id.*, at CASES109 (with respect to an unhoused person, noting "I checked [his] person for weapons, to which none were found"); *id.*, at CASES181 (conducting warrant check); *id.*, at CASES204 (detaining for warrant check); *id.*, at CASES219 (detaining for warrant check); id., at CASES224 (detaining for warrant check).

3

will not even be prosecuted after they are arrested.").[4]

Plaintiff has sufficiently pled RSA 644:6's facial unconstitutionality at this early stage. As the United States Supreme Court has repeatedly recognized over the last fifty years, vague laws like New Hampshire's loitering statute offend the Constitution's Due Process guarantees if they either (i) fail to give adequate notice of what conduct is prohibited, or (ii) invite arbitrary enforcement. *See Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972); *Kolender v. Lawson*, 461 U.S. 352, 361 (1983); *City of Chicago v. Morales*, 527 U.S. 41, 60 (1999) (plurality op. at Part IV); *see also City of Grants Pass v. Johnson*, 603 U.S. 520, 590 (2024) (Sotomayor, J., dissenting) (explaining that these and other precedents finding "some vagrancy laws [ ] unconstitutionally vague" remain unaffected by the *Grants Pass* holding). RSA 644:6 is unconstitutionally vague under both criteria, as the law continues a shameful legacy of vagrancy laws that used intentionally broad language to criminalize disfavored groups, and gives the police discretion to try to predict future criminal behavior (but without requiring actual criminal misconduct). Compl. ¶¶ 79-109. Separately, RSA 644:6 violates the Fourth Amendment in two ways. *Id.* ¶¶ 110-115. The statute violates the Fourth Amendment's requirement that arrests must be predicated on probable cause of criminal activity, not mere suspicion. The statute also allows police to stop and question any law-abiding person appearing in public (who, nonetheless, is subjectively deemed to "warrant alarm") without the requisite reasonable and articulable suspicion of criminal activity required by *Terry v. Ohio*, 392 U.S. 1, 27 (1968).

It is perhaps because of these well-established legal principles that New Hampshire's

---

[4] *See* Mara Hoplamazian, *Facing Constitutional Questions, NH Prosecutors Drop 'Loitering and Prowling' Case Against Climate Activist*, NHPR (Sept. 28, 2023) ("Environmental justice activist Jess Mills was set to stand trial this week in New Hampshire. But days after his lawyer challenged the constitutionality of the law he was charged under, the Concord City Prosecutor's office dropped the case."), https://www.nhpr.org/nh-news/2023-09-28/loitering-prowling-climate-activist-protest-law-constitutionality.

loitering law, which is based on Section 250.6 of the 1962 Model Penal Code ("MPC"), is an outlier among the states. Compl. ¶ 56. While some municipalities throughout the country still have loitering provisions modeled on Section 250.6 of the 1962 MPC, it appears that only four other states have loitering statutes similar to Section 250.6 of the 1962 MPC—Arkansas, Delaware, Florida, and Georgia. *See* Ark. Code Ann. § 5-71-213(a)(1); Del. Code Ann. tit. 11, § 1321(6); Fla. Stat. § 856.021 (enacted in 1973 and, unlike RSA 644:6, contains "not usual for law-abiding individuals" language)[5]; Ga. Code Ann. § 16-11-36 (enacted in 1980 and, unlike RSA 644:6, contains "not usual for law-abiding individuals" language)[6]. On October 18, 2024, the Delaware Attorney General, following the filing of a lawsuit in July 2023, *see Wilmington Food Not Bombs v. Jennings*, 1:23-cv-00736-MN (D. Del.), agreed to not enforce Delaware's loitering law "until the Delaware General Assembly acts to amend these Statutes" in light of similar concerns. Compl. ¶ 61; *see also Exhibit D*. That law remains unenforced to date. And multiple courts have rejected similar anachronistic laws modeled after the 1962 MPC. *See, e.g.*, *City of Portland v. White*, 495 P.2d 778, 9 Ore. App. 239, 242 (Or. Ct. App. 1972); *City of Bellevue v. Miller*, 536 P.2d 603, 85 Wn.2d 539, 544 (Wash. 1975) (en banc); *Fields v. Omaha*, 810 F.2d 830, 833-34 (8th Cir. 1987); *State v. Bitt*, 798 P.2d 43, 118 Idaho 584, 590 (Idaho 1990).

For these reasons and the reasons explained below, this case, like prior constitutional cases

---

[5] *See State v. Ecker*, 311 So. 2d 104, 109 (Fla. 1975) (holding that Fla. Stat. § 856.021—which states, in part, that "[i]t is unlawful for any person to loiter or prowl in a place, at a time or in a manner *not usual for law-abiding individuals*, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity"—was constitutional) (emphasis added), *cert. denied*, 423 U.S. 1019 (1975); *Watts v. State*, 463 So. 2d 205, 207 (Fla. 1985) (affirming *Ecker* after *Kolender*).
[6] *See Bell v. State,* 313 S.E.2d 678, 252 Ga. 267, 270 (Ga. 1984) (upholding constitutionality of Ga. Code Ann. § 16-11-36, stating, in part, that "[a] person commits the offense of loitering or prowling when he is in a place at a time or in a manner *not usual for law-abiding individuals* under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity") (emphasis added).

5

heard by this, survives a motion to dismiss.[7]

## ARGUMENT

### I.    Plaintiff Has Sufficiently Pled Standing.

To establish standing, a plaintiff must show: (i) an "injury in fact" that is "concrete and particularized" and "actual or imminent," not "conjectural" or "hypothetical"; (ii) a "causal connection" between the injury and the defendant's conduct; and (iii) a likelihood that a favorable decision will "redress[]" the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To seek an injunction, a plaintiff must show "a sufficient likelihood that he will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). This requires either a "'substantial risk' that the harm will occur" or a threat that is "certainly impending." *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)); *see also Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) (holding that "a realistic risk of future exposure to the challenged policy" is sufficient to establish standing). Here, Defendant's standing challenge is focused on the first prong—namely, the question of whether Plaintiff's alleged injuries are "actual," "imminent," or "certainly impending." Def.'s Obj. at 7-8.

At this stage, Defendant is raising a "sufficiency challenge" to Plaintiff's standing under Fed. R. Civ. P 12(b)(1). In such a challenge, like a challenge under Fed. R. Civ. P. 12(b)(6), this Court "accepts the plaintiff's version of jurisdictionally-significant facts as true and addresses their sufficiency, thus requiring the court to assess whether the plaintiff has propounded an adequate basis for subject-matter jurisdiction." *See Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001). "In performing this task, the court must credit the plaintiff's well-pleaded factual

---

[7] *See, e.g., Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 464 (D.N.H. 2023) ("plaintiffs have pleaded a plausible claim that the amendments are unconstitutionally vague") (Barbadoro, J.); *see also Libertarian Party of N.H. v. Gardner*, No. 14-cv-00322-PB, 2014 U.S. Dist. LEXIS 178195, at *1-2 (D.N.H. Dec. 30, 2014) (Barbadoro, J.).

allegations (usually taken from the complaint, but sometimes augmented by an explanatory affidavit or other repository of uncontested facts), draw all reasonable inferences from them in her favor, and dispose of the challenge accordingly." *Id.* Here, Plaintiff has standing to seek prospective declaratory and injunctive relief based on the well-pled allegations that (i) Defendant has adopted an unlawful policy or practice of enforcing RSA 644:6's facially unconstitutional provisions, and (ii) there is a substantial or realistic risk that Plaintiff will be exposed to this unlawful policy or practice.

*First*, Defendant does not appear to meaningfully dispute that it has adopted a policy and practice of enforcing RSA 644:6. Compl. ¶¶ 136, 145. Defendant, in fact, doubles down on its ability to enforce the loitering law, rather than disclaiming its ability to do so. *See Drewniak v. United States Customs & Border Prot.*, 554 F. Supp. 3d 348, 365 (D.N.H. 2021) (finding standing, in part, where defendant has not stated that it "has abandoned" the alleged unconstitutional practice). "Courts have held that plaintiffs have standing to pursue injunctive or declaratory relief when the constitutional violations complained of stem from 'a pattern of … behavior' or 'an officially authorized policy.'" *Id.* at 364 (quoting *McBride v. Cahoone*, 820 F. Supp. 2d 623, 634 (E.D. Pa. 2011) (collecting cases)). "The rationale for permitting injunctive or declaratory relief to abate a pervasive practice or official policy is that, where a past injury is alleged to be due to the practice or policy, there is a substantial likelihood that the injury will recur." *Id.* (citing cases). Here, based on data from the New Hampshire state court system, for the 12 years from January 1, 2013 to December 31, 2024, approximately 2,364 cases were filed in which a violation of RSA 644:6 was alleged—an average rate of approximately 197 filed cases per year. Compl. ¶¶ 62, 119; *see also Exhibits I, J, and K*. It is likely that this statute is used at even higher rates to stop, question, and "move along" individuals from public places without the filing of a charge. *Id.* ¶ 64.

And Plaintiff explains that this enforcement of the loitering law disproportionately falls on those who are unhoused like Plaintiff.  *Id.* ¶ 67.  Plaintiff can show future injury here when "[t]he offending policy remains firmly in place."  *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 306 (1st Cir. 2003) (finding standing in ADA case, in part, because offending policy of retail store was still in existence).[8]  This past enforcement—and intention to enforce RSA 644:6 in the future—supports standing, as "the frequency of alleged injuries inflicted by the practices at issue … creates a likelihood of future injury sufficient to address any standing concerns."  *Floyd v. City of New York*, 283 F.R.D. 153, 170 (S.D.N.Y. 2012); *see also Drewniak*, 554 F. Supp. 3d at 365.  Many courts have distinguished *Lyons* on this basis.[9]

*Second*, there is a substantial risk that Plaintiff will be exposed to Defendant's unlawful policy and practice of enforcing RSA 644:6's facially invalid provisions given his own personal experience as an unhoused person, combined with the State's aggressive policy of enforcing RSA

---

[8] *See also, e.g., Mack v. Suffolk County*, 191 F.R.D. 16, 20-21 (D. Mass. 2000) (strip searches); *Petrello v. City of Manchester*, No. 16-cv-008-LM, 2017 U.S. Dist. LEXIS 144793, at *65 (D.N.H. Sep. 7, 2017) (granting injunction against a police department's practice of enforcing RSA 644:2, II(c) against passive panhandlers who do not step into the road or otherwise physically obstruct traffic).

