UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Robert Clark

v.

Case No. 1:25-cv-379-PB-AJ
Opinion No. 2026 DNH 113

John M. Formella, Attorney General,
State of New Hampshire

MEMORANDUM AND ORDER

In this putative class action, plaintiff Robert Clark seeks to challenge the constitutionality of New Hampshire's anti-loitering statute. See N.H. Rev. Stat. Ann. ("RSA") § 644:6. Clark, who lived in homeless camps around Concord, New Hampshire for about thirteen years, has twice been arrested and charged, but never convicted, under the statute. He also alleges that local police have repeatedly stopped him on public and private properties in Concord, implicitly threatening his arrest under the law if he did not comply. While Clark seeks to represent an expansive class encompassing all those against whom the statute could be enforced, he premises his own standing to bring this suit on the law's repeated invocation against him and its frequent enforcement against homeless individuals generally. Shortly after filing suit, however, Clark obtained housing, raising doubts about whether the statute will be enforced against him in the future.

Several motions are ripe for ruling in this case, including Clark's motion to certify his proposed class and the Attorney General's motion to dismiss, which advances arguments that Clark lacks standing to challenge § 644:6, see Fed. R. Civ. P. 12(b)(1), and that he fails to state a claim, see id. 12(b)(6). The Attorney General also cites to Clark's newfound housing as reason to question his suit's justiciability, raising a separate question of mootness that is not otherwise briefed.

Because the Court must assure itself of its own jurisdiction before reaching the merits, I only address the Attorney General's threshold standing argument here. The parties will be required to address mootness in subsequent motion practice under Rule 12(b)(1), only after which the Court will be able to entertain the Attorney General's arguments for dismissal under Rule 12(b)(6) and Clark's motion for class certification.

## I. BACKGROUND[1]

### A. RSA § 644:6

First enacted in 1971 and later amended in 1985, New Hampshire's "Loitering or Prowling" statute consists of three principal provisions. See

[1] Because this order addresses the Attorney General's motion to dismiss for lack of subject matter jurisdiction, I draw the well-pled facts from the complaint, "according the plaintiff the benefit of all reasonable inferences." Latigua-Núñez v. U.S. Coast Guard, 174 F.4th 293, 297 (1st Cir. 2026) (quoting Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995)).

RSA § 644:6. The first provision defines the offense and supplies four non-exhaustive examples of conduct that can evince its commission:

> A person commits a violation if he knowingly appears at a place, or at a time, under circumstances that warrant alarm for the safety of persons or property in the vicinity. Circumstances which may be considered in determining whether such alarm is warranted include, but are not limited to, when the actor:
>
> (a) Takes flight upon appearance of a law enforcement official or upon questioning by such an official.
>
> (b) Manifestly endeavors to conceal himself or any object.
>
> (c) Has in his possession tools or other property which would lead a reasonable person to believe a crime was about to be perpetrated.
>
> (d) Examines entrances to a structure which the actor has no authority or legitimate purpose to enter.

Id. § 644:6, I. Before a police officer may arrest an apparent violator of the statute, its second provision requires that the officer attempt to constructively engage with the suspect. Specifically,

> [p]rior to any arrest under this section, unless flight or other circumstances make it impossible, a law enforcement official shall afford the actor the opportunity to dispel any alarm which would otherwise be warranted, by requesting him to identify himself and give an account for his presence and conduct. Failure to identify or account for oneself, absent other circumstances, however, shall not be grounds for arrest.

Id. § 644:6, II. The statute's third provision makes clear that satisfaction of the second provision's procedural requirement is a prerequisite to conviction:

> No person shall be convicted under this section if the law enforcement official did not comply with paragraph II or it appears at trial that the explanation he gave of his conduct and purposes was true and, if believed by the law enforcement official at the

> time, would have dispelled the alarm. In such cases, any record of the arrest made under authority of paragraph I shall be expunged.

Id. § 644:6, III. Because § 644:6 classifies loitering as a violation under New Hampshire law, a convicted violator "may be sentenced to conditional or unconditional discharge, or a fine" of up to $1,000. Id. § 651:2, III-a and IV(a).