[9] *See also, e.g.*, *McBride v. Cahoone*, 820 F. Supp. 2d 623, 633 (E.D. Pa. 2011) ("the *Lyons* Court rested its decision largely on the fact that City policy did not authorize police officers to use illegal chokeholds"); *Smith v. City of Chi.*, 143 F. Supp. 3d 741, 752 (N.D. Ill. 2015) ("In addition, Plaintiffs have alleged ongoing constitutional violations pursuant to an unconstitutional policy or practice in tandem with allegations that CPD officers repeatedly subjected them to unconstitutional stops and frisks, which leads to the reasonable inference of the likelihood that CPD officers will unlawfully stop and frisk Plaintiffs in the future."); *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-80 (D. Ariz. 2011) ("In *Lyons* itself, the court wrote that a victim of police misconduct could seek an injunction if he could show that department officials 'ordered or authorized police officers to act in such manner.' MCSO affirmatively alleges that its officers are authorized to stop individuals based only on reasonable suspicion or probable cause that a person is not authorized to be in the United States. This assertion establishes the standing of all named Plaintiffs to seek injunctive relief."); *Rodriguez v. Cal. Highway Patrol*, 89 F. Supp. 2d 1131, 1142 (N.D. Cal. 2000) (noting that "Plaintiffs allege a pattern and practice of illegal law enforcement activity," whereas the *Lyons* complaint "did not assert that there was a pattern and practice of applying choke holds without provocation"); *Nat'l Cong. for Puerto Rican Rights by Perez v. City of N.Y.*, 75 F. Supp. 2d 154, 161 (S.D.N.Y. 1999) ("Here defendants' policy, evidenced by a pervasive pattern of unconstitutional stops and frisks, has allegedly affected tens of thousands of New York City residents, most of whom have been black and Latino men. Courts have not been hesitant to grant standing to sue for injunctive relief where numerous constitutional violations have resulted from a policy of unconstitutional practices by law enforcement officers.") (internal citations omitted).

644:6, including against unhoused people.  Compl. ¶¶ 61-69.[10]  To be clear, Plaintiff need not prove that he "inevitably will suffer" future injury.  *See Dimarzo v. Cahill*, 575 F.2d 15, 18 (1st Cir. 1978).  As explained in the Complaint, Plaintiff "reasonably fears future prosecution under RSA 644:6, especially where he continues to be unhoused and present in public spaces in New Hampshire," and where he "has been threatened with the law's enforcement many times."  Compl. ¶ 22.  For example, a month or two prior to the filing of the Complaint in September 2025—while Plaintiff "was walking through Concord at around 1:00 a.m., and he checked an outside ash tray for cigarettes adjacent to the Quick Stop at 201 South Main Street (which was closed at the time) while he was on his way to West Street"—"two bicycle police officers from the Concord Police Department detained him, ran his name through their system using their radio, and told him that if he was outside a business when it was closed, he could be arrested for loitering."  *Id.*  "They told him to leave the property, and they watched him until he left the property."  *Id.*  Further, "[w]ithin

_____

[10] Plaintiff is now living in an apartment in Franklin, which began on around December 11, 2025—over two months after this lawsuit was filed on September 30, 2025.  Plaintiff disclosed this fact to Defendant on December 18, 2025.  However, Plaintiff's standing should be evaluated "at the time the action commences" (here, as of September 30, 2025), and this Court cannot consider events after the filing of his original Complaint.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000) (noting that "we have an obligation to assure ourselves that FOE had Article III standing at the outset of the litigation").  At best, events following the filing of Plaintiff's September 30, 2025 Complaint would only be relevant under the doctrine of mootness where Defendant has the "heavy burden" to show that intervening events "make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur."  *Id.* at 189 (quoting *United States v. Concentrated Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968)); *Becker v. FEC*, 230 F.3d 381, 386 n.3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter.").  In any event, this change in Plaintiff's circumstances does not alter the fact that Plaintiff was homeless for 13 years and that he has been subject to the "unpredictable nature of homelessness."  *See Cross v. City of Sarasota*, No. 15-CV-02364-EAK-JSS, 2016 U.S. Dist. LEXIS 80772, at *9-10 (M.D. Fla. June 21, 2016) ("The unpredictable nature of transitional housing and lack of a long-term nighttime residence subjects Plaintiffs to a higher probability of being subjected to the disputed action than the plaintiff in *Lyons*."); *see also Poe v Snyder*, 834 F. Supp. 2d 721, 729 (W.D. Mich. 2011) ("Even though some Plaintiffs have found more permanent housing, it is likely that Plaintiffs will need the services of an emergency overnight shelter in the future."); *City of Grants Pass, Oregon v. Johnson*, 603 U.S. 520, 553 (2024) ("Often, a city's homeless population fluctuates dramatically, in part because *homelessness is an inherently dynamic status*.") (emphasis added).  Nor has Defendant voluntarily ceased its practice of enforcing RSA 644:6, let alone "refuse[d] to disavow prosecuting" people for loitering under RSA 644:6 "for the conduct they currently engage in."  *See N.H. Lottery Comm'n v. Barr*, 986 F.3d 38, 54 (1st Cir. 2021) (claim not moot where there was not disavowal); *see also FBI v. Fikre*, 601 U.S. 234, 243 (2024) ("A defendant's speculation about a plaintiff's actions cannot make up for a lack of assurance about its own.").

9

the past couple of years, [Plaintiff] also has repeatedly been told by the Concord Police Department to 'keep moving' and 'move along' from public places in Concord, including near the Eagle Square Clock Tower at 90 North Main Street, and while he was sitting on the rock wall part of the sidewalk outside the McDonald's restaurant on 90 South Main Street.  When the officers did this, they would run his name, and tell him to 'hold on a minute' while they do that.  He felt that he was not free to go until that process was complete."  *Id.*  "Also, within the past couple months [prior to the filing of the Complaint in September 2025], [Plaintiff] has been told two or three times by the police 'you can't just keep loitering around here' in Eagle Square, Bicentennial Square, and the Market Basket parking lot on Storrs Street in Concord.  During these interactions, the Concord Police Department ran his name, and he felt that he was not free to leave until they finished running his name, as the officers said on multiple occasions to 'hold on a second until we check for warrants.'"  *Id.*

Accordingly, as of the filing of the Complaint on September 30, 2025, Plaintiff—because he is regularly present in public spaces in New Hampshire and is a member of the very group that is regularly subjected to the unconstitutional enforcement of RSA 644:6 (namely, unhoused individuals)—"is at increased risk of encounters with law enforcement."  *Id.* ¶ 23; *cf. Kolender*, 461 U.S. at 355 n.3 (finding that plaintiff has standing to allege that the loitering law facially violated due process where the plaintiff "has been stopped on approximately 15 occasions pursuant to [the challenged law], and that these 15 stops occurred in a period of less than two years").[11]

---

[11] *See also Berner v. Delahanty*, 129 F.3d 20, 24 (1st Cir. 1997) (standing to challenge judge's policy exists where "Berner is a member of the Maine bar and a full-time practicing lawyer who regularly handles litigation," though the lawyer might have had future cases assigned to 15 other judges); *Alasaad v. Nielsen*, No. 17-cv-11730-DJC, 2018 U.S. Dist. LEXIS 78783, at *34 (D. Mass. May 9, 2018) (holding that plaintiffs' allegations that they regularly travel outside the U.S. for work, visit friends and family, engage in vacation and tourism, and will continue to do so in the future were sufficient to allege actual or imminent injury to provide standing to challenge ICE's practice of searching electronic devices at ports of entry and, in some instances, confiscating the devices being searched); *Ibrahim v. DHS*,

Given Plaintiff's own behavior, along with his status in a group that is regularly subjected to RSA 644:6, this is not a case in which Plaintiff has alleged "a vague intent" to engage in activities that likely will subject himself to RSA 644:6. *See Drewniak.*, 554 F. Supp. 3d at 363.[12]

Defendant's additional arguments against standing should be rejected. Defendant claims that Plaintiff does not have standing because he does not allege that he has been arrested for a violation of the statute or threatened with its enforcement "under circumstances in which he was engaged in a course of constitutionally protected conduct." Def.'s Obj. at 9. Setting aside RSA 644:6's impact on Plaintiff's ability to exist in public places, *see* Compl. ¶¶ 23, 132, through his "right to freedom of movement" *see Kolender*, 461 U.S. at 358; *Morales*, 527 U.S. at 54 (plurality op. at Part III), this is not a requirement for standing where Plaintiff need only show that there is a substantial likelihood that he will be injured through the challenged practice—here, having RSA 644:6's facially invalid provisions enforced against him given the unfettered discretion this law gives police to stop and arrest people who are like him. Further, Defendant argues that standing does not exist because Plaintiff has not alleged that he "intends to appear in a public place under circumstances that would warrant alarm for the safety of people or property in the vicinity" under RSA 644:6. *Id.* But the case law is clear that a person need not admit to an intention to violate a

---

669 F.3d 983, 993–94 (9th Cir. 2012) (plaintiff sufficiently pled standing to challenge the presence of her name on government watchlists).

[12] Though not dispositive, "past injury [is] probative of likely future injury." *See Suhre v. Haywood Cty.*, 131 F.3d 1083, 1088 (4th Cir. 1997) (discussing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 210-11 (1995)) ("A pattern of past participation in the challenged contract bidding process and the stated intention to participate in that process in the future combined to give the plaintiff standing."). Apart from the threats of enforcement Plaintiff has experienced, Plaintiff has been charged twice under this statute, "[t]hough standing here is not exclusively based on these [two] prior prosecutions." Compl. ¶ 24; *see also Alasaad*, 2018 U.S. Dist. LEXIS 78783, at *32-33 ("Plaintiffs' subjection to prior searches further bolsters their allegations of likely future searches."). However, Defendant complains that Plaintiff did not challenge the facial constitutionality in both cases. Def.'s Obj. at 8. Plaintiff did not need to, as one charge was nolle prossed and the other placed on file without a finding. Compl. ¶¶ 32-33. Further, Defendant claims that Plaintiff "does not allege that there is any charge pending against him." Def.'s Obj. at 8. But if Defendant was subject to a pending charge, Defendant presumably would assert that his facial claims are barred under the *Younger* abstention doctrine. *See Holloway v. Governor*, No. 21-cv-865-PB, 2022 U.S. Dist. LEXIS 173719, at *9-10 (D.N.H. Sept. 26, 2022) (explaining *Younger* abstention doctrine) (Barbadoro, J.).

law to have standing to challenge it.[13]  Nor is Plaintiff arguing that all unhoused people in New Hampshire *per se* have standing to challenge RSA 644:6.  Def.'s Obj. at 10.  Rather, Plaintiff's claim is that he has individual standing because *both* he is part of a group that is routinely subjected to this law and he has personally experienced being threatened with prosecution.