In practice, according to public data obtained from the New Hampshire court system, police routinely charge violations of § 644:6. From January 2013 through December 2024, 2,280 cases alleging violations of the statute were filed statewide, averaging 190 per year. See Doc. 29 at 1-2. Recent data further suggests that these cases are on the rise; from July 2024 through June 2025, 229 such cases were filed, reflecting a twenty-percent annualized increase compared to the average over the preceding twelve years. See id. at 2-3. And of course, charging data does not capture the frequency with which police question individuals without initiating an arrest pursuant to § 644:6, II. See Doc. 1 at 25.

Unsurprisingly, homeless individuals are often the subject of § 644:6's enforcement. In Manchester, for example, from July 2021 to December 2024, fifty out of eighty-nine cases charging a violation of § 644:6—more than half—involved homeless defendants. Id. at 32. Similarly, in Concord, from July 2021 to June 2023, ten out of twenty-three such cases charged homeless individuals. Id. at 32-33.

B. Factual and Procedural History

Clark was first arrested under § 644:6 just over fifteen years ago. In June 2011, he was observed "going from car to car . . . trying to open doors" in a parking lot on Commercial Street in Concord. Doc. 1-2 at 31. When police responded, they found Clark "sitting in the driver's seat" of a Chevrolet sedan. Id. Upon inquiry by the responding officers, Clark admitted that "he did not know who the owner of the car was" and "did not have permission to be in the car." Id. Clark also informed the police that he was carrying a knife. Id. He was arrested and charged with "prowling" under § 644:6, as well as criminal trespass and being a felon in possession of a dangerous weapon.[2] Id. at 24-26, 31. The felon-in-possession charge was later dropped, and the criminal-trespass and prowling charges were placed on file. Id. at 22-23.

Sometime over the next year, Clark became homeless when his father lost his job, leading to their eviction. Doc. 1 at 9. Since then, Clark has led a "transient and erratic life" in Concord, moving from place to place for more than thirteen years. Id. After his eviction, Clark first moved to "a field near The Friendly Kitchen soup kitchen" on Commercial Street. Id. More recently,

2 In April 2009, Clark had been convicted under RSA § 649-A:3 of possession of child sexual abuse images in state court. Doc. 1 at 10; Doc. 1-2 at 31. In his complaint, he notes that this conviction has impeded his ability to secure housing. Doc. 1 at 10.

Clark has lived "on a bench outside of the Concord Coalition to End Homelessness building" on North Main Street, "under a bridge near Manchester Street," and "in the woods" elsewhere in Concord. Id. In the winter months, Clark has spent evenings at an emergency winter shelter run by the Concord Coalition to End Homelessness. Id. at 10-11.

While he was homeless, Clark alleges that he was "threatened with" enforcement of § 644:6 "many times." Id. at 11. As one example, last summer, Clark recalls checking an outside ash tray for usable cigarettes at the Quick Stop on South Main Street around 1:00 a.m. Id. While doing so, he alleges that two police officers approached him on bicycles and "detained him" while they ran a warrant check over radio. Id. They ultimately instructed him to leave the premises and warned him, as Clark puts it, that he "could be arrested for loitering" "if he was outside a business when it was closed." Id. Similarly, over the last "couple of years," Clark has "repeatedly been told" by police officers to "keep moving" or "move along" from public areas including Eagle Square, Bicentennial Square, and a parking lot on Storrs Street. Id. He notes that, during these encounters, he "felt that he was not free to leave" until given permission after the police ran warrant checks. Id.

Clark's second arrest under § 644:6 took place during this period of homelessness. In March 2023, police responded to a report of a "suspicious person" near the top floor of a parking garage on School Street. Doc. 1-2 at 16.

There, the police encountered Clark and another man, who claimed that they were "just smoking cigarettes and 'staying warm.'" Id. When an officer inquired why the garage's security cameras observed them "smoking something out of tinfoil," the men claimed that the substance was tobacco. Id. Later, upon further inquiry, one of the men admitted "that they were lying," stated that "they found tinfoil on the ground inside of the garage with a little bit of fentanyl on it that they smoked," and then "denied having any more drugs on them." Id. As the police commenced "full custody arrests for loitering," however, they uncovered a small bag of fentanyl in the jacket pocket of Clark's companion. Id. Both were charged with "[l]oitering and prowling" under § 644:6, and Clark's companion was additionally charged with possession of a controlled drug. Id. at 5, 7. Clark was released on personal recognizance with conditions that he abstain from the use of alcohol and drugs and "not be at or in any City of Concord parking garages." Id. at 6. The loitering charge was eventually dropped. Doc. 1 at 14.