## II.    Plaintiff's Claims Survive Under Fed. R. Civ. P. 12(b)(6).

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must make factual allegations sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "In analyzing whether dismissal is appropriate, the court must accept as true all well-pleaded facts set forth in the complaint and must draw all reasonable inferences in the plaintiff's favor." *United States v. Isaacson*, No. 09-cv-332-JL, 2011 WL 2783993, 2011 U.S. Dist. LEXIS 77280, at *3 (D.N.H. July 15, 2011) (Laplante, J.) (citing *Tasker v. DHL Ret. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).  Under Fed. R. Civ. P. 12(b)(6), this Court may consider "facts and documents that are part of or incorporated into the complaint," as well as "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citations omitted).

---

[13] *See Babbitt v. UFW Nat'l Union*, 442 U.S. 289, 298 (1979) ("When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.'") (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007) ("[W]here threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced.").

A.    **Plaintiffs Has Sufficiently Pled a Vagueness Claim Under the Fourteenth Amendment's Due Process Provisions.**

At the outset, the standard to be applied in a facial vagueness claim has been addressed by this District.[14]  "[T]he void-for-vagueness doctrine does not require a showing that a statute is vague in all of its applications." *Local 8027 v. Edelblut*, 651 F. Supp. 3d 444, 459 (D.N.H. 2023) (Barbadoro, J.). "[T]hat some conduct clearly falls within the" law's "scope is insufficient to defeat [a] vagueness claim." *See id.*  The Supreme Court has long held that a criminal statute may be facially invalid "even when it could conceivably have had some valid application." *See Kolender*, 461 U.S. at 358 n.8 (citing *Colautti v. Franklin*, 439 U.S. 379, 394-401 (1979)).

The due process protections found in the Fourteenth Amendment require criminal laws to provide fair notice of what conduct is prohibited and to establish minimal guidelines for law enforcement.  An enactment is void for vagueness if its "prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A statute can be impermissibly vague (i) if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (ii) if it "authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008); *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *Morales*, 527 U.S. at 56 (plurality op. at Part III); *Kolender*, 461 U.S. at 357-58.  The Supreme Court further observed in *Kolender* that "the more important aspect of the vagueness doctrine is … the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)) (internal quotation marks omitted).  Laws that are written so broadly as to prohibit everyday behavior, regardless of a person's intent to

---

[14] *See Local 8027*, 651 F. Supp. 3d at 457–59; *Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052, at *12 (D.N.H. May 28, 2024) (Barbadoro, J.) (pending appeal filed July 26, 2024; argued on April 8, 2025); *Nat'l Educ. Ass'n v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 149, 185–86 (D.N.H. 2025) (adopting standard in *Local 8027*) (McCafferty, J.); *Nat'l Educ. Ass'n-New Hampshire v. NH AG*, 806 F. Supp. 3d 166, 192 n.16 (D.N.H.  2025) (same) (McCafferty, J.).

13

commit a criminal act, unconstitutionally permit police to criminalize those deemed undesirable, but who are not chargeable with any specific offense. *See Papachristou*, 405 U.S at 166-68. Similarly, laws that define criminal activity in "inherently subjective" terms, leaving it to police officers to determine what conduct is criminal, do not comport with due process. *See Morales*, 527 U.S. at 62 (majority op. at Part V). RSA 644:6 violates these vagueness principles in at least the three ways detailed below. It fails to provide notice to ordinary Granite Staters of what circumstances would "warrant alarm" and of what explanations could dispel it. RSA 644:6 does not require an overt act or substantial step towards the commission of a crime,[15] let alone any intent to commit a crime. Rather, a violation of the statute turns entirely on police officers' subjective determinations.

### 1. "Under circumstances that warrant alarm for the safety of persons or property in the vicinity"

#### a. This Phrase's Ambiguity.

RSA 644:6, I's phrase "under circumstances that warrant alarm for the safety of persons or property in the vicinity" is unconstitutionally vague because it contains no definitions and neither requires an overt act of criminal conduct nor an intent to commit a crime.

For example, the phrase "alarm" is undefined. What (or who) alarms one person may be unremarkable to another. "Alarm" is commonly defined as a "sudden sharp apprehension and fear resulting from the perception of imminent danger"[16]—a definition that highlights the inherent subjectivity of the statute. Under this definition, it is not what a person does—but rather the "apprehension and fear" that they (or their circumstances) instill in some undefined other person

---

[15] "A person is guilty of an attempt to commit a crime if, with a purpose that a crime be committed, he does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step toward the commission of a crime." RSA 629:1, I.

[16] *Merriam-Webster* Dictionary, *Alarm*, https://www.merriam-webster.com/dictionary/alarm (last visited April 22, 2026).

(here, in practice, the police officer making the decision to detain or arrest)—that matters.  The statute similarly does not define "safety" or explain what "safety" threats may exist to persons or property.  It also does not define "vicinity," or elaborate on how large of a geographic region may be considered "in the vicinity."[17]  Because the statute lacks definitions of these terms, an ordinary person in New Hampshire cannot know whether, at any given moment, they are "appearing in a place or at a time under circumstances that warrant alarm for the safety of persons or property in the vicinity."

Multiple courts have concluded that similar laws are unconstitutional given this lack of clarity.  *See, e.g., Portland*, 9 Ore. App. at 242; *Bellevue*, 85 Wn. 2d at 544.  For example, in *Portland*, the Court of Appeals in Oregon examined a municipality's loitering ordinance modeled after the 1962 MPC, and held that the terms "loiter" and "prowl" "standing alone are so elastic that men of common intelligence must necessarily guess their meaning."  9 Ore. App. at 242.  The Court added that this ambiguity is not cured by the phrase "in a place, at a time or in a manner not usual for law abiding persons."  *Id.*  Citing *Papachristou*, the Court explained that "[w]hat seems usual to one 'law abiding person' might seem quite unusual to another."  *Id.*  Similarly, in *Bellevue*, the Supreme Court of Washington deemed unconstitutional a wandering/prowling ordinance that contained the phrase "in a place, at a time, or in a manner, and under circumstances, which manifest an unlawful purpose or which warrant alarm for the safety of persons or property in the vicinity." *Bellevue*, 85 Wn. 2d at 542.  There, the Court found that "[a] determination of whether particular activity manifests an unlawful purpose or creates alarm is entirely dependent upon a police officer's opinion, not only with respect to what conduct the ordinance prohibits, but also with

---

[17] *See Chapdelaine v. Neronha*, 662 F. Supp. 3d 167, 181 (D.R.I. 2023) (holding that, since "neither an ordinary person nor law enforcement could understand the statutory language that attempts to define the boundaries of residences and schools," the residency prohibition is unconstitutionally void for vagueness).

15

respect to the suspected import of the activity observed. Such extravagant police discretion is plainly improper." *Id.* at 544-45.[18] RSA 644:6's use of the phrase "under circumstances that warrant alarm for the safety of persons or property in the vicinity" suffers from these same problems. As in *Portland* and *Bellevue*, laws like RSA 644:6 "which purport[] to define illegality by resort[ing] to such inherently subjective terms as … 'alarm' permit[], indeed require[], an *ad hoc* police determination of criminality." *See id.* at 545. Thus, legislation like RSA 644:6 "is vague because there can be no prior notice of what conduct an individual officer will find sufficiently suspicious to warrant arrest. The potential for arbitrary and discriminatory law enforcement under such legislation cannot constitutionally be tolerated." *Id.*

The unfettered discretion bestowed on the police in interpreting the phrase "under circumstances that warrant alarm for the safety of persons or property in the vicinity" also invites bias against groups of people who are perceived to be out of place, threatening, or dangerous, including unhoused individuals. For example, on September 14, 2018, the Manchester Police Department arrested an unhoused "disheveled" man who, during an afternoon, "was behind a small set or bushes/trees, positioned in a sitting/squatting position in the corner of" a corporate office building in Manchester "between the building and the fence line" and who said he was there to "eat a snack." <u>Exhibit C</u>, at CASES001-08; Compl. ¶ 67(a). On March 31, 2022, the Manchester Police Department handcuffed and charged with loitering an unhoused man who, during an afternoon, was "rustling around in a pile of blankets on the front steps of New Hampshire Fire Insurance Company," who appeared to bury himself in his blankets when he saw three police officers, and who then "abruptly ducked his head and crawled behind a stone pillar" before trying

---

[18] *See also Morales*, 527 U.S. at 62 ("The 'no apparent purpose' standard for making [the] decision [whom to disperse] is inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene.") (majority op. at Part V)

to leave the area by hastily walking in between two of the officers. *See id.*, at CASES041-45; Compl. ¶ 67(e). On July 23, 2022, that same police department arrested an unhoused man for loitering who was sleeping in the middle of the night alongside another person near the stairs of a parking garage. *Exhibit C*, at CASES046-51; Compl. ¶ 67(f). To some officers, this same behavior may not constitute "alarm" at all given that phrase's vagueness and lack of definition. But it did to these officers in these cases. This is precisely the problem where the statute leaves officers with the ability to arbitrarily decide when it applies and when it does not, including based on their own biases.