In September 2025, while still homeless, Clark brought this lawsuit challenging the constitutionality of § 644:6 under the Fourth and Fourteenth Amendments. Id. at 57-61. Naming New Hampshire's attorney general as defendant in his official capacity, Clark asks this Court to declare § 644:6 unconstitutional and enjoin New Hampshire officials from enforcing it. Id. at 1, 61. He also seeks to bring the case as a class action, moving to certify a

class of "[a]ll persons against whom" the attorney general (through his agents) "is enforcing, or will enforce, RSA 644:6." Doc. 4 at 2. The Attorney General has objected to class certification, Doc. 14, and moved to dismiss for lack of subject matter jurisdiction and failure to state a claim, Doc. 11.

While these motions were pending, in December 2025, Clark obtained housing. Doc. 23 at 11 n.10. Clark's counsel became aware of this development a week later and disclosed it in Clark's objection to the Attorney General's motion to dismiss. See id. In his reply, the Attorney General marshals this new fact as additional reason to doubt Clark's standing. See Doc. 25 at 2.

At a hearing held this month, the Attorney General agreed that Clark's newfound housing is properly understood to implicate mootness rather than his threshold standing to sue. Additionally, at that hearing, the parties each proffered facts critical to resolving any mootness issue that have not been properly presented to the Court (or one another) in briefing to date. I thus concluded that if Clark has plausibly established standing as an initial matter, supplemental briefing on mootness will be required to address that related but distinct question of justiciability.

## II. STANDARD OF REVIEW

A defendant may attack the court's subject matter jurisdiction through a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1)

either by challenging the facial sufficiency of the plaintiff's jurisdictional claim or by questioning its factual basis. Torres-Negrón v. J & N Recs., LLC, 504 F.3d 151, 162 (1st Cir. 2007) (citing Fed. R. Civ. P. 12(b)(1)). Facial challenges are evaluated using the familiar plausibility standard that applies to motions to dismiss for failure to state a claim. Gordo-González v. United States, 873 F.3d 32, 35 (1st Cir. 2017). Under that standard, dismissal "is appropriate only when the facts adumbrated in the plaintiff's complaint, taken at face value, fail" to demonstrate the court's jurisdiction. Id.

Factual challenges, however, require different treatment. If the relevant jurisdictional facts have no bearing on the merits of the parties' dispute, "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." Torres-Negrón, 504 F.3d at 163 (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (per curiam)). But if the jurisdictional facts are intertwined with the merits, a court ordinarily must borrow the standard for summary judgment and grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." Id. (quoting Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir. 1987)). Otherwise, the case proceeds to trial, at which point jurisdiction will be reevaluated. Id.

## III. ANALYSIS

Invoking Rule 12(b)(1), the Attorney General moves to dismiss on sufficiency grounds, claiming that Clark lacks standing to challenge New Hampshire's anti-loitering law and thus that this Court lacks subject matter jurisdiction to hear his suit under Article III of the Constitution. See U.S. Const. art. III, § 2, cl. 1. The Attorney General principally disputes whether § 644:6 is likely to be enforced against Clark in the future, casting doubt on the imminence of any injury that would thereby result. While the Attorney General variably refers to facts that may bear on the continued fitness of Clark's claims for judicial resolution since he sued, I begin by "treat[ing] . . . separately" the "distinct" question of whether Clark had standing to sue when he filed his lawsuit in the first instance. Becker v. Fed. Election Comm'n, 230 F.3d 381, 386 n.3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); see McCollester v. City of Keene, 668 F.2d 617, 618 n.3 (1st Cir. 1982) (assessing standing "as it was at the time the plaintiff filed her complaint" and reserving for separate analysis whether intervening developments "render[ed] moot what had been a live controversy").