Defendant cites several court cases applying RSA 644:6, suggesting that the phrase "under circumstances that warrant alarm for the safety of persons or property in vicinity" can be readily applied in individual cases based on a "consideration of all the circumstances" where "no single [consideration] may be dispositive." Def.'s Obj. at 18-21. But the fact that numerous circumstances go into considering whether "alarm" exists does not cure RSA 644:6's ambiguity. To the contrary, given the ambiguity of the phrase "alarm" and the near infinite permutations that go into an assessment of whether it exists, what may constitute "alarm" to one officer, lawyer, judge, or defendant may vary when examining or experiencing the same set of facts. As several cases bear out, RSA 644:6 leads to unpredictable applications, with judges, prosecutors, and police officers sometimes disagreeing when the statute can and cannot be used.[19]

---

[19] *Compare State v. Dodier*, 135 N.H. 134, 135 (1991) (where a police officer mistakenly thought the loitering statute provided justification to search a vehicle passenger compartment and where the superior court mistakenly agreed, the Supreme Court reversed the superior court where two men were found sitting in a pickup truck in a parling lot at 1:00 a.m., and the passenger made a "furtive gesture in placing the object in his hand beside the seat" at 1:00 a.m. at night; holding that this "furtive gesture" did not, by itself, warrant alarm "for the safety of persons or property") *and State of New Hampshire v. Gaynor*, No. 217-2024-cr-907, at *7-9 (Merrimack Cty. Super. Ct. Mar. 31, 2025) (rejecting State's argument that Concord Police Department officers had reasonable suspicion that a defendant was loitering because the defendant ran away from the officers in the middle of the day when it was bright out) (Edwards, J.) (*Exhibit P*), *with State v. Jaroma*, 137 N.H. 562, 564 (1993) (after apparent disagreement among the district court and

17

### b.      This Phrase's Failure to Require Criminality, and Defendant's Improper Narrowing Constructions.

RSA 644:6 is even more problematic because it omits the 1962 MPC's "in a manner not usual for law-abiding individuals" language. *See* <u>Exhibit E</u> (Model Penal Code § 250.6, cmt. 3, p. 390 (A.L.I. 1980), noting in 1980 comments that, "[a]s a threshold matter, the section requires at least some manifestation of abhorrent behavior. Specifically, the actor must loiter or prowl 'in a place, at a time, or in a manner *not usual for law-abiding individuals*'") (emphasis added). Defendant also appears to concede that it "might be true" that RSA 644:6 does not require loitering with an intent or purpose to commit a specific crime. Def.'s Obj. at 24. The omission of this "criminal activity" language in RSA 644:6 is critical. While Defendant asserts throughout its memorandum that "the reasonable suspicion standard" is built into RSA 644:6's "under circumstances that warrant alarm for the safety of persons or property in the vicinity" terminology, *see* Def.'s Obj. at 17, 22-23, the real question is "reasonable suspicion" of what? Here, RSA 644:6's text is not tethered to reasonable suspicion of any criminal activity.[20]

---

superior court, finding reasonable suspicion for a loitering *Terry* stop and probable cause for a loitering arrest, in part, when a police officer saw a vehicle exit a parking lot at 30 miles per hour at 4:30 a.m., where there had been several burglaries over the past year in the area, and the officer knew that the vehicle did not belong to any of the businesses). Again, even if some of these were appropriate applications of RSA 644:6, the standard for a facial vagueness claim does not require that RSA 644:6 be invalid in every application, including those found by the courts. *See Local 8027*, 651 F. Supp. 3d at 456 (rejecting notion "that clarity in some applications can save a statute from a facial vagueness attack").

[20] Moreover, RSA 644:6 does *not* require loitering with an intent or purpose to commit a specifically-named crime— *e.g.*, to solicit gambling or prostitution, or to sell illicit drugs, etc.—which was a trend that some states and municipalities embraced after various United States Supreme Court cases, including the 1983 *Kolender* decision. *See* William Trosch, Comment, *The Third Generation of Loitering Laws Goes to Court: Do Laws That Criminalize "Loitering With the Intent to Sell Drugs" Pass Constitutional Muster?*, 71 N.C. L. Rev. 513, 517 (Jan. 1993) ("Lawmakers responded to the Supreme Court's admonition by requiring a specific intent to engage in an unlawful activity. By adding a *mens rea* element, legislators hoped to wrap the same unconstitutional law in a prettier package that was more likely to receive judicial sanction.") And even still, many of those types of laws that prohibit loitering with a specific purpose too have been struck down. *See, e.g., Brown v. Anchorage*, 584 P.2d 35, 36 (Alaska 1978) ("inducing, enticing, soliciting or procuring another to participate in an act of prostitution"); *City of Akron v. Rowland*, 618 N.E.2d 138, 67 Ohio St. 3d 374, 383 (Ohio 1993) ("drug-related activity"); *Coleman v. Richmond*, 364 S.E.2d 239, 5 Va. App. 459, 466-67 (Va. Ct. App. 1988) ("manifesting the purpose of engaging in prostitution"); *Silvar v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 129 P.3d 682, 122 Nev. 289, 294 (Nev. 2006) ("in a manner and under

18

Perhaps in recognition of RSA 644:6's textual failure to include "in a manner not usual for law-abiding individuals" language, Defendant relies on *State v. Ecker*, 311 So. 2d 104 (Fla. 1975) to ask this Court to construe the statute to "prohibit[] a person from knowingly appearing at a place or at a time under circumstances that would warrant a *reasonable belief that the person was or was about to commit a crime against people or property*."  Def.'s Obj. at 21 (emphasis added).[21] In other words, according to Defendant, RSA 644:6's provisions codify the requirement under *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer must have a reasonable suspicion that a person has committed or is about to commit a crime, based on specific and articulable facts that objectively indicate criminal activity.  *See* Def.'s Obj. at 17-18, 22-23.  As in *Bellevue* and *Akron*, there are multiple reasons to reject what amounts to a request for a narrowing or limiting construction of RSA 644:6.[22]

*First*, RSA 644:6 is not "readily susceptible to such a construction"; thus, to adopt such a construction would "rewrite [the] law" in a way that invades the New Hampshire legislature's "domain" and would  "sharply diminish … [its] incentive to draft a narrowly tailored law in the first place."  *See Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 U.S. Dist. LEXIS 94052, at *21 (D.N.H. May 28, 2024) (quoting *United States v. Stevens*, 559 U.S. 460, 481, (2010) (cleaned up)).  Here, by its plain terms, RSA 644:6 requires only "circumstances that warrant alarm."  Unlike the 1962 MPC or the Florida law in *Ecker*, RSA 644:6 does *not* include "in a manner not usual for law-abiding individuals" language that arguably can be construed to incorporate the

---

circumstances manifesting the purpose of inducing, enticing, soliciting for or procuring another to commit an act of prostitution").

[21] *See also Ecker*, 311 So. 2d at 109 (construing Florida statute containing "in a manner not usual for law-abiding individuals" language to "mean those circumstances where peace and order are threatened or where the safety of persons or property is jeopardized"); *Bell*, 252 Ga. at 271-72 (applying same construction to Georgia law).

[22] *See City of Bellevue v. Miller*, 536 P.2d 603, 85 Wn.2d 539, 547 (Wash. 1975) (en banc) ("we are unable to place a sufficiently limited construction upon the standardless sweep of this legislation"); *Akron*, 67 Ohio St. 3d at 380 (rejecting specific intent narrowing construction not found in law).

19

standard under *Terry* where there must be a "reasonable belief that the person was about to commit a crime."  Moreover, the *Terry* stop standard already is the law under both existing constitutional principles and under New Hampshire's stop-and-identify law at RSA 594:2 (which was amended at the same time as RSA 644:6 in 1985, *see Exhibit H*).  Thus, the legislature must have intended RSA 644:6 to do *more* than *Terry* or RSA 594:2 because, otherwise, RSA 644:6 would be rendered superfluous.  *See Local 8027*, 2024 U.S. Dist. LEXIS 94052, at *32 ("the legislature is presumed not to use words that are superfluous or redundant") (quoting *State v. Bakunczyk*, 164 N.H. 77, 79, (2012)).  That "more" here is RSA 644:6's expansive inclusion of "warrant alarm" language that allows for a stop using a standard that is below the "reasonable suspicion of specific criminal activity" standard under *Terry* or RSA 594:2.  *See infra* Section II.B.2 (arguing that this lower "stop" standard also violates Fourth Amendment).

*Second*, the legislative history establishes that the legislature intended to use the broader term "alarm," as opposed to the language "about to commit a crime" or "in a manner not usual for law-abiding individuals."  The 1971 origins of RSA 644:6 suggest that the legislature initially modeled it after the 1962 MPC, which pre-dated the *Terry* standard by six years.  Yet the 1971 drafters specifically omitted from its version of RSA 644:6 the phrase "in a manner not usual for law-abiding individuals" that existed in the 1962 MPC.  This demonstrates that the drafters knew about, but consciously intended to delete, any requirement from the 1962 MPC of suspicion of criminal activity.  Compl. ¶¶ 57, 59.  Furthermore, the legislative history of the 1985 amendment to RSA 644:6 that brought this statute to its current form says little about any "suspicion of criminal activity" limitation.  *Exhibit H*, at 1985LEG 017.

*Third*, we know that Defendant's narrowing construction is untethered to RSA 644:6 because it exists nowhere in the Attorney General's training on the law, *see Exhibits N and O*, and

20

this construction has not been communicated to police officers by Defendant.  Nor has this narrowing construction been stated explicitly in the court cases that have interpreted RSA 644:6 in the law's over 50 years of existence.

*Lastly*, even if one were to impute a "not usual for law-abiding individuals" element into the statute along the lines of the 1962 MPC, this would not save the statute.  Several courts have held that such language was not sufficient to cure the law's ambiguities.[23]  In other words, RSA 644:6 is even more extreme than the laws struck down in *Portland* and *Bellevue* where there was at least some requirement that the defendant act in a non-law-abiding manner.  Under RSA 644:6, there is no such limitation.  Similarly, if this Court were to, as Defendant suggests, construe RSA 644:6's provisions as merely codifying the *Terry* standard *for stops*, *see* Def.'s Obj. at 17-18, 22-23—and, thus, allowing *an arrest* for loitering under this *Terry* standard—then this statute violates the Fourth Amendment's requirement that arrests must be predicated on probable cause, not mere suspicion.  *See infra* Section II.B.1.

Relatedly, Defendant makes much of RSA's 644:6 "knowing" *mens rea* requirement, arguing that RSA 644:6 should further be construed such that a person must know that his presence "will warrant alarm for the safety of people or property in the vicinity."  Def.'s Obj. at 32; *see also id.* at 16.  At the outset, "a scienter requirement cannot save a statute … that has no core of meaning to begin with," especially where that core has no textual nexus to criminal activity.  *See Lifchez v. Hartigan*, 735 F. Supp. 1361, 1372 (N.D. Ill. 1990) (citing *Colautti v. Franklin*, 439 U.S. 379, 395

---

[23] *See also, e.g., City of Portland v. White*, 495 P.2d 778, 9 Ore. App. 239, 240 (Or. Ct. App. 1972) (deeming unconstitutionally vague ordinance stating, in part, "[n]o person shall loiter or prowl in a place, at a time, or in a manner not *usual for law abiding persons* under circumstances that warrant alarm for the safety of persons or property in the vicinity") (emphasis added); *Bellevue*, 85 Wn.2d at 542 (deeming vague ordinance stating, in part, "[a]ny person who wanders or prowls in a place, at a time, or in a manner, and under circumstances, which *manifest an unlawful purpose* or which warrant alarm for the safety of persons or property in the vicinity is hereby declared to be a vagrant, and is guilty of a misdemeanor") (emphasis added).