"The '[f]irst and foremost' concern in standing analysis is the requirement that the plaintiff establish an injury in fact."[3] Reddy v. Foster, 845 F.3d 493, 500 (1st Cir. 2017) (alteration in original) (quoting Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016)). The injury-in-fact requirement means that a plaintiff seeking prospective relief must "assert[] at the commencement of the litigation" a "risk of future harm" that is "sufficiently imminent and substantial." Nat'l Assoc. of Gov't Emps. v. Yellen, 120 F.4th 904, 909-10 (1st Cir. 2024) (citation modified). In the pre-enforcement context, a plaintiff need not "await the consummation of threatened injury to obtain preventive relief" so long as the injury is "certainly impending." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979) (quoting Pennsylvania v. West Virginia, 262 U.S. 553, 593 (1923)); see also N.H. Right to Life Pol. Action Comm. v. Gardner, 99 F.3d 8, 13 (1st Cir. 1996) ("[I]t is not necessary that a person expose herself to arrest or prosecution under a statute in order to challenge that statute in federal court" because "a credible threat of present or future prosecution itself works an injury that is sufficient to confer standing[.]"). Rather, a plaintiff must "demonstrate a

---

3 Injury is one of "a familiar triad" of standing elements, the other two of which are causation and redressability. Katz v. Pershing, LLC, 672 F.3d 64, 71 (1st Cir. 2012). The defendant only contests Clark's satisfaction of the injury-in-fact requirement, and the present record does not raise any doubt about the others.

realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," Babbitt, 442 U.S. at 298, that is not "too attenuated or too speculative," Roe v. Healey, 78 F.4th 11, 20 (1st Cir. 2023).

Graded against this rubric, Clark's challenge to § 644:6 readily passes the standing test. Far from speculating about how police would react if he "expose[d]" himself to potential prosecution under § 644:6, N.H. Right to Life, 99 F.3d at 13, he alleges with specificity several occasions in which he was "threatened with the law's enforcement." Doc. 1 at 11; see also Kolender v. Lawson, 461 U.S. 352, 355 n.3 (1983) (noting in dicta that plaintiff's fifteen prior stops under challenged statute over two-year period evinced a "credible threat" of future stops (citation modified)). Indeed, the Attorney General, for his part, does not dispute that § 644:6 supplied the authority to stop Clark on various occasions while he was homeless and instead "doubles down" on the statute's enforceability, as Clark notes. See Doc. 23 at 9; cf. Blum v. Holder, 744 F.3d 790, 798-99 (1st Cir. 2014) (finding no standing in pre-enforcement challenge where government "disavowed any intention to prosecute plaintiffs for their stated intended conduct"). For Clark, who anticipated when he first filed this lawsuit that he would continue to inhabit public spaces under circumstances akin to those which had previously prompted police to confront him under the auspices of § 644:6, it was natural to infer that this pattern of encounters would continue. The charging data that Clark appended to his

complaint further vindicates this perception, demonstrating the statute's regular use by New Hampshire law enforcement, especially when interacting with homeless individuals like him. See Doc. 1 at 32-33; Doc. 29 at 1-3. Accordingly, the "threat" of § 644:6's enforcement that Clark confronted was clearly a "credible" one. N.H. Right to Life, 99 F.3d at 13.

The Attorney General's three countervailing arguments are unpersuasive. First, the Attorney General contends that Clark has never been threatened with the law's enforcement "under circumstances in which he was engaged in a course of constitutionally protected conduct." Doc. 11-1 at 9. To argue as much, the Attorney General focuses on Clark's two arrests under § 644:6, in which he was also engaged in criminal conduct chargeable under other statutes, as well as his encounter at the Quick Stop, which the Attorney General suggests involved criminal trespassing. Setting those three instances aside, however, the Attorney General entirely ignores Clark's separate and specific allegations of being stopped pursuant to § 644:6 on several other occasions, including "near the Eagle Square Clock Tower" on North Main Street, "outside the McDonald's restaurant" on South Main Street, and "in Eagle Square, Bicentennial Square, and the Market Basket parking lot on Storrs Street." Doc. 1 at 11. Accepting these allegations as true and drawing inferences therefrom in his favor, as I must, Gordo-González, 873 F.3d at 35, Clark has sufficiently identified instances in which he was