(1979)); *see also Coleman v. Richmond*, 364 S.E.2d 239, 5 Va. App. 459, 466 (Va. Ct. App. 1988) (finding vagueness even with specific intent requirement because, "since loitering is not unlawful, the statute proscribes no illegal conduct"). In any event, Defendant's interpretation is belied by the text of the statute itself, which focuses less on a person's subjective mental state, and more on whether a person is observed "*under circumstances* that warrant alarm."[24] Indeed, as noted above, the term "alarm" is commonly defined as a "sudden sharp apprehension and fear resulting from the perception of imminent danger"—a definition that is premised not on the perception of the person causing the "alarm," but rather on the perception of the person observing it (here, the perception of the police officer making the decision whether to invoke the statute). Additionally, Defendant's interpretation that a person stopped and charged must know that their presence will warrant "alarm" not only fails to square with the numerous instances of enforcement documented in Paragraphs 67 and 70 and *Exhibit C* of the Complaint, but also is not explicitly referenced (i) in the cases that have applied RSA 644:6 over the decades, or (ii) in any guidance from the Defendant. *See Jaroma*, 137 N.H. at 568 (focusing analysis on officer's perceptions, stating that "[t]he officer reasonably believed that the defendant's presence in the parking lot warranted alarm for the safety of the property in the vicinity"); *Exhibits N and O*.[25]

---

[24] *See Akron*, 67 Ohio St. 3d at 380 (rejecting interpretation that incorporates specific intent where "[a]cting under 'circumstances manifesting' a purpose to do something is a far cry from specifically intending to do something."); *Silvar*, 122 Nev. at 299 (same).

[25] This case is distinguishable from *Frese v. Formella*, 53 F.4th 1 (1st Cir. 2022), *cert denied,* 144 S. Ct. 72 (2023), where New Hampshire's criminal defamation law was not unconstitutionally vague. While that criminal defamation statute required that the defendant "know" that an assertion was false, *see id.* at 12, that statute contained the additional, unambiguous protection of incorporating the common law defamation standard where "[w]ords may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair [the plaintiff's] standing in the community." *Id.* at 7-8. The *Frese* Court also distinguished the criminal defamation law from the law struck down in *Kolender*, as well as noted that "[o]ther laws or regulations found by courts to be unconstitutionally vague include statutes that contain no standard at all about when officials can exercise their discretion, as well as regulations prohibiting any 'appearance' that is 'objectionable.'" *Id.* at 9. Here, unlike the criminal defamation provisions in *Frese*, RSA 644:6's "knowing" provisions are tethered to additional phrases like "warrant alarm" that, like the law in *Kolender*, "contain no standard at all about when officials can exercise their discretion," and, thus, provide minimal protection to defendants. *See id.*

22

### 2.    Four Nonexhaustive Factors.

The four circumstances in RSA 644:6, I(a)-(d) added to the statute in 1985 that "may be considered" in determining whether a person "appears at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity" do not cure the statute's vagueness.    The statute's language makes clear that the existence of one or more of these circumstances is not necessary to find a violation of the RSA 644:6.    Rather, such circumstances "*may*" (but need not) be considered.    And when any one of these circumstances is "considered," the circumstance, by itself, may be enough in ascertaining whether "alarm" exists.    RSA 644:6 fails to state that any individual circumstance, by itself, does not constitute "alarm."    Rather, each circumstance alone is an example of when "alarm" *may* be warranted.

In keeping with the rest of the statute's imprecision, this paragraph of RSA 644:6 also fails to indicate _how_ these circumstances should be considered.    For example, the statute provides that an officer may consider whether an actor "takes flight upon appearance of a law enforcement official" in determining whether alarm is warranted, but it does not explain how this circumstance should weigh in that determination.    The four examples of circumstances that may be considered also fail to cabin the discretion of law enforcement because they are explicitly non-exhaustive ("circumstances that may be considered . . . *include, but are not limited to*"), and thus, like the law struck down in *Kolender*, they still allow for unfettered discretion where their reach "remains essentially unbounded and indeterminate."    *See Bellevue*, 85 Wn.2d at 545.    In addition to *Bellevue*, several courts have reached similar conclusions.[26]

---

[26] *See Akron,* 67 Ohio St. 3d at 383 ("The word 'among' indicates that there are other circumstances, not specified in the ordinance, which may be used to form the basis of an arrest and conviction.  It is, of course, unlawful for a citizen to be convicted of a criminal offense not defined by a legislative enactment. We find this lack of specificity to be fatal to the ordinance."); *Brown*, 584 P.2d at 37 ("A literal reading of the ordinance before us discloses such an infirmity. AO 8.14.110 sets out separate and disjunctive circumstances which may be considered in determining whether a

### 3.    Identify-and-Explain-Presence Requirement.

While Paragraph II of RSA 644:6 provides that a person—absent "flight or other circumstances [that] make it impossible"—cannot be arrested unless he is afforded the opportunity to dispel any alarm which would otherwise be warranted, this provision too is vague because it contains no standard for determining what a suspect has to do in order to satisfy this "dispel" requirement. Relatedly, the statute allows for arbitrary and discriminatory enforcement by failing to require law enforcement officers to even identify specific and articulable facts indicating that a person is engaged in prohibited conduct before ordering him to stop and "requesting him to identify himself and give an account for his presence and conduct." *See* RSA 644:6.

In *Kolender v. Lawson*, 461 U.S. 352 (1983), the United States Supreme Court struck down as unconstitutionally vague a California statute that required an individual to produce "credible and reliable" identification when stopped by the police. *Id.* at 353-54. The statute left local police with "virtually complete discretion" to decide what constitutes "credible and reliable" identification, as the statute contained no standards for making this determination. *Id.* at 358. In any given situation, one police officer might accept a simple recitation of name and address as sufficient identification, while another officer might not. *Id.* at 360. Thus, the statute "entrust[ed] lawmaking to the moment-to-moment judgment of the policeman on his beat." *Id.* (internal quotations omitted) (cleaned up). RSA 644:6 is no different. As explained above, *see supra* Section II.A.2, the changes made to this statute in 1985—including the creation of four

---

person who is loitering manifests the purpose of soliciting for prostitution."); *Coleman*, 5 Va. App. at 465 ("The language 'among the circumstances which may be considered' indicates that the enumerated circumstances are not exclusive. A finding of one or more of the specified circumstances is not essential to find the required intent. It is not clear, however, whether the inclusion of the three particular circumstances was intended to prove that the presence of one or more of those circumstances would sufficiently manifest the intent, or whether the particular circumstances are of no significance except as investigative 'hints' for police officers."); *see also Nat'l Educ. Ass'n-New Hampshire*, 806 F. Supp. 3d at 198 ("the inclusion of specific statutory categories purported to be illustrative of 'DEI-related activities' exacerbates rather than diminishes vagueness concerns").

"circumstances which may be considered in determining whether such alarm is warranted"—do not meaningfully address the vagueness concerns raised in *Kolender*. Here, RSA 644:6 provides no guidance on how to "identify [oneself] and give an account of his presence and conduct" in a way that "dispels any alarm which would otherwise be warranted," thereby "vest[ing] virtually complete discretion in the hands of the police to determine whether the suspect has satisfied the statute." *See Kolender*, 461 U.S. at 358. Thus, like the California law at issue in *Kolender*, RSA 644:6 allows an individual to walk the public streets "only at the whim" of any police officer who happens to stop that person based on the suspicion of "alarm" and demands that the person identify themselves and give an account for their presence and conduct. *See id.* (quoting *Shuttlesworth v. City of Birmingham*, 382 U.S. 87, 90 (1965)). And though the second sentence of paragraph II states in isolation that "[f]ailure to identify or account for oneself, *absent other circumstances*, however, shall not be grounds for arrest," *see* RSA 644:6, II (emphasis added), that sentence must be read in the context of the entire paragraph—including its earlier "dispel" requirement—which effectively allows an officer to use their unfettered discretion to consider a person's silence, *combined with whatever facts the officer observes to suspect "alarm,"* to unilaterally decide that a person has not sufficiently dispelled the suspected alarm.[27] Put differently, there will always be

---

[27] Indeed, there are multiple examples of officers arresting people because they declined to respond to officers. *See* Compl. ¶¶ 67(a), (e), (f), (m), 70(b), (g), (h), (i), 107; *Exhibit C*, at CASES001-08 (unhoused man arrested for loitering after declining to give real name); *id.*, at CASES041-45 (unhoused man arrested for loitering where the man "was given ample time to give a valid reason as to why he was there, but failed to do so"); *id.*, at CASES046-51 (officer stating to unhoused man sleeping in a parking garage late at night that he "needed to provide his given name," and that "he would be placed under arrest unless he gives me the information I was asking for," and where the man was ultimately arrested for not providing a full name and date of birth); *id.*, at CASES131-138 (unhoused man arrested for loitering after refusing to provide name and after being informed that "he would be arrested if he did not provide his name"); *id.*, at CASES149-156 (man arrested principally for using profanity in exercising his right to not answer officer's questions about whether he was on a patio; noting that the man "had not explained his reasoning for being" on the patio); *id.*, at CASES184-189 (man charged with loitering because of silence when questioned why he would have a key for a motel 100 yards away if he was staying at a residential property, as the man was unable to "dispel any suspicion about what he was doing" at the residential location); *id.*, at CASES201-207 (officer noting that, upon initial contact, the man allegedly "was uncooperative and refused to identify himself" because the man thought the

"other circumstances" that the officer will combine with the person's silence—namely, the very observations the officer made to suspect "alarm" in the first place.