plausibly threatened with § 644:6's enforcement while otherwise engaged in innocuous conduct. As alleged, these instances at least "arguably" implicate his constitutional rights.[4] Babbitt, 442 U.S. at 298; see Kolender, 461 U.S. at 358 (noting the "constitutional right to freedom of movement"); McCollester v. City of Keene, 586 F. Supp. 1381, 1384-85 (D.N.H. 1984) (identifying "freedom of movement" as a "constitutional right[]").

Second, the Attorney General cites the Supreme Court's landmark decision in City of Los Angeles v. Lyons, 461 U.S. 95 (1983), and a decision issued in the Southern District of New York, D.H. v. City of New York, 309

---

[4] The formulation of the standing standard which suggests that a plaintiff's intended conduct must be "arguably affected with a constitutional interest" primarily surfaces in cases involving pre-enforcement challenges on First Amendment grounds, which trigger an eased injury requirement out of sensitivity to an unenforced statute's potential chilling effects. See N.H. Right to Life, 99 F.3d at 13-14 (quoting Babbitt, 442 U.S. at 298); Wilson v. State Bar of Ga., 132 F.3d 1422, 1428 (11th Cir. 1998). Whether that characteristic is required of a plaintiff's intended conduct in pre-enforcement facial challenges brought on other grounds is unclear. Compare McCollester, 668 F.2d at 620 (only requiring non-First Amendment plaintiff, post-Babbitt, to show that her "intended conduct [is] at least plausibly within the potential reach of the statute or ordinance") with Hightower v. City of Grand Rapids, 256 F. Supp. 3d 742, 749 (W.D. Mich. 2017) (requiring non-First Amendment plaintiff to show "course of conduct arguably affected with a constitutional interest" (citation modified)). I need not resolve that uncertainty here, as Clark's conduct does implicate a constitutional right in any event and the enforcement of § 644:6 against him as of his complaint's filing was sufficiently imminent to satisfy even the "[m]ore stringent" injury requirement in the non-First Amendment context. Nat'l Rifle Ass'n of Am. v. Magaw, 132 F.3d 272, 285 (6th Cir. 1997).

F. Supp. 3d 52 (S.D.N.Y. 2018), for the proposition that Clark's past arrests and other encounters with police pursuant to § 644:6 alone cannot form the basis for standing premised on a future injury. Neither case supports the Attorney General's argument.

In Lyons, the Supreme Court dealt with a claim brought by the victim of an unprompted police beatdown, in which officers forced the plaintiff into an illegal chokehold during a routine traffic stop. 461 U.S. at 97-98. The plaintiff subsequently brought several claims against the City of Los Angeles and the officers, one of which sought "a preliminary and permanent injunction against the City barring the use of the control holds." Id. at 98. The Court held that the plaintiff lacked standing to bring that claim. Id. at 105. The Court's reasoning essentially turned on the chain of contingent assumptions required to predict that the plaintiff would again be placed in a chokehold. See id. at 105-06. In effect, the Court reasoned, concluding that a similar event would imminently recur required an assumption not only that the plaintiff would again encounter police officers, but also that the police officers would violate City policy by using a chokehold against the plaintiff without requisite provocation. Id. At bottom, the Court concluded it was "no more than conjecture to suggest that" such a sequence of events would occur, at least as to that particular plaintiff. Id. at 108.

Viewed from its onset, the same cannot be said of Clark's case. As explained above, Clark's allegations provide ample reason to believe that, while homeless, he would continue to encounter police in circumstances that would trigger application of § 644:6. The gulf between Clark and the plaintiff in Lyons is thus substantial; not only does he allege his justified anticipation that he will again encounter police, but also that he will do so in precisely the circumstances which are likely to implicate § 644:6. Even more significantly, the Attorney General cannot claim that the especially tenuous logical leap in Lyons is required here—that all officers whom the plaintiff might encounter would violate City policy, id. at 106—because the injurious conduct alleged is compliance with the law, not deviation from it. Clark simply asks the Court to assume that New Hampshire law enforcement will continue to enforce the statute as they have since its enactment, a reasonable assumption far afield from the speculation avoided in Lyons.