Several courts after *Kolender* have declared facially vague vagrancy laws on similar grounds. *See Fields*, 810 F.2d at 833-34 ("We cannot distinguish the subsequent identification provision of the Omaha ordinance from the 'identify himself [or herself] and . . . account for his [or her] presence' clause of § 647(e), which the Supreme Court [in *Kolender*] held did not specify with sufficient definiteness what is contemplated by the requirement of 'identification.' …. We conclude that neither the language of the ordinance, nor its interpretation in *Porta II*, defines 'identification' or provides a standard by which a police officer can test the adequacy of any identification a suspect provides."); *Bitt*, 118 Idaho at 589 ("The fatal constitutional flaw of this ordinance is brought out when we consider whether the ordinance provides sufficient guidelines to those who must enforce the ordinance …. Thus, the Pocatello ordinance suffers from the same lack of enforcement guidelines as the California statute struck down in *Kolender*. The ordinance provides that a person cannot be arrested or convicted unless he fails to identify himself and offer an explanation of his presence and conduct which dispels the police officer's alarm. This vests complete discretion in the hands of the police officer to determine whether the person has provided a credible and reliable explanation."); *Coleman*, 5 Va. App. at 467 ("the officer is not required to accept any particular type of explanation or to give one any weight"); *Silvar v. Eighth Jud. Dist. Ct. ex rel. Cnty. of Clark*, 129 P.3d 682, 122 Nev. 289, 295 (Nev. 2006) ("although the ordinance provides a right to explain one's actions, the inadequate guidelines for evaluating these

---

stop was illegal); *id.*, at CASES208-221 (man arrested for loitering where, after the officer requested identification, the man refused, "stating that he had done nothing wrong and has no legal obligation to produce identification"; officer's police report further states: "I continued to explain that he had failed to dispel suspicion for being in area and is committing a violation by loitering or prowling. Based on these circumstance[s], he shall provide identification upon request. The subject continued to refuse and was subsequently placed under arrest.").

explanations render the right to explain inconsequential, and furthermore an officer could still disregard the explanation").[28]

Highlighting how this provision provides the police with unfettered discretion, in one documented instance, the police arrested an unhoused man for loitering after rejecting the man's explanation that he was in the area because he was staying the night at an adjacent autobody shop where he worked—an explanation that apparently turned out to be true (and which the officers later seemed to accept, dropping him off at the autobody shop after arresting, charging, and booking him because he was outside near that location). *Exhibit C*, at CASES068-76; Compl. ¶¶ 67(h), 96. In another case, an officer appears to have rejected the explanation of an unhoused man who asserted that he had been sitting on a bench outside of the building of a business in the afternoon "to eat a snack." *Exhibit C*, at CASES001-08; Compl. ¶¶ 67(a), 96. One officer seems to have rejected the explanation of an unhoused man that he was in an alley because he was "stashing" his two bikes and a bag full of food in between two homes in the alley, and that he was trying to find the bag of food. *Exhibit C*, at CASES017-21; Compl. ¶¶ 67(c), 96. One officer appeared to reject the explanation of an unhoused man that he was not trying to access a building in the afternoon. *Exhibit C*, at CASES077-84; Compl. ¶¶ 67(i), 96. Another officer rejected the explanation of a man—who walking along the drive through lane towards the rear of a closed Burger King late at night—that "he was out for a walk due to being locked out of his sober living

---

[28] Similar findings were made in cases before *Kolender*. *See Brown*, 584 P.2d at 38 ("The Municipality also claims that the ordinance can be saved from a vagueness attack because it affords the suspect the opportunity to explain his or her conduct. We do not agree. The opportunity to explain one's conduct provides little protection from police harassment when it remains for the arresting officer to decide whether he or she is satisfied with the explanation given."); *Bellevue*, 85 Wn.2d at 547 ("Indeed, since it is the arresting officer who weighs the credibility of the explanation, this section makes even more obvious the fact that arrest and prosecution under the ordinance proceed essentially upon the officer's unqualified and undefined discretion. The vagueness of the proscription is, if anything, exacerbated by the fact that there are and can be no standards by which the sufficiency of the proffered explanation is evaluated.").

house for the night for missing curfew hours."  *Exhibit C*, at CASES208-221; Compl. ¶¶ 70(i), 96. Another officer rejected the explanation of a disheveled man—who allegedly "peered into a parked car" at a bus station parking lot in the afternoon—that he was in the lot to smoke a cigarette.  (The man had a cigarette in his hand.).  *Exhibit C*, at CASES222-228; Compl. ¶¶ 70(j), 96.

### 4.   Heightened Vagueness Scrutiny Applies.

Heightened scrutiny is not necessary to strike down RSA 644:6, as this Court need only apply the principles in *Kolender* and *Morales*.  In any event, heightened scrutiny applies for two reasons.

*First*, Defendant argues that the phrase "under circumstances that warrant alarm for the safety of persons or property in vicinity"—and all of RSA 644:6—are not vague because the statute only carries "civil penalties."  Def.'s Obj. at 21.  At the outset, "'the happenstance that a law is found in the civil or criminal part of the statute books' is not dispositive."  *Local 8027*, 2024 U.S. Dist. LEXIS 94052, at *18 (quoting *Sessions v. Dimaya*, 584 U.S. 148, 184 (2018) (Gorsuch, J., concurring in part)).[29]  Here, heightened scrutiny is appropriate because, though a violation-level offense, RSA 644:6 is "quasi-criminal" where its consequences can be severe—including leading to handcuffing and warrantless arrest under RSA 594:10, I(a)[30], a subsequent search of their person and any property on their person, imposition of bail conditions that are often unrelated to the

---

[29] *See also Giaccio v. Pennsylvania*, 382 U.S. 399, 402 (1966) (rejecting distinction between criminal and civil penalties in vagueness analysis, and noting that due process protection "is not to be avoided by the simple label a State chooses to fasten upon its conduct or its statute"); *Manning v. Caldwell*, 930 F.3d 264, 273 (4th Cir. 2019) (en banc) ("[E]ven laws that nominally impose only civil consequences warrant a 'relatively strict test' for vagueness if the law is 'quasi- criminal' and has a stigmatizing effect.") (quotation omitted).

[30] Under RSA 594:10, I(a) & (c), warrantless arrests can occur for violation-level offenses when, for example, the officer "has probable cause to believe that the person to be arrested has committed a misdemeanor or violation in [his] presence" or if the officer "has probable cause to believe that the person to be arrested has committed a misdemeanor or violation, and, if not immediately arrested, such person will not be apprehended, will destroy or conceal evidence of the offense, [or] will cause further personal injury or damage to property."  There are numerous examples of individuals who are arrested for loitering, as opposed to merely being issued a summons to later appear in court.  *See, e.g. Exhibit C*, at CASES001-08; *id.*, at CASES009-16; *id.*, at CASES052-67; *id.*, at CASES127-130; *id.*, at CASES183-188; *id.*, at CASES201-07.

28

offenses charged,[31] and fines and bench warrants that can lead to arrest if a person does not appear in court.[32] Compl. ¶ 75. A loitering stop often becomes the basis to run a warrant check and search people, which can lead to further involvement with the criminal justice system. *Id.* ¶ 73 (citing cases). Further, the financial penalties imposed "include confiscatory rather than compensatory fines," *see Sessions*, 584 U.S. at 184 (Gorsuch, J., concurring in part), and a charge under RSA 644:6 is processed on the state courts' criminal docket. Most unhoused people are unable to pay even relatively low fines and fees like those imposed under RSA 644:6, and they face unique difficulties in contesting citations and appearing for court. For example, because they usually do not have a fixed address, an unhoused person may not be able to timely receive court date notifications.[33] It also may be difficult to hold on to sensitive documents, like citation paperwork, while living outside, including because encampment "sweeps" often result in the loss and destruction of property. They also may miss court dates because they lack access to transportation.[34] When these challenges result in a person failing to pay a fine or appear in court, judges may issue bench warrants for their arrest. Compl. ¶ 74. In short, a loitering charge can upend a person's life.

*Second*, while Plaintiff is not raising an independent First Amendment facial overbreadth claim in this case, heightened vagueness scrutiny applies here because RSA 644:6 implicates First Amendment-protected activity, as well as the freedom of movement and other constitutionally-

---

[31] *See, e.g. Exhibit C*, at CASES117 (unhoused defendant must refrain from excessive use of alcohol, though this bail condition is unrelated to the loitering or resisting arrest charge); *id.*, at CASES073 (same bail condition imposed on unhoused defendant after loitering and false report to law enforcement charges).

[32] *See, e.g. Exhibit C*, at CASES033 (bench warrant issued for unhoused woman's failure to appear at Dec. 10, 2024 plea).

[33] *See, e.g., Exhibit C*, at CASES078 (court notice to unhoused defendant returned as undeliverable); *id.*, at CASES041 (court notice "unable to forward" for unhoused defendant); Compl. ¶ 74.

[34] *See* Madeline Bailey, Erica Crew, & Madz Reeve, Vera Institute of Justice, *No Access to Justice: Breaking the Cycle of Homelessness and Jail* (2020), homelessness-brief-web.pdf

protected activity. *See Kolender*, 461 U.S. at 358 (noting that the statute at issue implicated "consideration of the constitutional right to freedom of movement"); *Morales*, 527 U.S. at 52 ("even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests") (plurality op. at Part III). The Supreme Court has made clear that, where "a law 'is capable of reaching expression sheltered by the First Amendment, [due process] demands a greater degree of specificity than in other contexts.'" *Local 8027*, 2024 U.S. Dist. LEXIS 94052, at *37 (quoting *Smith v. Goguen*, 415 U.S. 566, 573 (1974) (alteration in original). Here, RSA 644:6's broad language—which allows enforcement in any circumstance "that warrant[s] alarm for the safety of persons or property in the vicinity"—"can easily implicate a person's status, associates, mere presence, or otherwise innocent behavior," thereby infringing core constitutional rights like the right to free association, the right to travel, and the freedom to loiter for innocent purposes. *See Akron*, 67 Ohio St. 3d at 387; *see also Morales*, 527 U.S. at 53 (plurality op. at Part III stating that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment," and identifying the "right to remove from one place to another"). "The case law is legion that people cannot be punished because of their status, the company they keep, or their presence in a public place." *Akron*, 67 Ohio St. 3d at 387 (citing cases). This concern is especially acute here where RSA 644:6 requires no specific act in furtherance of any crime (let alone behavior "not usual for law-abiding individuals" under the 1962 MPC), nor any specific intent to engage in criminal activity. Compl. ¶ 98.

Defendant claims that there is no authority "recognizing a constitutional right to knowingly be present in places or at times 'under circumstances that warrant alarm for the safety of people or

30

property in the vicinity.'" Def.'s Obj. at 28. This is not Plaintiff's argument. Rather, Plaintiff's argument is that RSA 644:6 is so vague that it can prohibit anything that might seem "alarming," including protected expression that includes telling a police officer to go away (including through protected language that the police may view as profane or disrespectful)[35], wearing clothes that are unusual or perceived to be associated with a local gang, walking in a perceived "high crime" area while late at night, being of a different race or socioeconomic status than most residents in the area, or engaging in constitutionally-protected protests designed to evoke a provocative or even alarming message to make a point. Compl. ¶ 99.