D.H. is even less helpful to the Attorney General. There, the court held in relevant part that several plaintiffs who were arrested under New York's law against loitering for purposes of prostitution could not demonstrate a credible threat of future injury based on their past arrests. 309 F. Supp. 3d at 63, 66. The court principally reached this conclusion because the plaintiffs denied ever violating the statute (instead attributing their past arrests to false allegations) and disclaimed any intention to engage in future violative

conduct. Id. at 66. That reasoning simply has no bearing in this case, where Clark does not claim that his past arrests or stops constituted misapplications of § 644:6[5] and, at least when he filed suit, Clark fully expected that he would continue to engage in the exact same conduct that precipitated his prior alleged encounters with police under the statute.

What is more, the court in D.H. specifically distinguished one plaintiff who alleged "that she ha[d] received a specific threat by an officer" that "girls like [her]" would be arrested if caught "out after midnight" and allowed her claim for injunctive relief to proceed. Id. at 67 (second alteration in original). Clark makes substantially the same allegation, asserting that when he was detained at the Quick Stop on South Main Street, police "told him that if he was outside a business when it was closed, he could be arrested for loitering." Doc. 1 at 11 (emphasis added). If anything, the individualized nature of the officers' threat and its explicit invocation of the offense criminalized by § 644:6 evince an even closer nexus to Clark's predicted future injury than the generalized intimation that the court held sufficient in D.H. Indeed, D.H. is germane to this case as persuasive authority—for the plaintiff.

---

[5] Indeed, the gravamen of Clark's vagueness challenge is that the statute is too unspecific for an individual to know whether his or her conduct violates it. See Doc. 1 at 42 ("[RSA § 644:6] fails to provide notice to ordinary New Hampshire residents of what circumstances would 'warrant alarm' and of what explanations could dispel it.").

Third and finally, the Attorney General asserts that "the fact that the plaintiff is homeless does not create a per se basis to reasonably fear future prosecution" because "[a]ny person, homeless or not, could be prosecuted for a violation of" § 644:6. Doc. 11-1 at 10. True enough, and indeed, it appears that Clark's first arrest under § 644:6 occurred before he became homeless. Doc. 1 at 9; Doc. 1-2 at 31. And if Clark could not point to a single instance in which § 644:6 was enforced against him while homeless, his prediction of its future enforcement in connection with his homelessness might be less credible. But, as explained, Clark does not purport to invoke a "per se" rule; his prediction of future injury is well supported by the numerous instances in which he alleges that the law was applied to him specifically, as recently as the "couple months" preceding his lawsuit. Doc. 1 at 11.

In summary, as of the time he filed his complaint, Clark met his burden of demonstrating a realistic, imminent risk that § 644:6 would be enforced against him in the immediate future. That injury was sufficient to support his standing to seek prospective relief at the time he filed his lawsuit.

## IV. CONCLUSION

For the reasons explained, I conclude that Clark has standing to bring this lawsuit.

Separately, however, the Attorney General has alluded to the possibility that, regardless of whether Clark had standing to begin with, his

claim is moot now that he is no longer homeless. Neither party sufficiently developed this issue in briefing to date. Even so, I cannot proceed to consider the parties' merits arguments—either with respect to dismissal under Rule 12(b)(6) or class certification—while my jurisdiction is in doubt, as mootness bears on the Court's sua sponte obligation to address its own jurisdiction. See Brito v. Garland, 22 F.4th 240, 247 (1st Cir. 2021); Ruskai v. Pistole, 775 F.3d 61, 67 (1st Cir. 2014).

Accordingly, the Attorney General is hereby ordered to assert any arguments for dismissal based on mootness in a second motion under Rule 12(b)(1) within seven days. Clark is ordered to respond to that motion within seven days thereafter. In the meantime, the Attorney General's motion to dismiss, Doc. 11, is denied without prejudice to the aforementioned motion and his right to renew any arguments under Rule 12(b)(6) in a future motion if the case is not moot.

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 28, 2026

cc: Counsel of Record