RSA 644:6 further risks chilling protected expression by listing "conceal[ing] himself" as a circumstance that may be considered in determining whether alarm is warranted. RSA 644:6, I(b). This could apply to any protester who may wish to wear a mask to ensure their own safety and to avoid the prospect of doxing, or even where the act of concealing contains a communicative element.[36] RSA 644:6 makes this a potential ground for stopping and arresting a person, even as some in federal immigration law enforcement have been concealing their faces in performing their

---

[35] *See* Compl. ¶¶ 67(e), 70(b); <u>Exhibit C</u>, at CASES149-156 (loitering arrest after man swore at the officer and exercised his right to not answer the officer's questions about whether he was the man on the patio, including saying "I don't have to f***ing talk to you"); *id.*, at CASES 041-45 (loitering arrest after unhoused man said "get your f***ing hands off me!" after police officer placed his hand on the man's chest and told him to stop, and where the police concluded that the man's "behavior was loud and boisterous, and his posture towards me was aggressive"). *See also State v. E.J.J.*, 183 Wn. 2d 497, 501 (Wash. 2015) ("While E.J.J.'s words [against the police] may have been disrespectful, discourteous, and annoying, they are nonetheless constitutionally protected."); *United States v. Poocha*, 259 F.3d 1077, 1082 (9th Cir. 2001) (repeatedly saying "f*** you" to park rangers, even in front of crowd, was constitutionally-protected speech that cannot be punished as disorderly conduct); *Gulliford v. Pierce County*, 136 F.3d 1345, 1350 n.7 (9th Cir. 1998) (telling police officer to "get the f*** off the island" was constitutionally-protected speech and could not justify obstructing a public servant charge), *cert. denied*, 525 U.S. 828 (1998); *Sandul v. Larion*, 119 F.3d 1250, 1255-56 (6th Cir. 1997), *cert. denied*, 522 U.S. 979 (1997) (yelling "f*** you" out a car window does not create probable cause to arrest the speaker; case law "should leave little doubt in the mind of the reasonable officer that the mere words and gesture 'f–k you' are constitutionally protected speech").

[36] *See Aryan v. Mackey*, 462 F. Supp. 90, 92-94 (N.D. Tex. 1978) (issuing temporary restraining order precluding university from implementing a provision in a demonstration permit that required student protesters to not wear masks during demonstration against the Shah of Iran); *American KKK v. City of Goshen*, 50 F. Supp. 2d 835, 845 (N.D. Ind. 1999) (holding that city ordinance that made it illegal for members of plaintiff to wear masks in public assembly was unconstitutional).

31

duties.  Compl. ¶ 100.[37]  RSA 644:6 even begs the question of whether its "alarm for the safety"

language could implicate protests themselves whose message are viewed as implicating "safety"—

for example, racial justice protesters (whose speech advocating for reducing the presence of local

law enforcement on the streets could be perceived by some as causing "alarm" to public safety) or

those protesting vaccination requirements (whose speech could be perceived as promoting the

spread of infectious disease, thereby causing "alarm" to the safety of persons).  *Id.* ¶ 101.  In sum,

with this unfettered discretion, the statute provides police with a catch-all provision through which

they can allow "desirables" to use the streets and speak freely, while "moving along" (or, worse,

arresting) individuals who are perceived to be less desirable or whose messages are disfavored—

all without specifying what criteria is being used in making this distinction.  *Id.* ¶ 102.[38]

**B.**      **Plaintiff Has Sufficiently Pled a Claim Under the Fourth Amendment's Right Against Unreasonable Seizures.**

Plaintiff has sufficiently pled a Fourth Amendment facial challenge to RSA 644:6.  The

standard for evaluating this claim derives from *City of Los Angeles v. Patel*, 576 U.S. 409 (2015).

There, the Court found that a Los Angeles Municipal Code provision facially violated the Fourth

Amendment because it forced hotels to maintain records of their guests and to make those records

"available to any officer of the Los Angeles Police Department for inspection" upon demand

without any opportunity for precompliance review.  *Id.* at 412.  The Court characterized the statute

as one "authorizing warrantless searches," and explained that—while "a plaintiff must establish

that a law is unconstitutional in all of its applications"—"when addressing a facial challenge to a

statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches

---

[37] *See* Taylor Robinson, *Nassau County Will Let Officers Wear Masks When Working With ICE*, N.Y. Times (July 11, 2025), https://www.nytimes.com/2025/07/11/nyregion/nassau-county-police-officers-ice-masks.html.
[38] Plaintiff here is not raising an independent claim that RSA 644:6 facially violates the Fifth Amendment right against self-incrimination.

that the law actually authorizes, not those for which it is irrelevant." *Id.* at 418.  Synthesizing the Supreme Court's jurisprudence in *Patel* and other cases, whenever a law gives absolute authority to search or seize an individual without a legitimate reason, it facially violates the Fourth Amendment.[39]  For example, where the law in *Patel* authorized blanket searches and seizures of private records without any pre-established reason, the Fourth Amendment was violated regardless of whether law enforcement in some cases would have sufficient probable cause or consent to search the records.  There, the law was facially invalid because it authorized seizures *when police otherwise had no legitimate basis*.  RSA 644:6 similarly violates the Fourth Amendment in two independent ways.

### 1.    RSA 644:6 Improperly Allows an Arrest For Mere Suspicious Conduct Not Amounting to Probable Cause that a Crime Has Been, or Will Be, Committed.

It does not appear to be meaningfully disputed that RSA 644:6  allows for an arrest and conviction based on "alarm for the safety of persons or property" without any probable cause of specific criminal activity, but rather based on mere suspicion.  *See* Def.'s Obj. at 17-18 (arguing that RSA 644:6 "essentially establish[es] 'reasonable suspicion'"), 21-23 (arguing that RSA 644:6 requires "a reasonable belief that the person was or was about to commit a crime against people or property").  However, in doing so, RSA 644:6 violates the Fourth Amendment.  *See Papachristou*, 405 U.S. at 169 ("We allow our police to make arrests only on 'probable cause' …. Arresting a person on suspicion, like arresting a person for investigation, is foreign to our system, even when

---

[39] *See e.g., Payton v. New York*, 445 U.S. 573, 574-76 (1980) (striking down a New York law that allowed officers, without a warrant, to enter a private home to make any felony arrest); *Torres v. Puerto Rico*, 442 U.S. 465, 466, 474 (1979) (holding that a Puerto Rico statute authorizing "police to search the luggage of any person arriving in Puerto Rico from the United States" was unconstitutional because it failed to require either probable cause or a warrant); *Ferguson v. Charleston*, 532 U.S. 67, 86 (2001) (holding that a hospital policy authorizing "nonconsensual, warrantless, and suspicionless searches" contravened the Fourth Amendment).

the arrest is for past criminality.").[40]

Here, RSA 644:6 effectively acts as a "catch all" basis for arrest where—even if a police officer does *not* have independent probable cause to believe that a separate crime is being (or has been) committed—the officer can conclude that probable cause exists for a loitering charge based on the *mere suspicion* of criminality predicated on a circumstance that an officer deems "alarming," including when the person "[t]akes flight upon appearance of a law enforcement official or upon questioning by such an official," *see* RSA 644:6, I(a), or "[m]anifestly endeavors to conceal himself or any object," *see* RSA 644:6, I(b).  But, notwithstanding RSA 644:6, I(a) and II (which separately eliminates an officer's requirement to give a person an opportunity to dispel "alarm" if "flight … make[s] it impossible"), the mere act of "flight" from police is not by itself sufficient—including, for example, without consideration of whether the area is a criminal hot spot—to *per se* conclude that there is reasonable suspicion to believe that a crime has been committed, let alone probable cause.  *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000) ("Walking away from the police hardly amounts to the headlong flight considered in *Wardlow* and of course would not give rise to reasonable suspicion by itself, even in a high-crime area, but it is a factor that can be considered in the totality of the circumstances.").  And, under RSA 644:6, II, if a person fails to adequately respond to an officer's inquiries about their "presence and conduct," mere suspicious conduct can serve as a predicate for arrest, conviction, and punishment, not just a detention or seizure.  *See*

---

[40] *See also Lawson v. Kolender*, 658 F.2d 1362, 1366-67 (9th Cir. 1981) (identifying Fourth Amendment concerns where "statutes bootstrap the authority to arrest on less than probable cause," and finding that "this vagrancy ordinance subverts the probable cause requirement"), *aff'd on other grounds*, 461 U.S. 352, 361 n.10 (1983) (majority declining to address Fourth Amendment question); *Kolender*, 461 U.S. at 365 (Brennan, J., concurring) (separately arguing that the statute at issue violated the Fourth Amendment, and noting that the "[f]ailure to observe these limitations converts a *Terry* encounter into the sort of detention that can be justified only by probable cause to believe that a crime has been committed").

34

RSA 644:6, II.

At least two other courts have raised similar constitutional concerns where the loitering laws in question allowed an officer to conduct an arrest after merely observing suspicious conduct not amounting to probable cause that a separate crime has been committed. The Supreme Court of Washington in *Bellevue* articulated this concern when it struck down a similar law:

> In other words the *crime* is not the objective fact of flight from a police officer, refusal to identify oneself or an attempt to conceal something, but rather consists merely of being observed in circumstances which a police officer deems questionable. Such a basis for arrest, predicated upon nothing more than an officer's suspicion that a person has been involved in unlawful activity or prediction that the person will become involved in unlawful activity, contravenes the traditional reluctance in our jurisprudence to punish individuals for anticipated but as yet uncommitted, or suspected but unknown crimes. Arrest must be grounded upon a more substantial basis than police hunch. Furthermore, if it is not the purpose then it is surely an important effect of legislation such as the Bellevue ordinance that the constitutional safeguard of requiring probable cause to arrest is circumvented.

*Bellevue*, 536 P.2d at 607 (emphasis in original) (internal citations omitted); *see also Britt*, 798 P.2d at 49 (citing with approval the trial judge's conclusion that the "ordinance criminalizes behavior which amounts to nothing more than the type of suspicious conduct which justifies a *Terry* stop").

This case is distinguishable from *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177 (2004), where the Court upheld on Fourth Amendment grounds a Nevada stop-and-identify law that required a person to identify themselves during a *Terry* stop, and where failure to do so would provide a basis for an arrest. There, the Court rejected the argument that the stop-and-identify statute "circumvents the probable-cause requirement, in effect allowing an officer to arrest a person for being suspicious." *Id.* at 188. But the Court did so on the grounds that the statute was narrow insofar as it was expressly limited to a refusal to identify oneself upon request, and thus did "not alter the nature of the stop itself: it does not change its duration, or its location." *Id.*

35

(internal citations omitted).  In other words, the identification demand was "reasonably related to the circumstances justifying the stop" under *Terry* itself, *see id.,* in part, because "questions concerning a suspect's *identity* are a routine and accepted part of many *Terry* stops" and are "not an effort to obtain an arrest for failure to identify after a *Terry* stop yielded insufficient evidence." *Id.* at 186 (emphasis added), 189.  Here, however, RSA 644:6 pre-dates *Hiibel* by decades and, thus, unsurprisingly is broader than the statute there.  Unlike the narrow statute in *Hiibel* that was limited to the context of a person failing to identify themselves, RSA 644:6 more broadly allows for an arrest when a person does not, during a *Terry* stop, satisfactorily dispel an officer's suspected "alarm" by "giv[ing] an account for his presence and conduct"—an inquiry that has the practical effect of, unlike the identification requirement in *Hiibel* that is consistent with the nature of the stop itself, "expand[ing] the scope of the stop" and "prolong[ing] the stop."  *See United States v. Henderson*, 463 F.3d 27, 46 (1st Cir. 2006); *see also United States v. Avagyan*, 164 F. Supp. 3d 864, 898 (E.D. Va. 2016) ("However, *Hiibel* … speak[s] to an officer's authority to request identification—not to stick his hands into a suspect's clothing and withdraw his wallet.").[41]

RSA 644:6's unconstitutional conversion of suspicion created by flight or efforts to conceal oneself into probable cause for an arrest is not merely hypothetical.  Multiple cases show arrests based solely on individuals' attempts to avoid or flee from the police, absent any significant facts to suggest that genuine criminal activity is underway.  Compl. ¶¶ 67(b), (e), (g), (k), 70(f),  115; *Exhibit C*, at CASES0009-16 (unhoused man arrested and charged for hiding and fleeing from the police, after police rejected his explanation that he was scared of one of the men he previously was

---

[41] New Hampshire's stop-and-identify law, *see* RSA 594:2, was amended in 2019 to make clear that an "officer shall not arrest the person based solely on the person's refusal to provide" their name or address during a *Terry* stop.  This change was made through 2019's House Bill 491.  *See* https://gc.nh.gov/bill_status/legacy/bs2016/bill_docket.aspx?lsr=0520&sy=2019&sortoption=billnumber&txtsession year=2019&txtbillnumber=HB491.

with); *id.*, at CASES041-45 (unhoused man with mental health issues who was "rustling around in a pile of blankets on the front steps of New Hampshire Fire Insurance Company, which is located at 156 Hanover St." charged with loitering after trying to "flee away from" the police); *id.*, at CASES052-67 (unhoused man charged with loitering after allegedly "peering into a parked vehicle," noticing a law enforcement cruiser, and then "put[ting] his head down and … walking" in a different direction); *id.*, at CASES104-126 (unhoused man who was observed "pacing back and forth on the sidewalk" and crossing a road without using a crosswalk arrested and charged with loitering because he ran away and hid from the police and told them to "stop harassing me"); *id.*, at CASES175-182 (man previously in front of a closed CVS charged with loitering after fleeing at sight of police; police rejected explanation that "cops make him nervous").[42]

Defendant's arguments in defense of RSA 644:6's elimination of the probable cause standard are unavailing. Defendant asserts that RSA 644:6 does not violate the Fourth Amendment because RSA 594:10, I(a)—which allows for a custodial arrest for a violation-level offense like RSA 644:6—requires probable cause for an arrest. Defendant adds that, based on several court decisions[43], RSA 644:6 "consistently" has been "applied by courts to require probable cause for an arrest." Def.'s Ob. at 34. In other words, Defendant's theory is that RSA 644:6 does not violate the principle that probable cause is necessary to make an arrest because there still must be probable cause that a defendant had "knowingly appear[ed] at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity" under RSA 644:6's terms. This argument is both circular and misses the point. While it is true that both the Fourth Amendment and RSA 594:10, I(a) require probable cause under RSA 644:6 to make an arrest, the Fourth

---

[42] Similar charging has occurred when people have declined to respond to officers. *See supra* note 27.

[43] *See Jaroma,* 137 N.H. at 567-68; *Dodier*, 135 N.H. at 136-41; *Toney v. Perrine*, No. 06-cv-327-SM, 2007 U.S. Dist. LEXIS 67255, at *12-16 (D.N.H. Sept. 10, 2007).

37

Amendment problem here is that RSA 644:6's provisions themselves do *not* require probable cause that an independent crime be committed. Rather, RSA 644:6 creates its own separate "crime" that authorizes an arrest without the requisite probable cause that actual criminal activity has occurred. None of the cases cited by Defendant address this fundamental flaw in RSA 644:6.

**2.    RSA 644:6 Violates *Terry v. Ohio*, 392 U.S. 1 (1968).**

RSA 644:6 also independently violates the Fourth Amendment by eliminating the requirement under *Terry v. Ohio*, 392 U.S. 1 (1968), that an officer must have a reasonable suspicion that a person has committed or is about to commit a crime, based on specific and articulable facts that objectively indicate criminal activity, before they may initiate an investigatory stop. *See also Brown v. Texas,* 443 U.S. 47, 52 (1979) ("When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits."). RSA 644:6 is not, as Defendant suggests, merely coextensive with the *Terry* stop standard. Def.'s Obj. at 33. Instead, RSA 644:6 allows an officer to stop and temporarily seize a person based solely on undefined "circumstances that warrant alarm for the safety of persons or property in the vicinity," without the officer having "reasonable suspicion" that a crime is being/about to be committed. Put another way, this "alarm" standard is effectively a "mere hunch" standard in disguise.[44] Indeed, how can a stop based on an officer's suspicion that a person is violating the loitering statute be based on an objective indicia of criminal activity when the statute itself permits conviction based on nothing more than unarticulated and subjective "circumstances that warrant alarm"?

Defendant states that RSA 644:6 does not violate *Terry* because one of the circumstances under this statute that may create such alarm includes, but is not limited to, when the person "[h]as

---

[44] *See United States v. Garcia*, 53 F. Supp. 3d 502, 508 (D.N.H. 2014) ("Officers' 'hunches,' unsupported by articulable facts, cannot substitute for reasonable suspicion."); *see also United States v. Hernandez*, 470 F. Supp. 3d 114, 126 (D.N.H. 2019) (same).

38

in his possession tools or other property which would lead a reasonable person to *believe a crime was about to be perpetrated*."  *See* RSA 644:6, I(c) (emphasis added); *see also* Def.'s Obj. at 33. But this provision does not help Defendant where it creates an independent basis for a stop that *already* is permissible under *Terry* and RSA 594:2—namely, where there is reasonable suspicion to believe that a specific crime has been, or was about to be, committed.  As *Patel* makes clear, conduct that is independently authorized by a legal provision other than the challenged law is not relevant to that law's facial constitutionality.  Here, RSA 644:6 as a whole provides a basis for a stop beyond such situations that are already permissible under *Terry* and RSA 594:2, especially where RSA 644:6, I(c) is merely a nonexclusive factor where other unspecified considerations can justify a stop.

Defendant's argument that RSA 644:6 appropriately allows for a stop when there is "flight upon appearance of a law enforcement official or upon questioning by such an official," *see* RSA 644:6, I(a), similarly fails.  *See* Def.'s Obj. at 33.  For starters, this provision goes beyond *Illinois v. Wardlow*, 528 U.S. 119 (2000), which did not accept the *per se* proposition that "flight is . . . necessarily indicative of ongoing criminal activity"; instead, *Wardlow* adhered to the view that "the concept of reasonable suspicion . . . is not readily, or even usefully, reduced to a neat set of legal rules," but rather must be determined by looking to "the totality of the circumstances—the whole picture."  *Wardlow*, 528 U.S. at 126-27 (Stevens, J., dissenting summarizing majority); *see also State of New Hampshire v. Gaynor*, No. 217-2024-cr-907, at *8 (Merrimack Cty. Super. Ct. Mar. 31, 2025) ("the defendant's flight alone, without any other suspicious behavior or indications that he may pose a danger to persons or property in the vicinity, did not warrant alarm under RSA 644:6") (Edwards, J.) (*Exhibit P*).  Further, to the extent one were to read RSA 644:6, I(a) as merely being coextensive with *Wardlow*, then this provision does little because *Wardlow* (and

39

RSA 594:2 by extension) already authorize the stops specified in this provision; thus, RSA 644:6, I(a) is "irrelevant" to RSA 644:6's broader application in authorizing stops in situations beyond *Wardlow* where the *Terry* standard is not met.  *See Patel*, 576 U.S. at 418.

Further, Defendant argues that, "to the extent that RSA 644:6 permits an officer to *request (not order)* an individual to identify himself and dispel any alarm for safety of people or property, it is 'consistent with Fourth Amendment prohibitions against unreasonable searches and seizures.'"  Def.'s Obj. at 33-34 (emphasis added, and quoting *Hiibel*, 542 U.S. at 188).  This is a strawman.  Plaintiff is not challenging the ability of police to approach a person and engage in questioning (i) without effectuating a seizure where a reasonable would believe that they were "not free to leave," *see United States v. Mendenhall*, 446 U.S. 544, 554 (1980), and (ii) without having developed reasonable suspicion that a crime has been or will be committed.  The Fourth Amendment is not implicated in such situations.[45]  Rather, Plaintiff's argument is that RSA 644:6 violates the Fourth Amendment because it authorizes a police officer to *order* a person to stop where a seizure has been effectuated that would otherwise not be permitted under *Terry*.  For such a stop and questioning, as *Hiibel* makes clear, the standard for a *Terry* stop must be satisfied.[46]  However, RSA 644:6 authorizes stops below this *Terry* standard.

In conclusion, each of these independent violations of the Fourth Amendment satisfy the facial standard under *Patel*.  The critical inquiry under *Patel* is the following: What *additional* stops or arrests does RSA 644:6 authorize? Those are the only stops or arrests that must be considered when examining RSA 644:6's constitutionality.  Here, RSA 644:6 effectively only

___

[45] *See Jones v. Clark*, 630 F.3d 677, 682 (7th Cir. 2011) ("So long as communication between an officer and a citizen remains consensual, the Fourth Amendment is not implicated.").

[46] *See Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 605 (6th Cir. 2015) ("*Hiibel* held that States may require suspects to disclose their names in the course of a valid *Terry* stop. What makes a *Terry* stop valid is reasonable suspicion—something that existed in *Hiibel* but did not exist here.") (internal quotations and citation omitted)

40

applies when there is *no* other requisite reasonable suspicion or probable cause to, respectively, seize or arrest the person under another more specific criminal offense. *All* such applications are unconstitutional.[47]

 For all these reasons, Defendant's motion to dismiss should be denied.

Respectfully submitted,

*/s/ Gilles R. Bissonnette*
Gilles R. Bissonnette (N.H. Bar. No. 265393)
Henry R. Klementowicz (N.H. Bar No. 21177)
Maria D. Savarese (N.H. Bar. No. 273285)
AMERICAN CIVIL LIBERTIES UNION OF NEW
 HAMPSHIRE
Concord, NH 03301
Tel.: 603.224.5591
gilles@aclu-nh.org
henry@aclu-nh.org
maria@aclu-nh.org

Date: April 23, 2026

---

[47] *See also Johnson v. Vanderkooi*, 509 Mich. 524, 546 (2022) (applying *Patel*); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1276 (Del. Super. Ct. 2018) (same).